**2022-1649**

In The
# United States Court of Appeals
For The Federal Circuit

**ZIRCON CORP.,**

*Appellant,*

**v.**

**INTERNATIONAL TRADE COMMISSION,**

*Appellee,*

**BLACK & DECKER (U.S.), INC.,**
**STANLEY BLACK & DECKER, INC.,**

*Intervenors.*

**APPEAL FROM THE UNITED STATES INTERNATIONAL TRADE COMMISSION IN INVESTIGATION NO. 337-TA-1221.**

## NON-CONFIDENTIAL BRIEF OF APPELLANT

**Omari M. Farooqui**
**PALO ALTO LEGAL GROUP, PC**
**1023 Corporation Way, 2nd Floor**
**Palo Alto, California 94303**
**(408) 579-1281**
**omair@paloaltolegalgroup.com**

***Counsel for Appellant***

# CLAIMS

**U.S. Patent 6,989,662**

1. A method of recalibrating a stud sensing device for finding a location of a stud positioned behind a surface, the method comprising the acts of:

holding the stud sensing device at a first location on the surface; placing the stud sensing device in an calibration mode;

sensing a first density at the first location in the calibration mode; setting a calibration value based on the first sensed density;

placing the stud sensing device in an operating mode; moving the stud sensing device to a second location on the surface;

sensing a second density at the second location; setting a second density value based on the second sensed density;

the stud sensing device determining if it was calibrated over or near a stud; and

the stud sensing device recalibrating itself if it determined that the stud sensing device was calibrated over or near the stud.

6. The method of claim 1, wherein the act of recalibrating the stud sensing device includes the stud sensing device resetting the calibration value based on the second density value.

9. The method of claim 1, further comprising the acts of:

moving the stud sensing device to a new location on the surface;

sensing a new density at the new location;

resetting the second density value based on the new sensed density;

the stud sensing device determining if it was recalibrated over or near the stud; and

the stud sensing device recalibrating itself if it determined that the stud sensing device was calibrated over or near the stud.

12. A stud sensing device capable of automatically recalibrating if it has erroneously been calibrated at a location over or near a stud, the stud sensing device comprising:

a first memory adapted to hold a calibration value; a second memory adapted to hold a sensed value;

a sensor adapted to be applied to a surface, thereby determining a density behind the surface and providing the sensed value, wherein the sensor is operationally coupled to the second memory;

a comparator adapted to compare the first memory location to the second memory location, thereby determining if the calibration value represents a value sensed over or near the stud, wherein the comparator is operationally coupled to the first and second memories; and

an updater adapted to update the first memory with an updated calibration value, wherein the updater is operationally coupled to an output of the comparator.

13. The sensor of claim 12, further comprising a controller adapted to coordinate operation of the sensor, the comparator and the updater.

15. The sensor of claim 12, wherein the stud sensing device updates the calibration value without operator intervention.

16. The method of claim 1, wherein the device recalibrates itself by updating a calibration value without user intervention.

17. A method of recalibrating a stud sensing device for finding a location of a stud positioned behind a surface, the method comprising the acts of:

holding the stud sensing device at a first location on the surface; placing the stud sensing device in an calibration mode;

sensing a first density at the first location in the calibration mode; setting a calibration value based on the first sensed density;

placing the stud sensing device in an operating mode;

moving the stud sensing device to a second location on the surface;

sensing a second density at the second location;

setting a second density value based on the second sensed density;

determining whether the stud sensing device was calibrated over or near a stud;

recalibrating the stud sensing device if the stud sensing device was calibrated over or near the stud;

wherein the act of determining whether the stud sensory device was calibrated over or near a stud includes:

comparing the calibration value to the second density value; and

determining that the stud sensing device was calibrated over or near the stud if the second density value is more than a threshold amount less than the calibration value.

**U.S. Patent 8,604,771**

1. A hand tool for sensing a measurement behind a target surface, the hand tool comprising:

a housing;

a sensor coupled in the housing; and

a grip having a pair of three-dimensional concave finger holds positioned at opposite sides of the grip to provide an axis of rotation.

5. The hand tool of claim 1, further comprising:

a power button;

wherein the power button is positioned in one of the pair of three-dimensional concave finger holds.

9. The hand tool of claim 1, wherein the hand tool comprises a stud finder.

10. The hand tool of claim 1, wherein the sensor comprises a capacitive sensor.

13. A hand tool for sensing a measurement behind a target surface, the hand tool comprising:

housing means for providing a housing to the hand tool;

sensing means for sensing a hidden characteristic, wherein the sensing means is coupled in the housing means; and

gripping means for gripping and for providing an axis of rotation.

14. The hand tool of claim 13, further comprising a switching means to energize the tool.

15. The hand tool of claim 14, wherein the switching means is mechanical.

22. The method of claim 17, further comprising detecting a hidden object behind the first target surface; and

indicating to an operator detection of the hidden object.

**U.S. Patent 9,475,185**

1. A stud finder for sensing a measurement behind a target surface, the stud finder comprising:

a housing;

a sensor coupled in the housing; and

only two depressed finger holds positioned at opposite sides of a grip allowing pivoting to provide an axis of rotation.

2. The stud finder of claim 1, further comprising:

a power button;

wherein the power button is positioned in one of the two depressed finger holds.

5. The stud finder of claim 1, further comprising a running board.

6. The stud finder of claim 5, wherein the running board isolates a thumb and a finger from the target surface.

7. The stud finder of claim 5, wherein the running board distances a thumb and a finger from the target surface.

8. The stud finder of claim 5, wherein the running board inhibits a thumb and a finger from inadvertently touching the target surface.

9. The stud finder of claim 5, wherein the running board provides a barrier between: a thumb and a finger; and the target surface.

10. The stud finder of claim 1, wherein the housing forms an acute angle at a front edge in a side view for a side comprising one of the two depressed finger holds.

11. The stud finder of claim 10, wherein the acute angle is 70 degrees or less.

13. The stud finder of claim 1, wherein the housing forms a V-notch at a center of a front side in a top-down view.

14. A stud finder for sensing a measurement behind a target surface, the stud finder comprising:

housing means for providing a housing to the stud finder;

sensing means for sensing a hidden characteristic, wherein the sensing means is coupled in the housing means;

gripping means for gripping and for providing an axis of rotation, wherein the gripping means comprises only two depressed finger holds positioned at opposite sides allowing pivoting to provide an axis of rotation; and

a running board means to distance a thumb and a finger from the target surface.

15. The stud finder of claim 14, further comprising a switching means, within the gripping means, to energize the stud finder.

17. A method for using a stud finder against target surfaces, wherein the stud finder comprises a grip having only two depressed finger holds allowing pivoting to provide an axis of rotation, the method comprising:

providing the stud finder with the only two depressed finger holds;

holding the stud finder with a thumb at a first depressed finger hold of the two depressed finger holds and with a finger at a second depressed finger hold of the two depressed finger holds;

positioning the stud finder against a first target surface; and

rotating the stud finder about the axis of rotation relative to the thumb and the finger.

20. The method of claim 17, further comprising:

detecting a hidden object behind the first target surface; and

indicating to an operator detection of the hidden object.

21. The method of claim 17, wherein holding the stud finder comprises energizing the stud finder with at least one of the thumb and the finger using one of the two depressed finger holds.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1649

**Short Case Caption** Zircon Corporation v. U.S. Int. Trade Commission

**Filing Party/Entity** Zircon Corporation

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/14/2022

Signature: /omair m farooqui/

Name: Omair M. Farooqui

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Zircon Corporation | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Potomac Law Group PLLC | Richard Juang, Esq. | Oded Burger, Esq. |
| Daignault Iyer LLP | Chandran B. Iyer, Esq. | |
| Shailendra Maheshwari, Esq. | Ronald M. Daignault, Esq. | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Zircon Corporation v. Stanley Black and Decker, Inc. | N.D. California, Case No. 19-CV-08044-DMR | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ v

I. STATEMENT OF RELATED CASES ........ 1

II. JURISDICTIONAL STATEMENT ........ 1

III. STATEMENT OF ISSUES ........ 1

IV. STATEMENT OF CASE ........ 2

A. The Commission Institutes §337 Investigation ........ 2

B. The ALJ's October 7, 2021 Initial Determination ........ 3

C. The Commission's February 15, 2022 Opinion ........ 4

D. The Commission Upholds the ID's '662 Infringement Findings ........ 4

E. The Commission Erroneously Departs from the ID in Finding that all Asserted Claims of the '662 Patent Were Obvious ........ 5

F. The Commission Reverses the ID's Incorrect Findings of Infringement for the '771 and '185 Patents ........ 5

G. The Commission Erroneously Concludes that the Zircon 1 Legacy Devices Anticipated Claims 1, 5, 9 and 10 of the '771 Patent and Claims 1 and 2 of the '185 Patent but Finds Similar Claims 13, 14, 15, 17 and 22 Not Anticipated ........ 6

H. The Commission Upheld the ID's Erroneous Finding that Zircon Did Not Establish the Economic Prong of the Domestic Industry Requirement ........ 7

V. STATEMENT OF FACTS ........ 8

A. Appellant Zircon Corporation .......... 8

B. Respondents Stanley Black & Decker, Inc., and Black & Decker (U.S.) Inc. .......... 10

C. The Patents at Issue .......... 10

1. Overview of the Technology .......... 10

2. The ’662 Patent .......... 11

3. The ’771 Patent .......... 11

4. The ’185 Patent .......... 13

VI. SUMMARY OF ARGUMENT .......... 13

VII. ARGUMENT .......... 15

A. STATEMENT OF THE STANDARD OF REVIEW .......... 15

B. The Commission’s Findings that Claims 1, 6, 9, 12, 13, 15, 16, and 17 of the ’662 Patent are invalid Under 35 U.S.C. §103 as obvious Lacks Substantial Evidence and is Erroneous as a Matter of Law .......... 16

1. The Commission Failed to Account for the Fact that the ‘662 Patent was Previously Examined in View of the Same and Cumulative Prior Art and Found to be Novel and Non-Obvious .......... 19

2. Steber is Cumulative to the Prior Art Already Before the USPTO and Does Not Suggest Auto-Recalibration .......... 20

3. The Commission Relied on Conclusory Statements by Respondent’s Expert to find that Automating Calibration in a Stud Finder was Obvious in view of DE336 .......... 23

4. The Commission's Finding Regarding the Motivation to Combine Steber and Miller and its Resulting Findings of Obviousness Lack Substantial Evidence and are Erroneous as a Matter of Law ....................................29

5. The ID's obviousness Finding for Claim 17 of the '662 Patent are Erroneous ....................................31

a) The ID's finding that claim 17 does not require "automatic recalibration" contradicts the file history and proper scope of the claim ....................................31

C. The Commission's Findings that Claims 1, 5, 9 and 10 of the '771 patent and claims 1 and 2 of the '185 patent' are Invalid under 35 U.S.C. § 102 and Claims 5, 6, 7, 8, 9, 10, 11, 13, 14 and 15 of the '185 Patent are invalid as obvious under 35 U.S.C. §103, based on the Zircon 1, Lack Substantial Evidence and are Erroneous as a Matter of Law ....................................33

1. The Commission Also Failed to Account for Designs Like the Zircon 1, That Were Already Before the Patent Office During Prosecution ....................................39

2. Because Zircon 1 Lacks "Grips" Providing an "Axis of Rotation", the Commission's Findings that Claims 5, 6, 7, 8, 9, 10, 11, and 13 of the '185 Patent Invalid Under 35 U.S.C. §103 Must be Reversed....................................41

3. The Commission's Determination that Claims 14 and 15 of the '185 Patent are Invalid under 35 U.S.C. §103 Lacks Substantial Evidence and is Erroneous as a Matter of Law ....................................41

D. The Commission Erred in Upholding the ID's Finding that claims 13, 14 and15 of the '771 patent were not infringed....................................42

E. The Commission erred in Finding Claims 22 of the '771 patent and claims 17, 20 and 21 of the '185 patent are not infringed....................................43

F. The Commission's findings that Zircon failed to satisfy the economic prong of the domestic industry requirement constitutes reversible error ....45

1. The Commission Erred In Refusing to Consider Zircon's Investments in PP&E, L&C and R&D which are Quantitatively and Qualitatively Significant In Terms of the Stud Finder Industry....47

2. The Commission's Refusal to Consider Zircon's Investments Because It Improperly "Aggregated" Its Investments for All Three Patents Constitutes Reversible Error ....54

3. The Commission's Failure to Find a Domestic Industry For the '662 Patent Based on Zircon's Investments in the Simon Chip Constitutes Reversible Error....61

II. CONCLUSION....63

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

**CONFIDENTIAL MATERIAL OMITTED**

Confidential Material Subject to the Protective Order has been omitted from Appellant's Confidential Brief at pages 7-9, 46-47, 50-53, 55, 60, and 62. The material omitted contains confidential business information, confidential financial information, and other confidential business information obtained and/or provided in discovery.

Confidential Material Subject to the Protective Order entered by the ALJ in this matter has been omitted from the (i) the Commission Opinion at pages Appx23-25, Appx27-28, Appx56-58, and Appx65 of the Addendum. The material omitted contains confidential business information, confidential financial information, confidential deposition and hearing testimony, and other confidential business information obtained in discovery.

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ....................26

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) ....................16

*Certain Digital Cameras, Software, and Components Thereof*,
Inv. No. 337-TA-1059, Init. Det. at 97 (Sep. 13, 2018) ....................61

*Certain Digital Video Receivers and Related Hardware and Software Components*,
Inv. No. 337-TA-1103, Init. Det. at 23 (June 4, 2019) ....................45

*Certain Dynamic RAMS*,
Inv. No. 337-TA-242, Comm'n Op. at 64 (Sep. 21, 1987) ....................59

*Certain Elec. Imaging Devices*,
USITC Inv. No. 337-TA-850, 2013 WL 5956227 (Sept. 30, 2013) .......58, 60

*Certain Ground Fault Circuit Interrupters*,
Inv. No. 337-TA-739, Comm'n Op. at 79 (June 8, 2012) ....................59

*Certain Integrated Circuit Chips*,
Inv. No. 337-TA-859, Comm'n Op., 41-42 (Aug. 22, 2014) ....................58

*Certain Laser Bar Code Scanners*,
Inv. No. 337-TA-551, Order 25 at 10-11 (Jul. 17, 2006) ....................59

*Certain LED Lighting Devices, LED Power Supplies, and Components Thereof*, ("LED Lighting Devices")
Inv. No. 337-TA-1081, Init. Det. at 140 (December 19, 2018) ..............62, 63

*Certain Mobile Device Holders and Components Thereof*,
Inv. No 337-TA-1028, Comm'n Op at 19 (Sept. 12, 2017) ....................51

*Certain Printing and Imaging Devices and Components Thereof*,
Inv. No. 337-TA-690, Comm’n Op. at 27 (Feb. 17, 2011) ............................7

*Certain Solid State Storage Drives, Stacked Electronics Components, and Products Containing Same* ("Solid State Storage Drives"),
Inv. No. 337-TA-1097, Comm’n Op. at 21(June 20, 2018) ..........................62

*Certain Television Sets, Television Receivers, Television Tuners, & Components Thereof*, Inv. No. 337-TA-910, Comm’n. Op. at 68 (Oct. 30, 2015) ......................57

*Certain Variable Speed Wind Turbines & Components Thereof Inv.*
No. 337-TA-376, Comm'n Op. at 21 (Nov. 1996) ...........................45, 46, 57

*Certain Variable Speed Wind Turbines*,
Inv., No. 337-TA-376, ID,
USITC Pub. No. 3003, 1996 WL 1056330 (Nov. 1996)...............................47

*Certain Wireless Devices*,
USITC Inv. No. 337-TA-868, ID, 2014 WL 2965327 (June 13, 2014)........47

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
885 F.3d 1367 (Fed. Cir. 2018) ....................................................................25

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
464 F.3d 1356 (Fed. Cir. 2006) ....................................................................17

*Finnigan Corp. v. ITC*,
180 F.3d 1354 (Fed. Cir. 1999) ....................................................................15

*Graham v. Connor,*
490 U.S. 386 (1989)..........................................................................................5

*Hyosung TNS Inc. v. ITC*,
926 F.3d 1353 (Fed. Cir. 2019) ....................................................................57

*In re Warsaw Orthopedic, Inc.*,
832 F.3d 1327 (Fed. Cir. 2016) ....................................................................17

*Interdigital Commc’ns, LLC v. ITC*,
707 F.3d 1295 (Fed. Cir. 2013) ....................................................................57

*InTouch Techs., Inc. v. VGo Commc'ns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) ....................................................................26

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)...........................................................................5, 17, 18

*Lelo Inc. v. Int'l Trade Comm'n,*
786 F.3d 879 (Fed. Cir. 2015) ...........................................................7, 46, 47

*Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.*,
730 F.2d 1452 (Fed Cir. 1984) .......................................................................20

*Microsoft Corp. v. i4i Ltd. Partnership*,
564 U.S. 91 (2011).........................................................................16, 20, 39

*MobileMedia Ideas LLC v. Apple Inc.*,
780 F.3d 1159 (Fed. Cir. 2015) .....................................................................25

*Motorola Mobility, LLC v. ITC*,
737 F.3d 1345 (Fed. Cir. 2013) .....................................................................57

*Regents of Univ. of Minn. v. AGA Med. Corp.*,
717 F.3d 929 (Fed. Cir. 2013) ................................................................. 25-26

*Ruckus Wireless v. Innovative Wireless*,
824 F. 3d 999 (Fed. Cir. 2016) ......................................................................32

*Sitrick v. Dreamworks, LLC*,
516 F.3d 993 (Fed. Cir. 2008) ........................................................................26

*SRAM Corp. v. AD-II Eng'g, Inc.*,
465 F.3d 1351 (Fed. Cir. 2006) .....................................................................16

*Surface Tech., Inc. v. ITC*,
801 F.2d 1336 (Fed. Cir. 1986) .....................................................................15

*Takeda Pharm. US.A., Inc. v. W.-Ward Pharm. Corp.*,
785 F.3d 625 (Fed Cir. 2015) .........................................................................45

*Zenith Elecs. Corp. v. PDI Commun. Sys.*,
522 F.3d 1348 (Fed. Cir. 2008) ........................................................................35

**STATUTES**

5 U.S.C. §706 ........................................................................15

19 U.S.C. §337(a)(3)(A) ........................................................................45, 57

19 U.S.C. §337(a)(3)(B) ........................................................................45, 57

19 U.S.C. §337(a)(3)(C) ........................................................................45, 57

19 U.S.C. §1337 ........................................................................2, 3

19 U.S.C. §1337(a)(2) ........................................................................7

19 U.S.C. §1337(a)(3) ........................................................................58

19 U.S.C. §1337(c) ........................................................................1, 15

28 U.S.C. §1295(a)(6) ........................................................................1

35 U.S.C. §102 ........................................................................1, 14, 63, 64

35 U.S.C. §102(b) ........................................................................19

35 U.S.C. §103 ........................................................................*passim*

35 U.S.C. §271(b) ........................................................................43

## I. STATEMENT OF RELATED CASES

No appeal in or from the same civil action or proceeding in the lower tribunal was previously before this or any other appellate court. The following cases may be affected by the Court's decision in the pending appeal:

• *Zircon Corporation v. Stanley Black & Decker, Inc. et al*, N.D. Cal. Case No. 19-cv-08044 at Docket No. 13 (stayed pending the outcome of the Investigation on which this appeal is based).

## II. JURISDICTIONAL STATEMENT

Jurisdiction over Zircon's appeal is proper under 28 U.S.C. §1295(a)(6) and 19 U.S.C. §1337(c). The Commission entered its final Opinion ("CO") on February 15, 2022. Zircon timely filed its notice of appeal on April 13, 2022.

## III. STATEMENT OF ISSUES

1. Did the Commission err in finding that claims 1, 6, 9, 12, 13, 15, 16 and 17 of U.S. Patent No. 6,989,662 (the "'662 patent") are invalid under 35 U.S.C. §103 as obvious in view of U.S. Patent No. 6,593,574 to Steber ("Steber") with German Patent Application DE10159336 ("DE336") and/or U.S. Pub. No. 2001/0010460 ("Miller")?

2. Did the Commission err in finding that claims 1, 5, 9 and 10 of U.S. Patent Nos. 8,604,771 (the "'771 patent") are invalid under 35 U.S.C. §102 as anticipated by the Zircon 1 stud finder?

3. Did the Commission err in finding that claims 1 and 2 of U.S. Patent 9,475,185 (the "'185 patent") are invalid under 35 U.S.C. §102 as anticipated by the Zircon 1 stud finder, and that claims 5, 6, 7, 8, 9, 10, 11, 13, 14 and 15 of the '185 patent are invalid under 35 U.S.C. §103 as obvious?

4. Did the Commission err in finding that claims 13, 14, 15 and 22 of the ‘771 patent are not infringed?

5. Did the Commission err in finding that claims 17, 20 and 21 of the ‘185 patent are not infringed?

6. Did the Commission err in finding that Zircon failed to satisfy the economic prong of the domestic industry requirement?

## IV. STATEMENT OF CASE

### A. The Commission Institutes §337 Investigation

Zircon Corporation filed its Complaint under 19 U.S.C. §1337 in the ITC on August 30, 2020. Appx984-1040. The Commission instituted its Investigation on October 5, 2020. 85 Fed. Reg. 62758-62759 (Oct. 5, 2020). Appx1059-1060. The Complaint alleged violations of §1337 based on the importation into the United States, the sale for importation, and the sale within the United States after importation, of certain electronic stud finders, metal detectors, and electrical scanners by reason of infringement of claims of the ’662 patent; U.S. Patent 7,148,703 (“the ’703 patent”); the ’771 patent, and the ’185 patent (“Asserted Patents”).[1] Appx105-162. The notice of investigation named two respondents: Stanley Black and Decker, Inc., of New Britain, Connecticut; and Black & Decker (U.S.), Inc., of Towson, Maryland (collectively, Intervenors, who are referred to as “Respondents” herein). Appx13-14; Appx5127-5129.

[1] The ‘703 patent was previously terminated from the investigation and is not relevant to any issue on review.

### B. The ALJ's October 7, 2021 Initial Determination

The ALJ issued the Initial Determination ("ID") in this investigation on October 7, 2021, finding no violation of section 337 as to the Asserted Patents and accused stud finder products. ID, Appx14; Appx3725-3891.

The ID correctly concluded that the accused products infringed claims 1, 9, and 16 of the ’662 patent. ID, Appx3889. The ID also correctly concluded that Zircon's domestic industry products ("DI Products") practice claims 1, 6, 8, 12, 13, 15, 16, and 17 of the ’662 patent; claims 1, 5, 9, 10, 13, 14, 15, and 22 of the ’771 patent; and claims 1, 2, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 17, and 20, 21, and 22 of the ’185 patent. ID, Appx3889. The ID also correctly found (except for claim 17) of the ’662 patent, that all asserted claims of the ‘662, ‘771 and ‘185 patents were not invalid. ID, Appx3889.

The ID incorrectly found that the asserted claims of the ‘771 and ‘185 patent were not infringed by Respondents' S Series products (S100, S150, S200, S300) because they allegedly lacked an "axis of rotation," even though it found that the products had the "concave" and "depressed finger holds" that included the axis of rotation. ID, Appx3889.

The ID also incorrectly found that Zircon did not satisfy the economic prong of the domestic industry requirement. ID, Appx3889. Although it concluded no violation under 19 U.S.C. §1337, the ID recommended that a limited exclusion order

should issue if the Commission found a violation of section 337. ID, Appx3885-3886.

### C. The Commission's February 15, 2022 Opinion

On October 19, 2021, the parties submitted petitions for review of the ID. Appx14; Appx3905-4025; Appx4039-4115. Both parties filed a response to the other's petition on October 27, 2021. Appx4106-4204; Appx4205-4303. On December 10, 2021, the Commission published notice in the Federal Register of its determination to review parts of the ID. Comm'n Notice, 86 Fed. Reg. 70529 (Dec. 10, 2021) ("Notice of Review"). Appx4309-4316. The Commission determined to review the ID *de novo* with respect to infringement, validity, and both the technical prong and economic prong requirement for domestic industry as pertained to the '662, '771 and '185 patents. Appx14-15; Appx4309-4316. The Commission invited the parties to submit briefing on the issues under review as well as on remedy, the public interest, and bonding. Appx15; Appx4309-4316.

### D. The Commission Upholds the ID's '662 Infringement Findings

The Commission upheld the ID's findings of infringement of claims 1, 9 and 16 of the '662 patent by Respondents' Craftsman and Dewalt stud finders and modified the ID's clarification to the parties agreed claim construction of "calibration value" as used in the asserted claims of the '662 patent. CO, Appx25-29; Appx15; Appx4309-4316.

### E. The Commission Erroneously Departs from the ID in Finding that all Asserted Claims of the ‘662 Patent Were Obvious

The ID found that Respondents failed to carry their burden by clear and convincing evidence that the ‘662 patent asserted claims 1, 9, 12, 13, 15 and 16 were obvious over Respondents’ prior art combinations. ID, Appx3786-3792. Under the *KSR* and *Graham* standards,[2] the Commission erred in finding that Respondents met their burden to demonstrate obviousness by erroneously adopting the conclusory and hindsight-based testimony of Respondents’ expert, Dr. William Messner. CO, Appx30-39.

### F. The Commission Reverses the ID’s Incorrect Findings of Infringement for the ‘771 and ‘185 Patents

Zircon asserted claims 1, 5, 9, 10, 13, 14, 15, and 22 of the ’771 patent (Appx39; Appx3800), and claims 1, 2, 5, 6, 7, 8, 9, 10, 11, 13, 14-15 of the ‘185 Patent (Appx49; Appx3838) against the Stanley S-Series Stud Sensor Products. The Commission reversed the ID’s finding that the accused products did not practice the “axis of rotation” limitation, due to the presence of a “lateral ridge” in the accused Stanley products, thereby finding that claims 1, 5, 9, and 10 of the ’771 patent and claims 1, 2, 5, 6, 7, 8, 9, 10, 11, and 13 of the ‘185 patent are infringed.[3] (CO,

---

[2] *KSR Int’l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-21 (2007); *Graham v. Connor*, 490 U.S. 386 (1989).

[3] The ID also incorrectly found that the accused Stanley products did not have an “axis of rotation” based on faulty reasoning that the “lateral ridge” at the top of their finger holds was “designed to resist rotational movement.” ID, Appx3808.

Appx46-47; CO, Appx51-52; See e.g., Appx7571-7572). As to claims 14 and 15 (means-plus-function claims) of the ‘185 patent, the Commission reversed the ID and found that under either party’s definition, the accused products include the claimed “gripping means” and therefore infringed these claims. CO, Appx52-53.

### G. The Commission Erroneously Concludes that the Zircon 1 Legacy Devices Anticipated Claims 1, 5, 9 and 10 of the ‘771 Patent and Claims 1 and 2 of the ’185 Patent but Finds Similar Claims 13, 14, 15, 17 and 22 Not Anticipated

The Commission erroneously found that claims 1, 5, 9 and 10 of the ’771 patent and claims 1 and 2 of the ’185 patent’ are invalid under 35 U.S.C. §102 and claims 5, 6, 7, 8, 9, 10, 11, 13, 14 and 15 of the ‘185 patent are invalid as obvious under 35 U.S.C. §103 based on the Zircon 1, an early 1980’s device. CO, Appx49; CO, Appx53-54. However, the Zircon 1 stud finder clearly does not have “grips” with concave and/or depressed finger holds providing an “axis of rotation” as required by the claims of the ‘771 patent (ID, Appx3822-3825) and ‘185 patent (ID, Appx3861-3864) which issued over several similar and cumulative prior art devices. Therefore, the ID’s original holding of no anticipation was correct. [4]

[4] Paradoxically, the Commission upheld the validity of claims 13, 14, 15, 17 and 22 of the ‘771 patent (CO, Appx49) despite the fact that these claims cover means plus function claims and method claims of similar scope to claims 1, 5, 9 and 10.

### H. The Commission Upheld the ID's Erroneous Finding that Zircon Did Not Establish the Economic Prong of the Domestic Industry Requirement.

The Commission upheld, with modified reasoning, the ID's erroneous conclusion that Zircon had not satisfied the economic prong of the domestic industry requirement under 19 U.S.C. §1337(a)(2) because Zircon's expert presented its investments in (i) plant, property, and equipment ("PP&E"); (ii) labor and capital ("L&C"); and (iii) research, development and engineering ("R&D") for Zircon's [redacted] Domestic Industry Products in the aggregate, instead of breaking those investments out on a patent-by-patent basis. CO, Appx55-65.

Although the Commission took no position on the ID's findings that Zircon's investments in PP&E and L&C did not meet a [redacted] of Zircon's sales revenue for its DI Products, as a matter of law, the economic prong does not require a minimum threshold investment or rigid accounting formulations related to the domestic industry products. *Certain Printing and Imaging Devices and Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 27 (Feb. 17, 2011). Yet, the ID improperly applied a [redacted] threshold test to compare Zircon's PP&E and L&C, expenditures to "gross revenue," instead of the costs of DI Products, the threshold comparison previously applied in *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879, 882, 885 (Fed. Cir. 2015), discussed infra. As a result, the ID found that Zircon's U.S. investments in these categories were not quantitatively significant and

not a significant "value add" to the DI Products when compared to "gross revenue" [Appx56-57; Appx3875-3880], a misapplication of the PP&E and L&C, expenditures threshold test resulting in an erroneous finding of no DI.

The Commission upheld the ID's erroneous finding that Zircon's substantial [redacted] investments (approximately [redacted] of its [redacted] budget) in the new "Simon" chip practicing the '662 patent was unreliable, ***even though*** this estimate was supported by sworn testimony, expert testimony and corroborating evidence. CO, Appx55-65.

## V. STATEMENT OF FACTS

### A. Appellant Zircon Corporation

Zircon, an American company founded in 1977 in California, designs, develops, manufactures, markets, sells and provides service for its electronic hand tools. Appx6589. In 1980, Zircon introduced the market's first capacitor plate-based stud finder capable of detecting changes in the dielectric constant of a wall – the StudSensor™ – which was recognized by IEEE Spectrum as one of the "Greatest Gadgets of the Past 50 Years" in its Consumer Electronics Hall of Fame. Appx6570-6572; Appx6573-6578; Appx14717-14719, Q/As 12, 24-27. As it pertains to its domestic industry, Zircon designs, develops, manufactures, markets, sells, and services electronic hand tools, including principally stud finders, but also metal detectors, and electrical scanners, for use in the home and commercial repair, construction, improvement, and interior décor industry. Appx14732, Q/A 104.

These tools include the [redacted] stud finder Domestic Industry Products, which are covered by the Asserted Patents. Despite the high level of competition within the industry at large, presentations produced by [redacted] prepared in 2014 and Q2 2017 indicate that Zircon has consistently held approximately 60% of the global market for stud finders:

Cofidential Business and Financial Information

[redacted]

Appx14419-14420, Q/A 21-22, citing Appx10908-10916.[5] Zircon's DI Products accounted for between 47.8% and 65.1% of the global market's sales of stud finder products from FY 2015 through FY 2020. Appx14420, Q/A 24. Based on the foregoing, it is evident that Zircon's DI Products, which embody the claimed

[5] Appx14419-14420 is the Direct Witness Statement of Walter Bratic, Zircon's DI Expert.

inventions of the Asserted Patents, have been commercially successful (in absolute and relative terms). Appx14420, Q/A 17, 23.

### B. Respondents Stanley Black & Decker, Inc., and Black & Decker (U.S.) Inc.

Respondents manufacture and import the accused products from China, which include the DeWalt DW0100, DeWalt DW0150, Craftsman CMHT77620, Craftsman CMHT77621, Craftsman CMHT77623 (infringed by the '662 patent), and the Stanley Stud Sensor 100, 150 (also STHT77404), 200 (also STH77406), 300 series (infringed by the '771 and '185 patents). Specifically, Respondents manufacture and import the accused products from their Chinese affiliates and subsidiaries, including Zhangzhou Eastern Intelligent Meter Co. Ltd., and Black & Decker (Suzhou) Co., Ltd. Respondents stipulated to the importation of the accused products. Appx6000-6002

### C. The Patents at Issue

#### 1. Overview of the Technology

The technology at issue relates generally to certain stud finders, metal detectors and electrical scanners for use in the home and commercial repair, construction, improvement, and interior décor industries. Appx1008, ¶32. A "stud" is a structural member of a building to which an interior wall surface such as wall board or paneling is affixed. Appx1008, ¶33. Due to the deficiencies in the prior art, Zircon invested heavily in its intellectual property and pioneered novel stud finder

technologies and designs covered by the asserted patents in this Investigation. Appx1009, ¶37; Appx14720, Q/As 33-34.

### 2. The ’662 Patent

A stud finder sensor according to the teachings of the ’662 patent detects a stud by measuring a change in capacitance due to a change in the dielectric constant along the wall. Due to the studs behind the surface, a wall surface exhibits changing dielectric constants (and capacitance) while the sensor is moved along the wall's surface. Appx112, 1:29-33. Stud finders typically need to be calibrated to a value that corresponds to the stud-finder’s not being over or near a stud. Calibrating over or near a stud may cause the sensor to store an erroneous calibration value, resulting in false negatives (i.e., missed detections) when the sensor is subsequently passed over a stud. Appx112, 1:50-59; Appx107, Fig. 1C. The ‘662 patent’s invention solves this problem by providing a mechanism and method for *auto-recalibrating* the stud sensing device when an erroneous calibration has been detected during the course of normal operation. Appx113, 4:14-52. Zircon asserted claims 1, 6, 9, 12, 13, 15, 16 and 17 of the ’662 patent in the Investigation. Appx115-116.

### 3. The ’771 Patent

The ’771 patent addresses the problem where conventional hand tools and stud fsensors fail to allow for accurate positioning among various orientations of a target surface, such as a floor below, a wall in front of, or a ceiling above, the

operator. Appx146, 4:46-58. Accordingly, the ’771 patent discloses a hand tool for sensing a measurement behind a target surface, the hand tool comprising: a housing; a sensor coupled in the housing; and a grip having a pair of concave finger holds positioned at opposite sides of the grip to provide an axis of rotation. Appx145, 2:50-52. The three-dimensional concave finger holds allow for various relative positioning of a hand, to provide the user a large range of relative angles by which to pivot the tool against a surface about an axis of rotation. Appx140, Fig. 4.



FIG. 4

Zircon asserted claims 1, 5, 9, 10, 13, 14, 15 and 22 of the ’771 patent. Appx39; Appx147-148.

#### 4. The ’185 Patent

The ’185 patent shares the same specification as the ’771 patent. The ’185 patent covers a stud finder for sensing a measurement behind a target surface, the stud sensor comprising: a housing; a sensor coupled in the housing; and two depressed finger holds positioned at opposite sides of a grip to provide an axis of rotation. Other features include finger ledges, running boards and power switches embedded within the finger grips. Appx161, 6:53-63. Zircon asserted claims 1, 2, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 17, 20, 21, and 22 of the ’185 patent. Appx49; Appx161-162; Appx3838.

## VI. SUMMARY OF ARGUMENT

The Commission’s determination that claims 1, 6, 9, 12, 13, 15, 16 and 17 of the ’662 patent are invalid under 35 U.S.C. §103 as obvious over Steber in view of DE336 and/or Miller is erroneous as a matter of law and is not supported by substantial evidence. The Commission failed to address the clear and convincing burden of proof that is required to overcome the presumption of validity of an issued patent. The Commission also erroneously credited the hindsight and conclusory testimony of Respondent’s expert, Dr. Messner, when nothing in the prior art suggested that combining the references would disclose or enable an auto-recalibrating stud sensor as disclosed in the asserted claims of the ‘662 patent. The combination of references does not disclose all claim elements of the ‘662 patent.

The Commission also failed to address the clear and convincing burden of proof in finding that claims 1, 5, 9 and 10 of the ’771 patent and claims 1 and 2 of the ’185 patent are invalid under 35 U.S.C. §102, as anticipated by the Zircon 1 device. Its findings are also not supported by substantial evidence because the Zircon 1, a legacy device from the 1980’s, fails to disclose key elements such as a pivot grip with concave or recessed finger holds providing an “axis of rotation”. Similarly, the Commission’s findings that claims 5, 6, 7, 8, 9, 10, 11 13, 14 and 15 of the ’185 patent are invalid under 35 U.S.C. §103 as obvious, based on Zircon 1 (combined with other references), are erroneous as a matter of law and are not supported by substantial evidence.

The Commission’s determination that claims 13, 14, 15 and 22 of the ‘771 patent are not infringed is not supported by substantial evidence and is erroneous as a matter of law. The Commission erred in finding that there was no infringement evidence provided for the “gripping means” limitation when this evidence was provided by Zircon’s expert and was identical to the evidence for the other claims found to be infringed.

The Commission’s determination that claims 17, 20, and 21 of the ‘185 patent are not infringed is not supported by substantial evidence and is erroneous as a matter of law. The Commission erred in finding that there was no evidence that Respondents or their customers were instructed to practice the method claims when

Zircon and its expert provided ample evidence of instructions and videos demonstrating the claimed methods in use.

The Commission's findings that Zircon failed to satisfy the economic prong of the domestic industry requirement is not supported by substantial evidence and is erroneous as a matter of law. The Commission erred in applying a stringent non-flexible approach in determining that Zircon's investments could not be aggregated for its three patents-in-suit, despite significant and substantial overlap between the asserted patents.

## VII. ARGUMENT

### A. STATEMENT OF THE STANDARD OF REVIEW

This Court's review of a Commission Order is statutory. 19 U.S.C. §1337(c). The reviewing court "shall decide all relevant questions of law." 5 U.S.C. §706. Thus, the Court reviews the ITC's legal determinations *de novo*. *See Finnigan Corp. v. ITC*, 180 F.3d 1354, 1362 (Fed. Cir. 1999). The Court reviews the Commission's factual determinations for substantial evidence. *Id*. at 1361-62. The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quoting *Surface Tech., Inc. v. ITC*, 801 F.2d 1336, 1340-41 (Fed. Cir. 1986)).

### B. The Commission's Findings that Claims 1, 6, 9, 12, 13, 15, 16, and 17 of the '662 Patent are invalid Under 35 U.S.C. §103 as obvious Lacks Substantial Evidence and is Erroneous as a Matter of Law.

The Commission's obviousness determination and its underlying factual determinations for substantial evidence should be reviewed *de novo*. *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064 (Fed. Cir. 2015). The Supreme Court emphasized that a defendant seeking to overcome an issued patent's presumption of validity must persuade the factfinder of its in-validity defense by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91(2011).

Zircon appeals the Commission's finding that it was obvious to implement auto-recalibration as claimed in method claims 1, 6, 9, 12, 13, 15, 16 and 17 of the '662 patent.[6] Specifically, the Commission erred as a matter of law by failing to apply the clear and convincing standard in finding the '662 claims invalid. *See, e.g., SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006). While the ID expressly found that Respondents had not met the clear and convincing standard (ID, 3791-3792), there is only a single reference to the clear and convincing standard in the Commission's Opinion (CO, Appx34) and that reference is a quotation from

---

[6] The auto-recalibration claim elements are: claim 1: "the stud sensing device recalibrating itself if it determined that the stud sensing device was calibrated over or near the stud"; claim 12: "A stud sensing device capable of automatically recalibrating if it has erroneously been calibrated at a location over or near a stud"; claim 17: "recalibrating the stud sensing device if the stud sensing device was calibrated over or near the stud"). Appx116-117.

Zircon's brief on a different issue. The Commission's Opinion does not refer to the presumption of validity at all. For this reason alone, the invalidity finding should be reversed.

Obviousness is a question of law based on multiple underlying factual determinations, including "whether a [person having ordinary skill in the art] would have been motivated to combine the prior art to achieve the claimed invention and whether there would have been a reasonable expectation of success in doing so." *In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333 (Fed. Cir. 2016) (quoting *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)). Identifying a motivation to combine the prior art is important because "inventions in most, if not all, instances rely on building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR, supra,* at 418–419. Furthermore, the Commission relied specifically on conclusory expert testimony and hindsight to determine "a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements" *KSR*, *supra*, at 418, in the way that is claimed in the '662 patent.

The Commission's obviousness findings in combining Steber with DE336 and/or Miller were based on hindsight and not supported by substantial evidence, relying only on conclusory testimony from Respondents' expert when nothing else

in the prior art suggested the combinations cited by the Commission. The Commission's sole reasoning is based on a sweeping generalization:

> When the Commission applies *KSR*'s flexible approach to the facts here, it finds that a person of ordinary skill in the art considering Steber in combination with DE336 and/or Miller would recognize that automatic recalibration was advantageously employed in prior art sensors to simplify their operation and that the same advantage could be readily applied to an electronic stud finder like Steber's to achieve the same benefit. Appx3791-3792.[7]

CO, Appx36-37. The Commission's statement cites to *dicta* from the ID that modifying Steber to implement automatic recalibration *might have succeeded*. ID, Appx3792. But this is nowhere suggested in the prior art or in any of the combined specifications of DE336 in combination with either Steber or Miller. Also, there is no support for the ID's dicta, because in the same statement the ID also states that Respondents failed to identify any reason that would have prompted a person of ordinary skill in the art ("POSITA") to combine the elements in a way claimed in the '662 patent. ID, Appx3792.

---

[7] The Commission cites to the ID's statement: "Although the undersigned agrees with Respondents that these references in combination show that it would have been possible for one of ordinary skill in the art to implement automatic recalibration in Steber's stud finder and that this modification would have likely succeeded, Respondents failed to identify 'a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements' in the way claimed in the '662 patent. Appx37; See also *KSR*, *supra*, at 418."

### 1. The Commission Failed to Account for the Fact that the ‘662 Patent was Previously Examined in View of the Same and Cumulative Prior Art and Found to be Novel and Non-Obvious

The ’662 patent was filed on April 29, 2004, naming inventors Charles Heger and Lawrence Miller, the same inventor who is on the *Miller* patent cited by Respondents as prior art. Appx163-264. During examination, original claims 1, 6, 9-12 and 14 were rejected under 35 U.S.C. §102(b) as being anticipated by Heger (U.S. Patent No. 5,619,128) (“Heger”). Appx206-207. The Applicant specifically pointed out to the Examiner that Heger had drawbacks that were overcome in the ‘662 patent application, including *auto-recalibration* if the operator was over or near a stud. Appx223, Remarks, pg. 11).

Independent claim 1 was amended to include limitations “determining if it [the stud sensing device] was calibrated over or near a stud” and “recalibrating itself if it determined the stud sensing device was calibrated over or near the stud” and other claims were amended to emphasize these features, including the addition of new claims. Appx215. The USPTO allowed the application based, in part, on these novel features. Appx236-237. Thus, the ’662 patent claims were fully considered in view of Heger ‘128, which disclosed a manual recalibration process for stud finders similar to *Steber*. Additionally, two of the three other references relied on by the Commission were also before the patent office: *Miller* (U.S. Pub. No. 2001/0010460) Appx17015-17027; and *Sanoner* (U.S. Pub. No. 2004/0000918).

Appx17486-17505. *See* Appx106, References cited. The USPTO reviewed prior art that is identical or cumulative to prior art cited by Respondents and relied on by the Commission when considering the ’662 patent. Appx14659-14660, Q/A 23-26. Accordingly, issuance of the ‘662 patent over the purported prior art entitles the ‘662 patent to the presumption of validity as to analogous and cumulative purported prior art that was before the examiner.

The Commission erred as a matter of law in applying the clear and convincing evidence standard required for obviousness by failing to consider that manual recalibration, much like Steber, was already before the Patent Office as were other combination references cited by Respondents, including Miller and Sanoner. There was a strong presumption of validity over these references which would preclude a finding of obviousness had the clear and convincing evidence standard been properly applied. *Microsoft Corp., supra,* 564 U.S. 91 (2011); *Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1460 (Fed Cir. 1984), [“the patentee defeats the uncited art by showing that its relevancy is equal to or less than that cited”].

**2. Steber is Cumulative to the Prior Art Already Before the USPTO and Does Not Suggest Auto-Recalibration**

Steber and its provisional application, U.S. Ser. No. 60/127,322 (“Steber Provisional”) disclose a basic, pen-like device. Appx14663-14664, Q/A 36, citing Appx16812-16825 (Steber) and Appx17354-17377 (Steber Provisional). The

relevant passage cited by Respondents' expert Messer and the Commission for the alleged motivation to implement auto-recalibration in Steber comes solely from the below passage:

> **When a user first puts the device against a wall or other surface to be probed, there is no way of telling if it is initially placed over a stud or other subsurface object or not. The device assumes that it is not. However, if by chance it is, then the subsequently found frequency difference will be negative and unless special provision is made in the programming of the microprocessor, an error will result**. It is an easy matter, however, to program the microprocessor so that if the fl-f2 frequency difference is found to be negative, it means that the device was initially placed over a stud or other subsurface object. **The device could be programmed to flash the LEDs or beep a buzzer in that event to alert the user to start over, placing the device in a different initial position.**

Steber (Appx16823, 4:27–39)(emphasis added).

In this excerpt, Steber explains that if a user initially places the device over a stud, and the device subsequently tries to detect studs, an error will result. Appx14663-14664, Q/A 36. According to Steber a special provision can be made in the programming to detect that the f1-f2 frequency difference is negative, flash the LEDs or beep a buzzer, *and thus alert the user to start over in a different initial position.* Appx16823, 4:39. As such, Steber's stud sensor is a ***manual*** user calibration device like Heger '128 and teaches nothing more than potentially programming the device to alert the user to a miscalibration, which itself does not even teach or suggest implementing *auto-recalibration*. The examiner would have

allowed the ‘662 patent over the Steber references just like over Heger ‘128. Appx16823; See Appx14662-14663, Q/A 33.

Zircon’s expert, Dr. Chrissan, also opined that there is no teaching of how to actually program Steber to do auto-recalibration as any *programming suggested in Steber is to implement manual calibration*. Appx14665-14666, Q/A 42-44. Moreover, regardless of whether Dr. Messner’s educational background qualifies him as a POSITA, he admitted he does not have programming experience with production devices and has never programmed a stud sensor or tested whether it would have been possible to easily add auto-recalibration to a device like Steber. Appx1763, 2-12. Dr. Chrissan, on the other hand, who has extensive experience with programming devices, testified that programming Steber to implement auto-recalibration would be no simple, easy or obvious solution. Appx14544-14545, Q/A 37-42. Because Steber has no teaching or suggestion to implement auto-recalibration in any form, Respondents’ relied on non-analogous art DE336 which uses stationary sensors to determine container fill levels. The Commission’s obviousness determination thus rests on using Steber (a manual calibration device) and combining it with DE336, which teaches calibrating a stationary fill level sensor using a different method, based solely on the testimony of Respondents’ expert, Dr. Messner. This combination does not meet Respondents’ obviousness burden by clear and convincing evidence.

### 3. The Commission Relied on Conclusory Statements by Respondent's Expert to find that Automating Calibration in a Stud Finder was Obvious in view of DE336

DE336 is directed to monitoring the level of liquids or other objects in a container (through filling and emptying the container) and describes automatic calibration of a *stationary capacitive sensor* in a process of filling and refilling a container. *See* Dr. Chrissan's testimony, Appx14666-14667, Q/A 46-50, citing Appx17329-17353 (English translation of DE336)). There is not a single mention in DE336 that it can be used or applied as a *moveable* sensor across wall surfaces to detect objects such as studs behind layers of sheetrock*, or that it would even work for such purposes*. (Id.). The ID properly recognized the distinctions between the sensor of DE336 and a stud sensor when it found a lack of evidence in the record to combine DE336 with Steber due to the differences in the sensors and differences in how the sensors were calibrated. Appx3787-3788. DE336 is not analogous art to the '662 patent's field of invention. Appx112, l:5-10. However, even if DE336 was properly considered, the Commission erred in finding a motivation or rational reasons to combine it with Steber because such a combination, even if it had occurred, would not lead a POSITA to implement an auto-recalibrating stud sensor as disclosed and claimed in the asserted claims of the '662 patent. Appx14667-14668, Q/A 50-52; see also Appx14955-14960 (showing how DE336 addresses a completely different problem).

Moreover, the Commission relied entirely on Dr. Messner's conclusory testimony that the sensor of DE336 could be implemented with stud finders. Citing Dr. Messner, the Commission's reasoning was:

> "DE336 itself touts that one of the advantages of the invention claimed therein is that 'a large number of conventional sensors can be readily retrofitted . . . according to the invention.' See, *e.g.*, RX-493 at [0034]; id. at ¶ [0035] ('[A] sensor according to the invention can be used for any application for which a conventional sensor can be used.'); RX-674C at Q/A 72, 141, 152."

CO, Appx37, citing to Appx17628 Q/A 72; Appx17649-17650 Q/A 141; Appx17654-17655, Q/A 152.

There are several problems with this reasoning. **First**, DE336 makes no mention of a "conventional sensor" applying to movable stud sensors and the only examples of conventional sensors according to DE336 is for stationary fill level monitoring of water, oil, grain, etc. and distance monitoring for background suppression. Appx17333, [0035]; see also Appx17330, [0007]; Appx17333, [0032]; and Tr. Appx2116, 833:8-12; Tr. Appx2121, 838:20; Appx2122, 839:13).

**Second**, Steber itself makes no mention of implementing an *automatic calibration* methodology and only references a potential method to "alert the user" that calibration is needed – i.e., *manual calibration*, which was the same problem posed by the Heger patent over which the '662 patent was allowed. A POSITA could not look to the teachings of either DE336 or Steber for the suggestion, motivation or

even logical inferences to implement automatic recalibration in a stud finder as taught and claimed in the ‘662 patent. Appx14688, Q/A 125.

**Third**, the Commission’s conclusion that DE336 and its calibration methodology could be applied to stud sensors is based solely on Dr. Messner’s conclusory and hindsight testimony in using the ‘662 patent as a roadmap for the obviousness combinations. Dr. Messner stated that “Automating something that was done manually is a matter of routine engineering. **As further support for my conclusions, the ’662 Patent admits in its background** at 1:65-67 that “[i]t may be desirable to automatically recalibrate the sensor that was erroneously calibrated over a hidden object.” Appx17635-17636, Q/A 93. Dr. Messner confuses desirability with capability. Auto recalibration was clearly desirable when only manual calibration and manual recalibration were available. Auto recalibration, while desired, was not available until a device covered by the ‘662 patent was invented by Zircon.

This court’s opinions have repeatedly recognized that conclusory expert testimony is inadequate to support an obviousness determination on substantial evidence review. See, e.g., *MobileMedia Ideas LLC v. Apple Inc*., 780 F.3d 1159, 1172 (Fed. Cir. 2015); *See DSS Tech. Mgmt., Inc. v. Apple Inc*., 885 F.3d 1367, 1374–77 (Fed. Cir. 2018); *Regents of Univ. of Minn. v. AGA Med. Corp*., 717 F.3d

929, 941 (Fed. Cir. 2013) (quoting *Sitrick v. Dreamworks*, LLC, 516 F.3d 993, 1001 (Fed. Cir. 2008)).

In *InTouch*, the challenger relied solely on the testimony of its expert to establish a motivation to combine the asserted prior art references which was ultimately rejected by the Federal Circuit as lacking a basis in substantial evidence. *InTouch Techs., Inc. v. VGo Commc'ns, Inc.*, 751 F.3d 1327, 1349; 1351–54 (Fed. Cir. 2014). The Court explained that the expert testimony "failed to provide any meaningful explanation for why one of ordinary skill in the art would be motivated to combine these references *at the time of this invention*." *Id*. at 1353–54 (emphasis added). The Court observed that the expert testimony "primarily consisted of conclusory references to [the expert's] belief that one of ordinary skill in the art could combine these references, not that they would have been motivated to do so." *Id*. at 1352 (citing *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc*., 694 F.3d 1312, 1327 (Fed. Cir. 2012)). Thus, this Court concluded that the expert appeared to have improperly "relied on the [challenged] patent itself as her roadmap for putting what she referred to as pieces of a 'jigsaw puzzle' together." *Id*. at 1351.

This is exactly the same approach taken by Respondent's expert, Dr. Messner. As the ID correctly pointed out, "Respondents' arguments for applying the recalibration of the DE366 (*sic*) sensor to the stud finder in Steber rely on citations to the specification of the '662 patent, rather than teachings in the prior art. See RRB

at 27-29; RX-0674C (Messner DWS) at Q/A 181-83. [Appx17666-17668, Q/A 181-183]. These obviousness arguments are based on hindsight, rather than the perspective of one of ordinary skill in the art at the time of the invention." Appx3788. Respondent's expert did exactly what this Court cautioned against – relying on the challenged patent as a roadmap for putting together the pieces of the jigsaw puzzle and that analysis was improperly adopted by the Commission. As noted, Zircon's expert, Dr. Chrissan, concluded otherwise. Appx14667-14668, Q/A 50-52; see also Dr. Chrissan's demonstratives Appx14955-14960).

Another problem with the Commission's Opinion is that it fails to provide any analysis regarding the actual calibration methodology used in DE336. Unlike the '662 patent, DE336 does not auto-*recalibrate* due to an initial miscalibration from being over an object such as a stud that is not visible to the user. Appx14667, Q/A 50). The Commission states that:

> "Dr. Chrissan offers no explanation as to why this distinction would deter a POSA from combining DE336 with Steber, or why such a combination would not be expected to succeed. Dr. Messner explained in detail why 'it would be straightforward for a [POSA] to program Steber according to the automatic recalibration of DE336.' See RX-674C at Q/A 159 [Appx17657-17660, Q/A 159]; *see also id.* at Q/A 156 [Appx17656-17657, Q/A 156]." CO, Appx37-38.

The Commission erred in its analysis. The ALJ, as the fact finder, had no trouble understanding Dr. Chrissan's testimony. (See ID, Appx3787-3788; Appx14667-14669, Q/A 50-56). As explained by Dr. Chrissan, DE336 discusses the automated

calibration of a completely different type of sensor, using a completely different method. (Appx14667-14668, Q/A 50-52). Dr. Chrissan pointed to the teachings in DE336 which state in detail operations completely different from those employed in locating studs with a movable sensor. (Appx14667-14668, Q/A 52, citing Appx17337, [0085]). See also Appx14958, slide 33 of Dr. Chrissan's demonstrative.




It was not Zircon's burden to disprove DE336's application to stud sensors, although Dr. Chrissan did just that. See Appx14664-14665, Q/A 37-42, explaining that programming Steber to implement auto-recalibration is no simple, easy or obvious solution and that DE336 describes a different solution to calibration which would require undue experimentation to implement and yield the inventions of the '662 patent. Appx14667-14669, Q/A 50-56)).

On the other hand, Respondents' expert, Dr. Messner, performed no tests and did not use any prior art sensors or attempt to program or modify a "conventional sensor" to adapt it to the teachings of the '662 patent. Appx1763, Tr. at 482:2-12. Thus, the Commission erred in finding that Respondents met their burden by *clear and convincing evidence* that Steber could be easily modified by DE336 to render the claims obvious.

#### 4. The Commission's Finding Regarding the Motivation to Combine Steber and Miller and its Resulting Findings of Obviousness Lack Substantial Evidence and are Erroneous as a Matter of Law

The Commission cites to a single statement in Miller and three paragraphs from Dr. Messner's Report to conclude that Steber's combination with Miller renders claims 1, 6, 9, 12, 13, 15, 16 and17 invalid as obvious under 35 U.S.C. §103. Appx5096. Miller has nothing to do with stud finding or using capacitance-based values or sensed density values to automatically recalibrate a stud finder in normal operation. Appx14673-14674, Q/A 71-74; *See* Appx261,'662 Information Disclosure Statement. The Commission took one paragraph from Miller [0039] which cites the need for automatic calibration of a wire finder to argue that this disclosure is sufficient to find a motivation to combine Steber with Miller. CO, Appx39, citing RX-674C at Q/A 149 [Appx17653-17654, Q/A 149]. Also, as discussed above, Steber does not teach or suggest *auto-recalibration*, but only suggests that the device could be programmed to facilitate manual recalibration.

(Appx14663-14664, Q/A 36). Miller is directed only to solving a completely different problem, wire finding, and is designed to ignore studs. *See* Appx17025, [0044]. Miller's instrument uses electric field sensing and detects alternating electric fields. As Dr. Chrissan confirmed, Miller addresses using a completely different technical solution than capacitive sensors. Appx14673, Q/A 71. One of ordinary skill in the art (capacitive density sensing) would not turn to the field of AC signal detection in order to design a capacitive stud sensor. Appx14660, Q/A 26; Appx14673, Q/A 71; Appx14673-14674, Q/A 72; and Appx14689, Q/A 129.

The Commission states that the ID reads Miller's disclosure of recalibration in wire finders too narrowly. CO, Appx38-40, citing Appx17025, [0039]. However, the ID fully considered Miller's teachings of how to recalibrate the wire finder and did not find that these disclosures satisfied Respondent's burden by clear and convincing evidence that a POSITA would be motivated to use this disclosure to modify Steber. ID, Appx3789. The Patent Office reached the conclusion when it did not consider Miller.

Even assuming that Miller is analogous art, Dr. Messner provided no explanation of how Miller's teachings regarding recalibration generally could be converted simply to auto-recalibrate for stud sensors as described and claimed in the '662 patent. Because Miller does not teach detecting studs or auto-recalibration in the context of capacitance and density changes behind a surface, it does not provide

any teaching, suggestion, inference or motivation for combination with Steber. Accordingly, the ID correctly found that "Miller merely describes the benefits of recalibration generally, which are also disclosed in Steber. Compare Appx17025, [0039] to Appx16823, 4:27-40. It is not clear from the record whether it would have been obvious to one of skill in the art to apply the automatic recalibration for AC wire detection in Miller to the stud detector in Steber." (ID at Appx3790). Furthermore, in reversing the ID, the Commission failed to apply the proper burden of proof (clear and convincing evidence) which is particularly erroneous because Miller was previously considered during prosecution of the '662 patent.

#### 5. The ID's obviousness Finding for Claim 17 of the '662 Patent are Erroneous

##### a) The ID's finding that claim 17 does not require "automatic recalibration" contradicts the file history and proper scope of the claim

The ID incorrectly found, and the Commission did not disturb the erroneous finding that claim 17 would have been obvious. The ID stated that Respondents' obviousness arguments for claim 17 were unrebutted. (ID, Appx3794). That is incorrect. Respondents relied on the same prior art references and combinations for claim 17 as they did for claim 1 of the '662 patent that the ID found was not obvious in light of the same combinations. (ID, Appx3781-3792). Dr. Chrissan incorporated his arguments for claim 1, which were adopted by the ID as persuasive in finding

that claim 1 was not obvious in view of the identical references for claim 17. (Appx14691, Q/A 135).

An issued claim must be interpreted in view of the specification and file history. *Ruckus Wireless v. Innovative Wireless*, 824 F. 3d 999, 1004 (Fed. Cir. 2016). The ID improperly interpreted claim 17 as covering *manual recalibration* instead of auto-recalibration. The ID states: "Unlike claims 1 and 12, claim 17 does not require "automatic recalibration." (ID, Appx3794). While the ID is correct in pointing out that the claim 17 language of "recalibrating the stud sensing device…" is not literally the same as "recalibrating itself…" as recited in claim 1, a review of the prosecution history shows that the applicant argued that claims 17, 18, 19 and 20, which were added in an office action response, were allowable for the same reasons as Claims 2, 3, 7, and 8 which depend on base claim 1.[8] Appx222-225, '662 file history. All the claims were distinguished over Zircon's Heger '128 reference which disclosed manual recalibration, but which did not disclose methods of *auto-recalibration*. *Id*. The specification of the '662 patent also states: "FIGS 3-6 each illustrate a capacitance curve and an overlying calibration of capacitance of an *auto-recalibration system*, in accordance with the present invention." Appx114, col. 5, ll.

[8] This issue was not before the ID during claim construction, but the ID interpreted claim 17 as manual recalibration in its final ID. Zircon requests de novo review of this interpretation which is erroneous as a matter of law.

23-25). The embodiments in the specification that discuss Figures 3-6 provide the written support for claim 17.

Interpreting claim 17 to cover manual recalibration was erroneous as a matter of law in that claims granted in an issued patent are presumptively valid. Accordingly, in light of the ID's incorrect interpretation of claim 17, the Court should reverse the ID's finding that claim 17 is obvious.

### C. The Commission's Findings that Claims 1, 5, 9 and 10 of the '771 patent and claims 1 and 2 of the '185 patent' are Invalid under 35 U.S.C. §102 and Claims 5, 6, 7, 8, 9, 10, 11, 13, 14 and 15 of the '185 Patent are invalid as obvious under 35 U.S.C. §103, based on the Zircon 1, Lack Substantial Evidence and are Erroneous as a Matter of Law

The Zircon 1 prior art product was Zircon's first stud sensor device and was sold to consumers beginning roughly in 1980. It is no longer sold and has been off the market for decades. The Zircon 1 is depicted below.



(Zircon Comm. Brief at Appx4389). In comparison, depicted below are two Zircon domestic industry products found to be practicing the '771 and '185 patents and which are representative of the types of devices and grips described in the asserted patents:




The ID correctly found that Zircon 1 did not anticipate or render any claims of the '771 or '185 patents obvious because it did not have "grips" with the claimed "axis of rotation." ID, Appx3822-3823, Appx3861. However, the ID incorrectly found that the Stanley accused products did not practice the "axis of rotation" limitation of the asserted '771 and '185 claims. The Commission then reversed both of the ID's findings, concluding that the accused products practiced the axis of rotation and that the Zircon 1 legacy stud finder included an axis of rotation, thus invalidating the axis of rotation claims in the '771 and '185 patents. CO, Appx47-48.

Invalidity is determined by comparing the prior art to the patent claims. "[M]ere proof that the prior art is identical, in all material respects, to an allegedly infringing product cannot constitute clear and convincing evidence of invalidity." *Zenith Elecs. Corp. v. PDI Commun. Sys.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008). The question here is what does the evidence demonstrate? The design itself of the Zircon 1 and its lack of "grips" fails to provide it any "pivoting" features for an "axis of rotation" as required by all claims of the '771 and '185 patents. For an extensive discussion on why the Zircon 1 could not have grips with finger holds providing for an axis of rotation, see Appx14508, Q/A 62; Appx14509-14510, Q/A 70; Appx14510-14511, Q/A 74; Appx14519-14520, Q/A 112; Appx14520, Q/A 115; Appx14531, Q/A 162. The Commission erred in finding that there was clear and convincing evidence that Zircon 1 provided a grip with an axis of rotation when the evidence was clearly to the contrary.

As shown in the images below, the Zircon 1 has no means to prevent a finger or thumb from slipping off and contacting the wall during use, a key element of the grips and pivot point for the designs claimed in the '771 and '185 patents. Appx14507-14508, Q/A 62; Appx17481.



The dimensions and depth of the "grips", and lack of any running board allow the thumb and finger to contact the wall during use of the Stud Sensor 1.

Photograph taken by Joel Delman 04/18/2021



This image was taken directly from Appx15500 of Respondents' Expert, Mr. Van Deursen's Opening Report, clearly showing the user's thumb making contact with the wall while using the Stud Sensor 1.

Appx2558, Zircon's Post Trial Brief.

The Zircon materials cited by Respondents only contradict the testimony of their expert, Mr. Van Deursen. The below images, taken directly from the Zircon instruction manual, show that the Zircon 1 is designed to be grasped by the user's hand, wrapped around the housing. There is no pivot point in the grips to use the Zircon 1 to rotate the device around an "axis of rotation" as required by all asserted claims of the '771 and '185 patents. (*Id).*

pressed. Do not move until light goes out which indicates calibration is complete.



Figure 1 Locating Vertical Wall Studs

-2-



Figure 2. Multiple Vertical Readings

-3-



Figure 3. Locating Horizontal Braces

-4-

Appx17422-17433.

***Mr. Van Deursen even admitted these shortcomings at the hearing***, confirming Mr. Delman's testimony that the finger hold areas in the Zircon 1 were "instructional", did nothing to stop a user's finger from going all the way to a wall, and that "[a]dmittedly, it's minimal. It would have been nicer if [Zircon] made it deeper". Tr., Appx1833-1834. Even Respondents and their expert understood the "finger hold" areas of the Zircon 1 were problematic in actually gripping or holding the device. Appx14509-14510, Q/A 70; (Tr., Appx1833, 25; Appx1834, 1-10;

Appx1834; 5-14; Appx2558, Zircon's Post Trial Brief; Tr. Appx1833; 2-12, Appx1834; 12-17.

Mr. Delman also provided detailed guidance as to the shortcomings of the Zircon 1 at the hearing, including its brick-like nature, the inability to provide an axis of rotation, and its design constraints causing a user's fingers to hit the wall, which were corroborated by the deposition testimony of Mr. Wingate (inventor of the '771 and '185 patents), as well as Mr. Delman's conversations with Mr. Wingate and Mr. Halliday (the other inventor of the '185 patent). See Tr., Appx2018; 5-23, Appx2020; 7:20, Appx2014; 24; Appx2016; 18; Appx14509, Q/A 65-66.

Therefore, the substantial evidence shows that the Zircon 1 lacks "grips" providing for an axis of rotation as required by all asserted claims of the '771 and '185 patents. Moreover, the Zircon 1 prevents rotation regardless of whether it has depressed or slightly concave features on the side of its housing, as rotation is impossible given the foregoing lack of any means to prevent the user's fingers from touching the wall. (See Appx14509-14510, Q/A 70).

The Commission failed to account for significant expert testimony (including admissions against interest by Respondents' expert), inventor testimony, design considerations and the file history of the '771 and '185 patents which disclosed devices similar to the Zircon 1, and constitute substantial evidence that the Zircon 1 and devices similar thereto do not constitute prior art with regard to a pivoting means

and axis of rotation applicable to the devices claimed in the ‘771 and ‘185. The Respondents did not meet their burden by clear and convincing evidence and the Commission erred as matter of law by conflating the designs of the infringing devices with that of the prior art.

### 1. The Commission Also Failed to Account for Designs Like the Zircon 1, That Were Already Before the Patent Office During Prosecution

There is a presumption of validity over the prior art that was considered by the USPTO. *Microsoft Corp.*, *supra*, at 2239. The basic designs of the Zircon 1 were before the patent office in the provisional application. Appx14507-14508, Q/A 62; Appx12153 [0003]-[0004], Appx12164-12165. The provisional patent application was incorporated by reference into both the ‘771 and ‘185 specifications and were considered by the patent examiner. Mr. Delman stated at trial, the Zircon 1 was cumulative to the prior art designs considered by the patent examiner. (Tr., Appx2022; 12-21). Images of prior art grip designs from the provisional application are shown below. Appx12164-12165.




Both the ‘771 and ‘185 patents clearly incorporate the provisional patent by reference. See Appx145, Col. 1., ll. 8-16; Appx159, Col. 1, ll. 8-20).

As Mr. Delman noted, many prior art designs which share similarities to those that Respondents have used as references for their invalidity arguments, including the Zircon 1 were included in this disclosure to the USPTO. Appx14527-14528, Q/A 148. Indeed, even Mr. Van Deursen admitted during his testimony that the provisional patent and these designs were before the patent office and that the patents issued over this art. (Tr., Appx1821, 15-25; Appx1822, 1-25; Appx1823, 1-25; Appx1824, 1-25; Appx1825, 1-25; Appx1826, 1-25; Appx1827, 1-25; Appx1828, 1-25; Appx1829, 1-25; Appx1830, 1-25; Appx1831, 1-25; Appx1832, 21). Mr. Delman learned from his discussions that Zircon was aware of the shortcomings in the prior art and made certain innovative and novel advancements related to useability, functionality, ergonomics, and an understanding of what was needed by consumers in the marketplace when developing these inventions. Appx14527, Q/A 147; Appx14527, Q/A 151.). This evidence should have been considered and accounted for by the Commission in evaluating whether the prior art designs, including the Zircon 1, rendered any claim of the ‘771 and ‘185 patent invalid as anticipated or obvious and whether Respondents met their burden by clear and convincing evidence.

Ultimately, the Commission’s decision was not based on substantial evidence and it erred as a matter of law in finding that the Zircon 1 devices include “*a grip having a pair of three-dimensional concave finger holds positioned at opposite sides*

*of the grip to provide an axis of rotation*" as required by claims 1, 5, 9 and 10 of the '771 patent, and "*two depressed finger holds positioned at opposite sides of a grip allowing pivoting to provide an axis of rotation*" as required by claims 1 and 2 of the '185 patent.

#### 2. Because Zircon 1 Lacks "Grips" Providing an "Axis of Rotation", the Commission's Findings that Claims 5, 6, 7, 8, 9, 10, 11, and 13 of the '185 Patent Invalid Under 35 U.S.C. §103 Must be Reversed

Claims 5-9 of the '185 patent depend from claim 1 and add limitations of a "running board". Claims 10, 11 and 13 of the '185 patent claim modifications to the housing, including acute angles and v-notches on the front edge of the housing. Because Zircon 1 does not disclose "grips" and "fingerholds" with an "axis of rotation" as required by all claims of the '771 and '185 patents, the combination of Zircon 1 with U.K. Patent Application No. GB 2188432 (Appx17028, "GB432") and (Appx17442, "Krantz '430) fails to disclose all the limitations of the asserted claims and the Commission's decision must be reversed.

#### 3. The Commission's Determination that Claims 14 and 15 of the '185 Patent are Invalid under 35 U.S.C. §103 Lacks Substantial Evidence and is Erroneous as a Matter of Law

Claim 14 and dependent claim 15, require: "*gripping means for gripping and for providing an axis of rotation, wherein the gripping means comprises only two depressed finger holds positioned at opposite sides allowing pivoting to provide an axis of rotation*". Appx162. Neither party offered a means plus function definition for the "gripping means" limitation during the *Markman* proceedings and both

experts construed it according to its ordinary meaning, with Zircon noting that gripping means referred to a "grip" with a "concave design" consistent with the specification of the '185 patent. CO, Appx53; Comm. Reply Br. on Rev., Appx4687-4688).[9] The Commission's sole basis for finding claims 14 and 15 obvious is based on its same erroneous findings pertaining to claims 1, and 5, 6, 7, 8 and 9. However, as discussed above, the Zircon 1 device lacks "grips" and actual finger holds that allow "pivoting" for "providing an axis of rotation". Accordingly, the Commission's obviousness decision related to claims 14 and 15 of the '185 patent lacks substantial evidence and is erroneous as a matter of law and must be reversed.

### D. The Commission Erred in Upholding the ID's Finding that claims 13, 14 and15 of the '771 patent were not infringed.

The Commission incorrectly upheld the ID's decision that claims 13, 14 and 15 of the '771 patent were not infringed based on the reason that Zircon "failed to offer any infringement analysis under the means-plus-function construction for 'gripping means.'" CO, Appx47; *see* ID, Appx3812, Appx3851-3852. The ID and Commission decision is erroneous, however, because Zircon and its expert offered the same evidence for the "gripping means" limitation which covered the same structure as the "concave finger holds" found in apparatus claims 1, 5, 9, and 10 of

[9] *See* Order No. 20, Appx1172; *see also* Stipulated Claim Constructions, Appx12099-12100; ID, Appx3843-3845.

the '771 patent.[10] See Appx14451, Q/A 90; Appx14465-14466, Q/A 148; Appx14487, Q/A 256. It is unclear what further analysis would be needed for such a simple element. A POSITA would understand that the two grips positioned on the opposite sides of the S Series products are finger holds and would fulfill the function of "gripping the hand tool," as Mr. Delman explained. (Id.). Mr. Delman also specifically noted that the analysis he provided with respect to Claim 1, element (d) which discussed "a grip having a pair of three-dimensional concave finger holds positioned at opposite sides of the grip to provide an axis of rotation" was directly relevant to the "gripping means" element of Claim 13 (and dependent claims 14 and 15) for the '771 patent.[11] Appx14451, Q/A 90.

### E. The Commission erred in Finding Claims 22 of the '771 patent and claims 17, 20 and 21 of the '185 patent are not infringed.

The Commission decision upholding the ID's findings that Zircon did not prove inducement of infringement of the method claims under 35 U.S.C. §271(b) is both legally and factually erroneous. CO, Appx47; ID, Appx3814-3815, Appx3854-3855. The ID appears to recognize that Respondents were on sufficient notice of the

---

[10] "Gripping means" was a stipulated means-plus-function term which was given the construction where the function is: "gripping the hand tool" and the corresponding structure is "a pair of concave finger holds positioned at opposite sides of the grip as disclosed in the specification and equivalents thereto [Appx145, 1:48-53; Appx145, 2:49-52; Appx146, 3:33-65; Appx147, 5:9-18, 44-52; and Appx138, Figs. 2A, 2B; Appx143, Figs. 6A, 6B; Appx142, Fig. 7; Appx144, Fig. 8]."

[11] The same analysis was provided for the '185 patent. See Appx14456-14472, Appx14465-14466.

'771 and '185 patents. ID, Appx3814; see also Appx2448-2452. However, the ID found that "Zircon has not identified sufficient evidence that Respondents have induced any customer to rotate the Accused Stanley Products while holding the tool against a wall in accordance with claim 17." ID, Appx3814. This is clearly erroneous as a review of the record shows that there is ample evidence that Respondents both instruct their customers, and in normal usage, as shown in Respondents' user manuals and Respondents' videos, the S Series Products are being rotated along the axis of rotation between the thumb and forefinger as required in the method claims of the '771 and '185 patent. Appx14452-14452, Q/A 97; Appx14453, Q/A 99; Appx14454, Q/A 102; Appx14454, Q/A 103; Appx14454, Q/A 105 (citing Appx12061; Appx12062; Appx12063; and Appx12064; *See also* Appx14504, Q/A 47; Appx14504, Q/A 48; Appx14515, Q/A 94; Appx14517-14518, Q/A 102; Appx14518, Q/A 103; Appx14530-14531, Q/A 159; Appx6983-7004; Appx7005-7024; Appx7025-7046; Appx7047-7068. For example, Respondents' YouTube videos promote the accused products as being capable of being rotated about the axis of rotation relative to a finger and thumb [Appx12064 at 00:02, 00:37, and 00:56]:

<table>
<tr><th>Stanley Stud Sensor 300<br>CX-543C at 00:02</th><th>Stanley Stud Sensor 300<br>CX-543C at 00:37</th><th>Stanley Stud Sensor 300<br>CX-543C at 00:56</th></tr>
<tr><td>
</td><td>
</td><td>
</td></tr>
</table>

With the knowledge that the S Series Products infringe the patents-in-suit Respondents have "induce[d] infringement after importation by recommending, encouraging, and promoting [their] customers to infringe [the patents-in-suit]." *See Certain Digital Video Receivers and Related Hardware and Software Components*, Inv. No. 337-TA-1103, Init. Det. at *23 (June 4, 2019) (citing *Takeda Pharm. US.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed Cir. 2015)).

Moreover, while the ID relied on this evidence as sufficient to demonstrate infringement of the other steps of the asserted method claims of the '771 and '185 patent, the ID disregards the same evidence for the "rotating" claim element. Accordingly, collectively, this evidence was sufficient for Zircon to satisfy its burden that Respondents induce their customers to infringe the method claims of the '771 and '185 patents.

### F. The Commission's findings that Zircon failed to satisfy the economic prong of the domestic industry requirement constitutes reversible error.

The economic prong of the domestic industry requirement is satisfied when it is determined that sufficient economic activities and investments set forth in subparagraphs (A), (B), or (C) of section 337(a)(3) have taken place or are taking place with respect to the articles protected by the asserted patent. *Certain Variable Speed Wind Turbines & Components Thereof Inv*. No. 337-TA-376, Comm'n Op. at 21 (Nov. 1996) ("Wind Turbines")(emphasis added). Satisfaction of any one

subparagraph is sufficient to meet the domestic industry requirement. *Wind Turbines, Comm'n* Op. at 15.

The Commission and the ID both improperly took a narrow and unduly restrictive approach to Zircon's domestic industry investments in PP&E, L&C and R&D, even though Zircon presented data showing such expenditures over a period of six fiscal years ([redacted]) prior to the ITC complaint being filed. See Zircon's Brief, Issue 12, Appx4397-4398. The Commission erroneously found that Zircon improperly "aggregated" its investments across three of its patents for each of the PP&E, L&C and R&D categories. CO, Appx55-65. The ID, on the other hand, did not challenge the aggregation (except for discounting marketing and sales costs), reviewed the numbers presented by Zircon and its financial expert, Mr. Walter Bratic, and arbitrarily (and erroneously) concluded that the investments in these categories were not *substantial* or *significant* because they did not rise to [redacted] of gross revenue, a metric that finds no support in the statutes or even in recent cases and was erroneously calculated. CO, Appx56.

The ID erroneously concluded that Zircon's domestic "value added" is less than [redacted] of the total value of the domestic industry products, and therefore found that this percentage is not quantitatively significant. See DI at 149-50 [Appx3877-3878], citing *Lelo Inc., supra*, at 882, 885 (where 5% of the cost of goods was deemed "insignificant.") However, the ID misapplied *Lelo's* cost of goods analysis

by comparing Zircon's investments in PP&E, L&C and R&D to its U.S domestic product revenue rather than to the cost of its DI goods to conclude that Zircon's investments were less than [redacted] of "value add" and not significant. Therefore, the ID's analysis of Zircon's "value add" was both factually and legally erroneous. If the Court were to apply the "cost of goods" or "cost of sales" metric as was done in *Lelo*, which is a more reliable indicator of "value add," Zircon's investments in each of the three categories were far greater than [redacted] of the cost of goods. See Zircon Petition for Review, Appx3954-3963.

The Commission upheld the ID's ultimate conclusion on the domestic industry prong with modified reasoning. Accordingly, Zircon addresses the Commission's reasoning as modified. CO, Appx59.

### 1. The Commission Erred In Refusing to Consider Zircon's Investments in PP&E, L&C and R&D which are Quantitatively and Qualitatively Significant In Terms of the Stud Finder Industry

The Commission has adopted a "flexible, market-oriented approach to domestic industry"; a case-by-case determination "in light of the realities of the marketplace." *Certain Wireless Devices*, USITC Inv. No. 337-TA-868, ID, 2014 WL 2965327, *64 (June 13, 2014); *Certain Variable Speed Wind Turbines*, Inv., No. 337-TA-376, ID, USITC Pub. No. 3003, 1996 WL 1056330, *55 (Nov. 1996).

Zircon is the international and U.S. market leader in the stud finder industry. Appx14410, Q/A 107; and Appx10908-10916; see also Appx14410-14411, Q/A

105-113. Despite the significant investments presented by Zircon in its U.S. operations, the Commission claims it cannot credit Zircon for any investments because it presented its investments as percentage of revenue of the *DI Products as a whole* as opposed to breaking out its investments per patent. This finding contradicts the flexible and market-oriented approach for domestic industry and also finds no support in the statute or legislative history.

Based on the investments in its asserted patents, Zircon's U.S. investments have culminated in the release of 53 DI Products, which are grouped (based on function) into families such as the MultiScanner and StudSensor, and product series such as A-Series stud finders, e-Series stud finders, HD Series stud finders, I-Series stud finders, K-Series, M-Series, L-Series, and Pro-Series stud finders. Appx14722-14724, Q/A 42-46; Appx14608, Q/A 169; Appx14609-14610, Q/A 173-178; Appx14472, Q/A 171-176, citing Appx14990-15172 and Appx18084-18088). In its briefing before the ALJ and Commission, Zircon specifically showed which products are covered by each of its patents in this Investigation. Appx3940-3941. The product to patent chart is shown below:

| Patent No. | Zircon's DI Products |
|---|---|
| '662 Patent | StudSensor™ HD70 OneStep®; MultiScanner® HD800 OneStep®; MultiScanner® HD900 OneStep®; MultiScanner® HD900c OneStep®; StudSensor™ L70 OneStep®; MultiScanner® L350 OneStep®; MultiScanner® L550 OneStep®; StudSensor™ 70; StudSensor™ i60 OneStep®; StudSensor™ i65 OneStep®; MultiScanner® i320 OneStep®; MultiScanner® i520 OneStep®; StudSensor™ A150; MultiScanner® A200; MultiScanner® A250; MultiScanner® A250c; MultiScanner® 740; MultiScanner® i700 OneStep®; StudSensor™ HD75 OneStep®; MultiScanner® HD850 OneStep®; MultiScanner® HD950 OneStep®; MultiScanner® HD950C OneStep®; SuperScan™ K1; SuperScan™ K2; SuperScan™ K3; SuperScan™ K4; SuperScan™ M1; SuperScan™ M2; SuperScan™ M3; SuperScan™ M4 |

| Patent No. | Zircon's DI Products |
|---|---|
| '771 Patent | StudSensor™ HD25; StudSensor™ HD35; StudSensor™ HD55; StudSensor™ HD70 OneStep®; MultiScanner® HD800 OneStep®; MultiScanner® HD900 OneStep®; MultiScanner® HD900c OneStep®; StudSensor™ L20; StudSensor™ L40; StudSensor™ L50; StudSensor™ L70 OneStep®; MultiScanner® L350 OneStep®; MultiScanner® L550 OneStep®; StudSensor™ EDGE; StudSensor™ e30; StudSensor™ e40; StudSensor™ e50; StudSensor™ A100; StudSensor™ A150; MultiScanner® A200; MultiScanner® A250; MultiScanner® A250c; StudSensor™ Pro25; StudSensor™ Pro35; StudSensor™ Pro45; StudSensor™ Pro55; StudSensor™ WM5; MultiScanner® x85; MetalliScanner® MT 7; MetalliScanner® MT X; XL300; XL500; StudSensor™ HD75 OneStep®; MultiScanner® HD850 OneStep®; MultiScanner® HD950 OneStep®; MultiScanner® |
| '185 Patent | StudSensor™ HD25; StudSensor™ HD35; StudSensor™ HD55; StudSensor™ HD70 OneStep®; MultiScanner® HD800 OneStep®; MultiScanner® HD900 OneStep®; MultiScanner® HD900c OneStep®; StudSensor™ L20; StudSensor™ L40; StudSensor™ L50; StudSensor™ L70 OneStep®; MultiScanner® L350 OneStep®; MultiScanner® L550 OneStep®; StudSensor™ EDGE; StudSensor™ e30; StudSensor™ e40; StudSensor™ e50; StudSensor™ A100; StudSensor™ A150; MultiScanner® A200; MultiScanner® A250; MultiScanner® A250c; StudSensor™ Pro25; StudSensor™ Pro35; StudSensor™ Pro45; StudSensor™ Pro55; StudSensor™ WM5; MultiScanner® x85; MetalliScanner® MT 7; MetalliScanner® MT X; StudSensor™ HD75 OneStep®; MultiScanner® HD850 OneStep®; MultiScanner® HD950 OneStep®; MultiScanner® |

Appx14722-14723, Q/A 42. Zircon has continued to exploit the Asserted Patents in the U.S. by continuing to research, develop, engineer and test new DI Products every

year that are improvements on its older models. Appx14733, Q/A 110; Appx14734-14735, Q/A 115).

The following table summarizes Zircon's global and domestic revenues, including revenues attributable to the sales of DI Products, for FY 2015 through FY 2020:

Cofidential Business and Financial Information [redacted]

Appx14755 *citing* Appx6536, Appx6547, Appx6552-6555; Appx6562; Appx6564; Appx6641-6643; Appx14729, Q/A 90. Approximately % [redacted] of Zircon's revenue between Year [redacted] is attributable to the DI Products. Appx14395, Q/A 20.

Zircon does not maintain separate records to record its PP&E for each of the patents separately. Zircon's annual investments in PP&E that support and facilitate the design and development of the DI Products is summarized in the below chart based on an allocation of its DI Product Revenue (*Id.*):

Cofidential Business and Financial Information

[redacted]

Appx14406, Q/A 84; Appx14758; Appx6536, Appx6547, Appx6552-6555; Appx6562; Appx6564; Appx6641-6643; Appx6858-6862. Zircon's expert, Mr. Bratic, took Zircon's annual investments in PP&E and multiplied it by Zircon's percentage of revenue allocatable to its DI Products practicing the '662, '771 and '185 patents.[12]

In addition, based on Zircon's annual financial statements for FY Year [redacted] through FY Year [redacted], as well as Mr. Bratic's analysis, Zircon's annual labor costs

---

[12] A sales-based allocation is a well-established concept under longstanding Commission precedent and also under managerial accounting and finance principles. (*Id.* citing Appx6593-6640; Appx6582-6588; Appx6579-6581; and Appx6565-6569). Moreover, it is common practice in managerial accounting to allocate costs (or investments) based on the revenues of the DI Products. (*Id.*; *See Certain Mobile Device Holders and Components Thereof*, Inv. No 337-TA-1028, Comm'n Op at 19 (Sept. 12, 2017)("The Commission has generally assessed allocation issues based on Complainants' presentation of measures such as sales, revenues, costs, or employee time estimates.").

incurred in support of the design, development, and sale of the DI Products as apportioned to the DI Product revenue is summarized in the table below:

Cofidential Business and Financial Information

[redacted]

Appx14408, Q/A 92.

Between FY [redacted] and FY [redacted], Zircon employed between [redacted] and [redacted] individuals in its U.S. facilities, of whom approximately [redacted] were engineers (on average). Appx14717, Q/A 13; Appx6546; Appx6548; Appx6549. These employees are U.S. residents and operate out of Zircon's U.S. headquarters where Zircon "conducts its U.S. based operations in a 14,000 sq. ft. facility dedicated to its American workforce." Appx14410-14411, Q/A 107-110; Appx14728-14730, Q/A 87-94; Appx6546; Appx6548; Appx14717, Q/A 13; Appx6546; Appx6548; Appx6549). DI Product labor activities performed at Zircon's U.S. headquarters include engineering, creation of product testing protocols, sensor design and placement, product support, product warranty support, product design, product

function design, selection of components and component suppliers, selection of product labeling and packaging, testing protocols, marketing, product logistics, and financial activities. Appx14733, Q/As 109; Appx14735, Q/A 116; Tr., Appx1351, 15-25; Appx1352, 1-6.

Based on Zircon's annual financial statements from FY [redacted] through FY [redacted], and allocating based on DI Product revenue, the following table, summarized Zircon's U.S. R&D expenditures pertaining to the DI Products from FY [redacted] through FY [redacted]:

Cofidential Business and Financial Information

[redacted]

Appx14403-14404, Q/A 72; Appx14774-14775; Appx15667-15677; Appx6564; Appx6641-6643.

This allocation of R&D to the Domestic Industry Product is based on an allocation of Zircon's total U.S. R&D investment consistent with the proportion of Domestic Industry Product revenues to total U.S. revenues. Appx14402-14403, Q/A 61-70. Zircon's investments in PP&E, L&C and R&D were each significant and substantial by their own measure and supported by substantial evidence. The Commission erred as a matter of law by refusing to consider each of these investments in the context of Zircon's domestic stud finder industry.

**2. The Commission's Refusal to Consider Zircon's Investments Because It Improperly "Aggregated" Its Investments for All Three Patents Constitutes Reversible Error**

The Commission's primary reason for refusing to consider Zircon's domestic investments in its DI Products is that Zircon improperly aggregated its investments in each of the three section 337 categories as opposed to breaking those investments out patent-by-patent. Recognizing that Zircon may present its expenditures based on an allocation, the Commission stated that:

> "The Commission has acknowledged that a complainant may not track its investments in a manner that is specific to each of the patents that are practiced by its DI products. Thus, the Commission has accepted reasonable allocation methods to estimate the amount of complainant's investments that can be attributed to each asserted patent, as for example, an allocation based on sales. Here, Zircon failed to present such an analysis." CO, Appx62.

On pages Appx59-64, the Commission claims it is unable to ascertain Zircon's investments by patent and cites to Zircon's Venn diagram from page 124 [Appx4742] of Zircon's Commission Reply Brief to support its argument that there

is not a 1:1 overlap between all of Zircon's DI Products and its asserted patents. However, the Commission erred in taking such a narrow interpretation of section 337 because Zircon's aggregate investment in its 53 DI Products as a whole provides a more accurate representation of its domestic industry investments given the overlap between the products and the single industry developed by Zircon in its stud finders.

**First**, a revenue-based allocation on a patent-by-patent basis of Zircon's PP&E, L&C and R&D, expenditures for FY 2018-FY2020 was provided by Mr. Bourque in his Declaration submitted with the ITC Complaint based on revenue allocation of the DI Products which practice each of asserted patents in this Investigation.

Cofidential Business and Financial Information

[redacted]

(*See* Appx1041-1056, Appx1054; Appx15667-15677, Appx15675; and where the chart in Mr. Bourque's Declaration was revised with respect to the total 3-year investment value for the '185 Patent by a supplemental letter to ITC at Appx1057-1058; Appx15687-15688).

This declaration is part of the ITC record because it was filed with the Amended Complaint. Appx1057-1058. The Commission abused its discretion and erred as a matter of law in refusing to consider this and labeling this declaration inadmissible evidence. The ALJ confirmed that "[p]ursuant to Commission Rule 210.38, <u>the pleadings in this investigation are already part of the record and do not need to be separately admitted as hearing exhibits</u>." (See Order No. 41, June 23, 2021, at p. 2)(emphasis added). Thus, the patent-by-patent allocation that the Commission sought was in the Bourque declaration. (*See* Appx1041-1056, Appx1054; also Appx15667-15677, Appx15675; chart revised with respect to the total 3-year investment value for the '185 Patent by a supplemental letter to the ITC at Appx1057-1058 and Appx15687-15688).

However, assuming *arguendo* that this patent-by-patent allocation was considered, as can be seen from the chart above, an investment allocation on a patent-by-patent basis results in double counting Zircon's investments, because there is nearly 100% overlap in the DI Products covered by the '771 and '185 patents. **Thus, Zircon's expert, Mr. Bratic presented Zircon's investments in the DI Products as a whole, which avoids double counting, and gives a more accurate picture of Zircon's domestic industry in the *articles* protected by the asserted patents.**

**Second**, there is nothing in the language of section 337 that prevents Zircon from presenting its expenditures for all the asserted patents in aggregate when all the articles protected by these patents are stud finders – the single industry that Zircon develops from its U.S. facilities. The economic prong of the domestic industry requirement is satisfied when it is determined that sufficient economic activities and investments set forth in subparagraphs (A), (B), or (C) of section 337(a)(3) have taken place or are taking place *with respect to the articles* protected by the asserted patent. *Certain Variable Speed Wind Turbines & Components Thereof Inv*. No. 337-TA-376, Comm'n Op. at 21 (Nov. 1996) ("Wind Turbines"). Satisfaction of any one subparagraph is sufficient to meet the domestic industry requirement. *Wind Turbines, Comm'n* Op. at 15.

The Federal Circuit has held that "expenditures may be considered to support a domestic industry claim so long as those **investments pertain to the complainant's industry with respect to the articles protected by the asserted intellectual property rights**" *Hyosung TNS Inc. v. ITC*, 926 F.3d 1353, 1361 (Fed. Cir. 2019) (citing *Certain Television Sets, Television Receivers, Television Tuners, & Components Thereof*, Inv. No. 337-TA-910, Comm'n. Op. at 68 (Oct. 30, 2015)(emphasis added); *Interdigital Commc'ns, LLC v. ITC*, 707 F.3d 1295, 1297 (Fed. Cir. 2013). *See also Motorola Mobility, LLC v. ITC*, 737 F.3d 1345, 1351 (Fed. Cir. 2013)("The investments or employment must only be 'with respect to the

**articles** protected by the patent.'") (*quoting* 19 U.S.C. §1337(a)(3))(emphasis added.).

Thus, under the plain language of the statute and Federal Circuit precedent domestic industry activities and expenditures need only be tied to the *articles* protected by the asserted patents and need not be further broken down on a patent-by-patent basis. This especially makes sense when all the articles in question are the same product – in this case, stud finders. When one or more patents are asserted that cover different versions of the same product (in this case a stud finder), it is logical to assume that the economic activities and investments must pertain to the *articles* covered by the asserted *patents.* Zircon's domestic industry products, its activities and workforce focus on all of its stud finders, and are not based on different patents. Appx14395, Q/A 20.

**Third**, whereas here, products are protected by multiple asserted patents, the complainant may present its investments on a product-by-product or product grouping basis. *Certain Elec. Imaging Devices*, USITC Inv. No. 337-TA-850, 2013 WL 5956227 at *105 (Sept. 30, 2013) ("allocations can be organized by product groups and [complainant] is not required to prove a domestic industry for each individual product practicing the asserted patents where such products overlap"); *Certain Integrated Circuit Chips*, Inv. No. 337-TA-859, Comm'n Op., 41-42 (Aug. 22, 2014) (requiring a patent-by-patent allocation "is an unduly narrow

interpretation of 'exploitation'" because "most firms have little reason to keep research and development records on a patent-by-patent basis, as opposed to a project-by-project basis"); *Certain Ground Fault Circuit Interrupters*, Inv. No. 337-TA-739, Comm'n Op. at 79 (June 8, 2012) (analysis on a "product-by-product" basis"). When one product is protected by multiple patents, the "analysis should proceed on the basis that there is a single industry which exploits the patents." *Id*. at 78-79 (quoting *Certain Dynamic RAMS*, Inv. No. 337-TA-242, Comm'n Op. at 64 (Sep. 21, 1987) ("[T]he exploitation of all five valid patents remaining in controversy results in the production of a single commercial product, DRAMs. . . . our analysis should proceed on the basis that there is a single industry which exploits the patents in the production of DRAMs.")); *Certain Laser Bar Code Scanners*, Inv. No. 337-TA-551, Order 25 at 10-11 (Jul. 17, 2006) ("[T]he central inquiry is whether [complainant] can establish domestic industry for at least one product practiced under each of the asserted patents, irrespective of any grouping or format presented in its Motion.").

The Commission states that only 14 DI Products out of 53 DI practice all three patents-in-suit and therefore Zircon cannot present its investments in aggregate because there is not substantial overlap. Appx64-65. The Commission's logic is flawed. Zircon presented a Venn diagram to show that there is a substantial overlap in the DI Products covered by the patents. (Zircon Comm. Reply Brief at 124). As

can be seen from the Venn diagram a majority of the DI Products practice either two or three of the asserted patents (35 DI Products Practicing Multiple Patents/ 53 Total DI Products).[13] While there are 16 DI Products that practice only the ’662 Patent’s auto-recalibration technology, there was no revenue attributable to 8 of those DI products, representing the K and M series DI products that were launched around the time of the Complaint and had not yet generated revenue information before the discovery cut-off date.[14] As a result, investment in those 8 products was not included in Mr. Bratic’s analysis and was not a part of the revenue allocation. Thus, excluding those 8 zero-revenue products, 35 of the [redacted] revenue-generating DI products [redacted]) practice multiple patents, and 14 of the [redacted] revenue-generating DI products [redacted]) practice all three asserted patents.

The Commission cites to two cases to support its position that a patent-by-patent breakdown of expenditures is absolutely required. CO, Appx62, citing *Certain Electronic Imaging Devices*, Inv. No. 337-TA-850 (“Electronic Imaging Devices”) and Certain Audio Digital-to-Analog Converters and Prods. Containing

---

[13] The ratio of (35 DI Products /53 DI Products), reflects the sum the sum of groups B and E, divided by a total of 53 DI products.

[14] The 16 DI Products that practice the ’662 patent only are: StudSensor™ 70; StudSensor™ i60 OneStep®; StudSensor™ i65 OneStep®; MultiScanner® i320 OneStep®; MultiScanner® i520 OneStep®; MultiScanner® 740 MultiScanner® i700 OneStep®; MultiScanner® HD950C OneStep®; **SuperScan™ K1**; **SuperScan™ K2**; **SuperScan™ K3**; **SuperScan™ K4**; **SuperScan™ M1**; **SuperScan™ M2**; **SuperScan™ M3**; and **SuperScan™ M4**. The DI Products bolded above generated no income.

Same, Inv. No. 337-TA-499 ("Audio Digital-to-Analog Converters"), Final Initial Determination at 113 (Jan. 13, 2005). However, in both of these cases there was *absolutely no overlap* between the asserted patents and the practicing domestic industry products. In this case, all of Zircon's domestic industry products are stud finders and there is overlap between all three asserted patents and the DI Products in question. *See Certain Digital Cameras, Software, and Components* Thereof, Inv. No. 337-TA-1059, Init. Det. at 97 (Sep. 13, 2018)(holding that "there is no requirement for a patent-by-patent expenditure allocation" even where "certain patents were eliminated from th[e] investigation and [complainant] did not adjust its expenditures.")(*citing Male Prophylactic Devices*, Comm'n Op. at 39).

### 3. The Commission's Failure to Find a Domestic Industry For the '662 Patent Based on Zircon's Investments in the Simon Chip Constitutes Reversible Error

The Commission also recognizes that Zircon could separately establish a domestic industry based on its R&D and engineering activities if the Simon chip included the functionality of the '662 patent. CO, Appx65. Also, Zircon continued to make extensive investment in the Simon chip, which incorporates the inventions of the '662 patent. The work on the Simon chip began in 2010. Appx14734-14736, Q/A 115-117; Appx14397-14400, Q/A 33-48. The Simon chip was the largest single R&D project undertaken by Zircon in the last decade. Appx14734-14735, Q/A 115; Appx14397-14400, Q/A 33-48.

But, the Commission, like the ID, improperly refused to consider Zircon's substantial R&D investments in the Simon chip simply because the ID, without explanation, deemed it "unreliable". Zircon's COO, Mr. Bourque who is in charge of Zircon's financial accounting, explained that Zircon's investments in the Simon chip constituted approximately [redacted]% of its R&D investments for the six (6) fiscal years for which it presented its R&D investments. *See* ID, Appx3884, citing Appx14734-14735, Q/A 115. The ID cites no evidence to the contrary, and in fact confirms that no such contradictory evidence exists. *See* ID, Appx3884, ("The **only** evidence regarding the amount of Zircon's investments in the Simon chip is Mr. Bourque's representation….")(Emphasis added.). Therefore, the ID failed to follow longstanding Commission evidentiary precedent that a complainant's estimate of investments is deemed reliable even when uncorroborated, absent "specific persuasive evidence" to the contrary. S*ee Certain Solid State Storage Drives, Stacked Electronics Components, and Products Containing Same* ("Solid State Storage Drives"), Inv. No. 337-TA-1097, Comm'n Op. at 21(June 20, 2018) (finding that the complainant's estimate of domestic industry investments was reliable absent "specific persuasive evidence" to the contrary). *See also Certain LED Lighting Devices, LED Power Supplies, and Components Thereof*, ("LED Lighting Devices") Inv. No. 337-TA-1081, Init. Det. at 140 (December 19, 2018)(same). Indeed, it has been held that:

> [t]he Commission commonly accepts good faith estimates of investments of this nature that are unsupported by actual records. '[T]here is no Commission requirement that sworn witness testimony directed to the domestic industry requirement cannot be credited without further corroboration by underlying documentation.' *Solid State Storage Drives*, Comm'n Op. at 22 (*citing Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers*, Inv. No. 337-TA-701, Order No. 58, 2010 WL 5621540, at *3 (Nov. 18, 2010)).

*LED Lighting Devices*, Init. Det. at 157.

Mr. Bourque's testimony and the activities concerning the Simon chip development were also corroborated by significant technical documentation cited by Zircon's technical expert, Mr. Douglas Chrissan. See Appx10055-10077; and Appx10091-10257. This additional evidence was not addressed in the ID or in the Commission's Opinion in deeming Mr. Bratic's and Mr. Bourque's testimony unreliable. The Commission erred in failing to credit Zircon's investments in its Simon chip for the '662 patent.

## II. CONCLUSION

For the reasons set forth above, this Court should:

1. Reverse the Commission's finding that claims 1, 6, 9, 12, 13, 15, 16 and 17 of the '662 patent are invalid under 35 U.S.C. §103 as obvious.

2. Reverse the Commission's finding that claims 1, 5, 9 and 10 of the '771 patent are invalid under 35 U.S.C. §102 as anticipated.

3. Reverse the Commission's findings (a) that claims 1 and 2 of the '185 patent are invalid under 35 U.S.C. §102 as anticipated; and (b) that claims 5, 6, 7, 8, 9, 10, 11, 13, 14 and 15 of the '185 patent invalid under 35 U.S.C. §103 as obvious.

4. Reverse the Commission's finding that claims 13, 14, 15 and 22 of the '771 patent are not infringed.

5. Reverse the Commission's finding that claims 17, 20 and 21 of the '185 patent are not infringed.

6. Reverse the Commission's finding that Zircon failed to satisfy the economic prong of the domestic industry requirement.

Accordingly, this Court should reverse the Commission's finding of no violation under section 337 and remand this case to the ITC to implement an exclusion order.

Dated: September 14, 2022

Respectfully submitted,

/s/ Omair M. Farooqui

Omair M. Farooqui
PALO ALTO LEGAL GROUP, P.C.
1023 Corporation Way, 2nd Floor
Palo Alto, California 94303
T: 408-579-1281
F: 408-886-9468
E: omair@paloaltolegalgroup.com

# ADDENDUM

# TABLE OF CONTENTS

**Appendix Page**

Protective Order
filed September 30, 2020 .......... Appx1

Commission Opinion
filed February 15, 2022 .......... Appx12

United States Pat. No. 6,989,662
dated June 24, 2006 .......... Appx105

United States Pat. No. 7,148,703
dated December 12, 2006 .......... Appx118

United States Pat. No. 8,604,771
dated December 10, 2013 .......... Appx135

United States Pat. No. 9,475,185
dated October 25, 2016 .......... Appx149

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN ELECTRONIC STUD FINDERS, METAL DETECTORS AND ELECTRICAL SCANNERS** | **Inv. No. 337-TA-1221** |

**ORDER NO. 1: PROTECTIVE ORDER**

(September 30, 2020)

WHEREAS, documents and information may be sought, produced or exhibited by and among the parties to the above captioned proceeding, which materials relate to trade secrets or other confidential research, development or commercial information, as such terms are used in the Commission's Rules, 19 C.F.R. § 210.5;

IT IS HEREBY ORDERED THAT:

1. Confidential business information is information which concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, or other information of commercial value, the disclosure of which is likely to have the effect of either (i) impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions; or (ii) causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such

information. The term "confidential business information" includes "proprietary information" within the meaning of section 777(b) of the Tariff Act of 1930 (19 U.S.C. § 1677f(b)).

2(a). Any information submitted, in pre-hearing discovery or in a pleading, motion, or response to a motion either voluntarily or pursuant to order, in this investigation, which is asserted by a supplier to contain or constitute confidential business information shall be so designated by such supplier in writing, or orally at a deposition, conference or hearing, and shall be segregated from other information being submitted. Documents shall be clearly and prominently marked on their face with the legend: "CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER" or a comparable notice. Such information, whether submitted in writing or in oral testimony, shall be treated in accordance with the terms of this protective order.

(b). The Administrative Law Judge or the Commission may determine that information alleged to be confidential is not confidential, or that its disclosure is necessary for the proper disposition of the proceeding, before, during or after the close of a hearing herein. If such a determination is made by the Administrative Law Judge or the Commission, opportunity shall be provided to the supplier of such information to argue its confidentiality prior to the time of such ruling.

3. In the absence of written permission from the supplier or an order by the Commission or the Administrative Law Judge, any confidential documents or business information submitted in accordance with the provisions of paragraph 2 above shall not be disclosed to any person other than: (i) outside counsel for parties to this investigation, including necessary secretarial and support personnel assisting such counsel; (ii) qualified persons taking testimony involving such documents or information and necessary stenographic and clerical

personnel thereof; (iii) technical experts and their staff who are employed for the purposes of this litigation (unless they are otherwise employed by, consultants to, or otherwise affiliated with a non-governmental party, or are employees of any domestic or foreign manufacturer, wholesaler, retailer, or distributor of the products, devices or component parts that are the subject of this investigation); (iv) the Commission, the Administrative Law Judge, the Commission staff, and personnel of any governmental agency as authorized by the Commission; (v) the Commission, its employees, and contract personnel who are acting in the capacity of Commission employees, for developing or maintaining the records of this investigation or related proceedings for which this information is submitted, or in internal audits and investigations relating to the programs and operations of the Commission pursuant to 5 U.S.C. Appendix 3; and (vi) by U.S. government employees and contract personnel, solely for cybersecurity purposes.[1]

4. Confidential business information submitted in accordance with the provisions of paragraph 2 above shall not be made available to any person designated in paragraph 3(i)[2] and (iii) unless he or she shall have first read this order and shall have agreed, by letter filed with the Secretary of this Commission: (i) to be bound by the terms thereof; (ii) not to reveal such confidential business information to anyone other than another person designated in paragraph 3; (iii) to utilize such confidential business information solely for purposes of this investigation; and (iv) including the following acknowledgment:

> I, the undersigned, acknowledge that information submitted in response to this request for information and throughout this investigation or other proceeding may be disclosed to and used:
>
> (i) by the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this or a related proceeding, or (b) in internal investigations, audits, reviews, and evaluations relating to the programs,

---

[1] *See* Commission Administrative Order 16-01 (Nov. 7, 2015).

[2] Necessary secretarial and support personnel assisting counsel need not sign onto the protective order themselves because they are covered by counsel's signing onto the protective order.

personnel, and operations of the Commission including under 5 U.S.C. Appendix 3; or

(ii) by U.S. government employees and contract personnel, solely for cybersecurity purposes. I understand that all contract personnel will sign appropriate nondisclosure agreements.

5. If the Commission or the Administrative Law Judge orders, or if the supplier and all parties to the investigation agree, that access to, or dissemination of information submitted as confidential business information shall be made to persons not included in paragraph 3 above, such matter shall only be accessible to, or disseminated to, such persons based upon the conditions pertaining to, and obligations arising from this order, and such persons shall be considered subject to it, unless the Commission or the Administrative Law Judge finds that the information is not confidential business information as defined in paragraph 1 hereof.

6(a). Any confidential business information submitted to the Commission or the Administrative Law Judge in connection with a motion or other proceeding within the purview of this investigation shall be submitted under seal pursuant to paragraph 2 above. Any portion of a transcript in connection with this investigation containing any confidential business information submitted pursuant to paragraph 2 above shall be bound separately and filed under seal. When any confidential business information submitted in accordance with paragraph 2 above is included in an authorized transcript of a deposition or exhibits thereto, arrangements shall be made with the court reporter taking the deposition to bind such confidential portions and separately label them "CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER." Before a court reporter or translator receives any such information, he or she shall have first read this order and shall have agreed in writing to be bound by the terms thereof. Alternatively, he or she shall sign the agreement included as Attachment A hereto.

Copies of each such signed agreement shall be provided to the supplier of such confidential business information and the Secretary of the Commission.

(b) Suppliers of confidential business information are strongly encouraged to encrypt nonpublic documents that are electronically transmitted to the Commission to protect your sensitive information from unauthorized disclosure. The USITC secure drop-box system and the Electronic Document Information System (EDIS) use Federal Information Processing Standards (FIPS) 140-2 cryptographic algorithms to encrypt data in transit. Submitting your nonpublic documents by a means that does not use these encryption algorithms (such as by email) may subject your firm's nonpublic information to unauthorized disclosure during transmission. If you choose a non-encrypted method of electronic transmission, the Commission warns you that the risk of such possible unauthorized disclosure is assumed by you and not by the Commission.

7. The restrictions upon, and obligations accruing to, persons who become subject to this order shall not apply to any information submitted in accordance with paragraph 2 above to which the person asserting the confidential status thereof agrees in writing, or the Commission or the Administrative Law Judge rules, after an opportunity for hearing, was publicly known at the time it was supplied to the receiving party or has since become publicly known through no fault of the receiving party.

8. The Commission, the Administrative Law Judge, and the Commission investigative attorney acknowledge that any document or information submitted as confidential business information pursuant to paragraph 2 above is to be treated as such within the meaning of 5 U.S.C. § 552(b)(4) and 18 U.S.C. § 1905, subject to a contrary ruling, after hearing, by the Commission or its Freedom of Information Act Officer, or the Administrative Law Judge. When such information is made part of a pleading or is offered into the evidentiary record, the data set

forth in 19 C.F.R. § 201.6 must be provided except during the time that the proceeding is pending before the Administrative Law Judge. During that time, the party offering the confidential business information must, upon request, provide a statement as to the claimed basis for its confidentiality.

9. Unless a designation of confidentiality has been withdrawn, or a determination has been made by the Commission or the Administrative Law Judge that information designated as confidential, is no longer confidential, the Commission, the Administrative Law Judge, and the Commission investigative attorney shall take all necessary and proper steps to preserve the confidentiality of, and to protect each supplier's rights with respect to, any confidential business information designated by the supplier in accordance with paragraph 2 above, including, without limitation: (a) notifying the supplier promptly of (i) any inquiry or request by anyone for the substance of or access to such confidential business information, other than those authorized pursuant to this order, under the Freedom of Information Act, as amended (5 U.S.C. § 552) and (ii) any proposal to redesignate or make public any such confidential business information; and (b) providing the supplier at least seven days after receipt of such inquiry or request within which to take action before the Commission, its Freedom of Information Act Officer, or the Administrative Law Judge, or otherwise to preserve the confidentiality of and to protect its rights in, and to, such confidential business information.

10. If while an investigation is before the Administrative Law Judge, a party to this order who is to be a recipient of any business information designated as confidential and submitted in accordance with paragraph 2 disagrees with respect to such a designation, in full or in part, it shall notify the supplier in writing, and they will thereupon confer as to the status of the subject information proffered within the context of this order. If prior to, or at the time of such a

conference, the supplier withdraws its designation of such information as being subject to this order, but nonetheless submits such information for purposes of the investigation, such supplier shall express the withdrawal, in writing, and serve such withdrawal upon all parties and the Administrative Law Judge. If the recipient and supplier are unable to concur upon the status of the subject information submitted as confidential business information within ten days from the date of notification of such disagreement, any party to this order may raise the issue of the designation of such a status to the Administrative Law Judge who will rule upon the matter. The Administrative Law Judge may *sua sponte* question the designation of the confidential status of any information and, after opportunity for hearing, may remove the confidentiality designation.

11. No less than 10 days (or any other period of time designated by the Administrative Law Judge) prior to the initial disclosure to a proposed expert of any confidential information submitted in accordance with paragraph 2, the party proposing to use such expert shall submit in writing the name of such proposed expert and his or her educational and detailed employment history to the supplier. If the supplier objects to the disclosure of such confidential business information to such proposed expert as inconsistent with the language or intent of this order or on other grounds, it shall notify the recipient in writing of its objection and the grounds therefore prior to the initial disclosure. If the dispute is not resolved on an informal basis within ten days of receipt of such notice of objections, the supplier shall submit immediately each objection to the Administrative Law Judge for a ruling by filing a motion for a protective order pursuant to Commission Rule 210.34. If the investigation is before the Commission the matter shall be submitted to the Commission for resolution. The submission of such confidential business information to such proposed expert shall be withheld pending the ruling of the Commission or the Administrative Law Judge. The terms of this paragraph shall be inapplicable

to experts within the Commission or to experts from other governmental agencies who are consulted with or used by the Commission.

12. If confidential business information submitted in accordance with paragraph 2 is disclosed to any person other than in the manner authorized by this protective order, the party responsible for the disclosure must immediately bring all pertinent facts relating to such disclosure to the attention of the supplier and the Administrative Law Judge and, without prejudice to other rights and remedies of the supplier, make every effort to prevent further disclosure by it or by the person who was the recipient of such information.

13. Nothing in this order shall abridge the right of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Commission, its Freedom of Information Act Officer, or the Administrative Law Judge concerning the issue of the status of confidential business information.

14. Upon final termination of this investigation, each recipient of confidential business information that is subject to this order shall assemble and return to the supplier all items containing such information submitted in accordance with paragraph 2 above, including all copies of such matter which may have been made. Alternatively, the parties subject to this order may, with the written consent of the supplier, destroy all items containing confidential business information and certify to the supplier (or his counsel) that such destruction has taken place. This paragraph shall not apply to the Commission, including its investigative attorney, and the Administrative Law Judge, which shall retain such material pursuant to statutory requirements and for other recordkeeping purposes, but may destroy such material (including electronic media containing such information) in its possession which it regards as surplusage.

Notwithstanding the above paragraph, confidential business information may be transmitted to a district court pursuant to Commission Rule 210.5(c).

15. If any confidential business information which is supplied in accordance with paragraph 2 above is supplied by a nonparty to this investigation, such a nonparty shall be considered a "supplier" as that term is used in the context of this order.

16. Each nonparty supplier shall be provided a copy of this order by the party seeking information from said supplier.

17. The Secretary shall serve a copy of this order upon all represented parties by electronic service, and Complainants shall complete service on unrepresented parties, pursuant to Ground Rule 1.5.

**SO ORDERED.**

Dee Lord

Dee Lord
Administrative Law Judge

Attachment A

NONDISCLOSURE AGREEMENT FOR REPORTER/STENOGRAPHER/TRANSLATOR

I, __________________ , do solemnly swear or affirm that I will not divulge any information communicated to me in any confidential portion of the investigation or hearing in the matter of *Certain Electronic Stud Finders, Metal Detectors and Electrical Scanners*, Investigation No. 337-TA-1221, except as permitted in the protective order issued in this case. I will not directly or indirectly use, or allow the use of such information for any purpose other than that directly associated with my official duties in this case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any person reveal the nature or content of any information communicated during any confidential portion of the investigation or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the participants in said investigation.

I am aware that the unauthorized use or conveyance of information as specified above is a violation of the Federal Criminal Code and punishable by a fine of up to $10,000, imprisonment of up to ten (10) years, or both.

Signed

Dated

Firm or affiliation

**CERTAIN ELECTRONIC STUD FINDERS, METAL DETECTORS, AND ELECTRICAL SCANNERS** **Inv. No. 337-TA-1221**

## PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **ORDER** has been served upon the following parties as indicated, on **September 30, 2020.**

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

**On Behalf of Complainant Zircon Corporation:**

| | |
|---|---|
| Omair M. Farooqui, Esq.<br>Palo Alto Legal Group, P.C.<br>1023 Corporation Way, 2nd Floor<br>Palo Alto, CA 94303<br>Email: omair@paloaltolegalgroup.com | ☐ Via Hand Delivery<br>☐ Via Express Delivery<br>☐ Via First Class Mail<br>☒ Other: Email Notification of Availability for Download |

**Respondents:**

| | |
|---|---|
| Stanley Black & Decker, Inc.<br>1000 Stanley Drive<br>New Britain, CT 06053 | ☐ Via Hand Delivery<br>☐ Via Express Delivery<br>☐ Via First Class Mail<br>☒ Other: Service to Be Completed by Complainant |
| Black & Decker (U.S.), Inc.<br>701 East Joppa Road<br>Towson, MD 21286 | ☐ Via Hand Delivery<br>☐ Via Express Delivery<br>☐ Via First Class Mail<br>☒ Other: Service to Be Completed by Complainant |

**PUBLIC VERSION**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN ELECTRONIC STUD FINDERS, METAL DETECTORS AND ELECTRICAL SCANNERS** | **Investigation No. 337-TA-1221** |

## COMMISSION OPINION

### CONTENTS

I. Introduction ... 2
II. Background ... 2
  A. Procedural History ... 2
  B. The Technology & Asserted Patents ... 4
  C. The Products at Issue ... 7
III. Commission Review of the Final ID ... 9
IV. Analysis ... 10
  A. The ’662 Patent ... 10
    1. Infringement ... 12
    2. Domestic Industry – Technical Prong ... 18
    3. Invalidity ... 19
  B. The ’771 Patent ... 28
    1. Infringement ... 30
    2. Invalidity ... 36
  C. The ’185 Patent ... 38
    1. Infringement ... 40
    2. Invalidity ... 42
  D. Domestic Industry ... 44
V. Conclusion ... 55

## I. INTRODUCTION

On December 6, 2021, the Commission determined to review in part the final initial determination ("ID") of the presiding Administrative Law Judge ("ALJ"), which issued on October 7, 2021. 86 Fed. Reg. 70529 (Dec. 10, 2021). On review, the Commission has determined to affirm in part, modify in part, reverse in part, and take no position on certain issues in the ID that are under review. Consistent with those determinations, the Commission affirms the ALJ's determination that there has not been a violation of section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, as amended. This opinion sets forth the Commission's reasoning in support of its determination. The Commission adopts the findings in the ID that are not inconsistent with this opinion.

## II. BACKGROUND

### A. Procedural History

The Commission instituted this investigation on October 5, 2020, based on a complaint filed by Zircon Corporation of Campbell, California ("Zircon"). 85 Fed. Reg. 62758-62759 (Oct. 5, 2020). The complaint alleged violations of section 337 based on the importation into the United States, the sale for importation, and the sale within the United States after importation of certain electronic stud finders, metal detectors, and electrical scanners by reason of infringement of certain claims of U.S. Patent No. 6,989,662 ("the '662 patent") (JX-1); U.S. Patent 7,148,703 ("the '703 patent") (JX-2); U.S. Patent No. 8,604,771 ("the '771 patent") (JX-3); and U.S. Patent No. 9,475,185 ("the '185 patent") (JX-4).[1] *Id.* The Commission's notice of investigation named two

[1] The '703 patent was previously terminated from the investigation and is not relevant to any issue on review. *See* Order No. 27, *unreviewed by* Comm'n Notice (July 15, 2021).

respondents: Stanley Black and Decker, Inc. of New Britain, Connecticut; and Black & Decker (U.S.), Inc. of Towson, Maryland (collectively, "Respondents").[2] *Id.*

The ALJ issued the final ID in this investigation on October 7, 2021, finding no violation of section 337 with respect to the asserted patents or accused stud finder products. ID at *ii*, 160–61. The ID's finding of no violation was based on several subsidiary findings, including that the '771 and '185 patents were not infringed and that Zircon had failed to show that it satisfied the economic prong of the domestic industry requirement for any of the asserted patents. ID at 161. On October 19, 2021, the parties submitted petitions for review of the ID.[3] Each filed a response to the other's petition on October 27, 2021.[4]

On December 10, 2021, the Commission published notice in the *Federal Register* of its determination to review parts of the ID. Comm'n Notice, 86 Fed. Reg. 70529 (Dec. 10, 2021) ("Notice of Review"). The Commission determined to review the ID with respect to (1) the ID's infringement findings for the '662 patent; (2) the ID's findings on the technical prong of the domestic industry requirement for the '662 patent; (3) the ID's obviousness findings for the '662 patent; (4) the ID's infringement findings for the '771 patent; (5) the ID's anticipation and obviousness findings for the '771 patent; (6) the ID's claim construction and infringement findings for the '185 patent; (7) the ID's anticipation and obviousness findings for the '185 patent; and (8)

---

[2] The Office of Unfair Import Investigations did not participate in this investigation. *See id.*

[3] Complainant Zircon Corporation's Petition for Review of the Initial Determination (Oct. 19, 2021) (EDIS Doc. ID 754542) ("Comp. Pet."); Respondents' Petition for Review of the Final Initial Determination on Violation (Oct. 19, 2021) (EDIS Doc. ID 754544) ("Resp. Pet.").

[4] Complainant Zircon Corporation's Response to Respondents' Petition for Review of the Final Initial Determination (Oct. 27, 2021) (EDIS Doc. ID 755252) ("Comp. Pet. Resp."); Respondents' Response to Complainant Zircon's Petition for Review of the Final Initial Determination on Violation (Oct. 27, 2021) (EDIS Doc. ID 755251) ("Resp. Pet. Resp.").

the ID's findings on the economic prong of the domestic industry requirement. The Commission invited the parties to submit briefing on the issues under review as well as on remedy, the public interest, and bonding.

On December 23, 2021, the parties submitted briefs responding to the questions posed in the Commission's Notice of Review and addressing remedy, the public interest, and bond.[5] Thereafter, on January 7, 2022, each submitted a reply to the other's brief on review.[6]

### B. The Technology & Asserted Patents

This investigation concerns electronic stud finders.[7] Specifically, the asserted patents claim electronic stud finders with two alleged improvements over the prior art: automatic calibration and grips to enable pivoting the device. The '662 patent, which is titled "Sensor Auto-Recalibration," is directed to "[a] sensor and method that detects a mis-calibration and automatically recalibrates itself without intervention." JX-1 at Cover, Abstract. In order to accurately detect a stud beneath a wall covering, an electronic stud finder must first calibrate its sensors. *See* '662 patent at 1:50–54. Calibration is performed by placing the stud finder against the wall surface and taking a measurement to serve as a baseline against which future

---

[5] Complainant Zircon Corporation's Initial Commission Brief for Review of the Final Initial Determination (Dec. 23, 2021) (EDIS Doc. ID 759264) ("Comp. Br. on Rev."); Respondents' Response to the Notice of Commission Determination to Review in Part a Final Initial Determination Finding No Violation of Section 337 (Dec. 23, 2021) (EDIS Doc. ID 759273) ("Resp. Br. on Rev.").

[6] Complainant Zircon Corporation's Reply Commission Brief for Review of the Final Initial Determination (Jan. 7, 2022) (EDIS Doc. ID 760043) ("Comp. Reply on Rev."); Respondents Reply to Complainant's Opening Submission Regarding the Commission Notice of Review (Jan. 10, 2022) (EDIS760055) ("Resp. Reply on Rev.").

[7] A stud finder is a handheld device for locating wooden framing studs encased behind the finishing surface of a wall. *See* Complaint at ¶¶ 32–38. The mechanism by which a stud is detected varies and can include a magnetic mechanism or an electronic one, among others. *Id.* Only electric stud finders are at issue in this investigation.

measurements can be compared. *See id.* By calibrating its sensors to a baseline value that corresponds to a portion of wall without a stud, the stud finder can then identify portions of the wall that do contain studs based on sensed values that differ from the baseline. *See id.* at 1:29–54. However, if the user inadvertently calibrated the stud finder over a stud, the stud finder would set an erroneous baseline. *See id.* 1:54–59. Prior art stud sensors were capable of detecting such erroneous calibration values and alerting the user of the error so that the calibration process could be done again. *See id.* 1:60–65. Broadly speaking, the invention of the ’662 patent provides for a stud finder that recalibrates itself automatically upon sensing a calibration error, without user intervention. *See id.* at Abstract. Figure 2 of the ’662 patent is a diagrammatic representation of that automatic recalibration process:




FIGURE 2

**PUBLIC VERSION**

JX-1 at Fig. 2; *see also id.* at 2:48–49 ("FIG. 2 shows a flow chart of an auto-recalibration process, in accordance with the present invention.").

The second improvement is ergonomic and is claimed in the '771 and '185 patents, both titled "Hand Tool Having a Pivot Grip for Sensing [A] Measurement[s] Behind a Target Surface." JX-3 at Cover; JX-4 at Cover. Those patents claim concave or depressed finger grips on opposite sides of the stud finder. *See, e.g.*, JX-3 at Abstract ("An implementation of a system and method for a hand tool having a pivot grip is provided."). The finger grips are positioned such that a user can hold them and move the stud finder as the user's hand rotates about an axis extending between the finger grips. *See id.* ("The pivot grip provides an axis of rotation perpendicular and centered with a pair of concave finger holds positioned at the grip."). Figures 4, 6A, and 6B, which appear in both the '771 and '185 patents, illustrate a stud finder with the claimed finger grips:




FIG. 4 FIG. 6A FIG. 6B

JX-3 at Figs. 4, 6A, 6B; *see also id.* at 2:17–21 (describing Figures 4, 6A, and 6B). The '771 and '185 patents distinguish their claimed grips from those known in the prior art, which they illustrate in Figure 1:

**PUBLIC VERSION**




FIG. 1

’771 Patent at Fig. 1; *see also id.* at 3:8–23 (“FIG. 1 shows top down views of various hand held tools, such as a stud sensor or other sensing tool …. None of these sensing tools, however, provide a pivoting grip and each have encumbrances when an operator changes a relative positioning between the hand tool sensing tool and the operator’s arm.”). The ’771 and ’185 patents share a common specification. *See* Order No. 20 at 32.

### C. The Products at Issue

The products at issue in this investigation—those accused of infringement and those relied on to demonstrate the existence of a domestic industry—are electronic stud finders. Certain stud finders bearing the DeWalt or Craftsman brand names are accused of infringing the ’662 patent:



ID at 3.[8] Certain stud finders bearing the Stanley brand name are accused of infringing the ’771 and ’185 patents:



Stanley Stud Sensor 100 | Stanley Stud Sensor 150 | Stanley Stud Sensor 200 | Stanley Stud Sensor 300

*Id.* [9] Zircon relies on various of its own stud finders to satisfy the domestic industry requirement for the ’662 patent[10] as well as the ’771 and ’185 patents.[11] *Id.* at 3–4.

[8] The DeWalt DW0100, DeWalt DW0150, Craftsman CMHT77620, Craftsman CMHT77621, and Craftsman CMHT77623 (collectively, “accused Craftsman/DeWalt products”) are the specific models accused of infringing the ’662 patent.

[9] The Stanley S100, S150, S200, and S300 products (“accused Stanley products”) are the specific models accused of infringing the ’771 and ’185 patents.

[10] For the ’662 patent, Zircon relies on the StudSensor™ HD70 OneStep®; MultiScanner® HD800 OneStep®; MultiScanner® HD900 OneStep®; MultiScanner® HD900c OneStep®; StudSensor™ L70 OneStep®; MultiScanner® L350 OneStep®; MultiScanner® L550 OneStep®; StudSensor™ 70; StudSensor™ i60 OneStep®; StudSensor™ i65 OneStep®; MultiScanner® i320 OneStep®; MultiScanner® i520 OneStep®; StudSensor™ A150; MultiScanner® A200; MultiScanner® A250; MultiScanner® A250c; MultiScanner® 740; MultiScanner® i700 OneStep®; StudSensor™ HD75 OneStep®; MultiScanner® HD850 OneStep®; MultiScanner® HD950 OneStep®; MultiScanner® HD950C OneStep®; SuperScan™ K1; SuperScan™ K2; SuperScan™ K3; SuperScan™ K4; SuperScan™ M1; SuperScan™ M2; SuperScan™ M3; and SuperScan™ M4. ID at 3–4.

[11] For the ’771 and ’185 patents, Zircon relies on the StudSensor™ HD25; StudSensor™ HD35; StudSensor™ HD55; StudSensor™ HD70 OneStep®; MultiScanner® HD800 OneStep®; MultiScanner® HD900 OneStep®; MultiScanner® HD900c OneStep®; StudSensor™ L20; StudSensor™ L40; StudSensor™ L50; StudSensor™ L70 OneStep®; MultiScanner® L350 OneStep®; MultiScanner® L550 OneStep®; StudSensor™ EDGE; StudSensor™ e30; StudSensor™ e40; StudSensor™ e50; StudSensor™ A100; StudSensor™ A150; MultiScanner® A200; MultiScanner® A250; MultiScanner® A250c; StudSensor™ Pro25; StudSensor™ Pro35; StudSensor™ Pro45; StudSensor™ Pro55; StudSensor™ WM5; MultiScanner® x85; MetalliScanner® MT 7; MetalliScanner® MT X; StudSensor™ HD75 OneStep®; MultiScanner®

## III. Commission Review of the Final ID

When the Commission decides to review an initial determination, it reviews the determination *de novo*. *Certain Polyethylene Terephthalate Yarn & Prods. Containing Same*, Inv. No. 337-TA-457, Comm'n Op. at 9 (June 18, 2002). Upon review, the "Commission has 'all the powers which it would have in making the initial determination,' except where the issues are limited on notice or by rule." *Certain Flash Memory Circuits & Prods. Containing Same*, Inv. No. 337-TA-382, USITC Pub. No. 3046, Comm'n Op. at 9–10 (July 1997) (quoting *Certain Acid-Washed Denim Garments & Accessories*, Inv. No. 337-TA-324, Comm'n Op. at 5 (Nov. 1992)). Commission practice in this regard is consistent with the Administrative Procedure Act. *Certain EPROM, EEPROM, Flash Memory, & Flash Microcontroller Semiconductor Devices & Prods. Containing Same*, Inv. No. 337-TA-395 (Reconsideration), Comm'n Op. at 6 (Dec. 11, 2000); *see also* 5 U.S.C. § 557(b).

On review, "the Commission may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, the initial determination of the administrative law judge." 19 C.F.R. § 210.45(c). The Commission also "may take no position on specific issues or portions of the initial determination," and "may make any finding or conclusions that in its judgment are proper based on the record in the proceeding." *Id.*; *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984). Here, aspects of the ID's determinations in connection with the '662 patent, the '771 patent, the '185 patent, and the domestic industry requirement of section 337 are on review.

---

HD850 OneStep®; MultiScanner® HD950 OneStep®; and MultiScanner®. ID at 4. For the '771 patent alone, Zircon additionally relies on the XL300 and XL500 products. *Id.*

## IV. ANALYSIS

### A. The ’662 Patent

In this investigation, Zircon asserted claims 1, 6, 9, 12, 13, 15, 16 and 17 of the ’662 patent. Those claims provide (with the disputed limitations in bold):

> 1. A method of recalibrating a stud sensing device for finding a location of a stud positioned behind a surface, the method comprising the acts of:
>
> holding the stud sensing device at a first location on the surface;
>
> placing the stud sensing device in an [sic] calibration mode;
>
> sensing a first density at the first location in the calibration mode;
>
> setting a **calibration value** based on the first sensed density;
>
> placing the stud sensing device in an operating mode;
>
> moving the stud sensing device to a second location on the surface;
>
> sensing a second density at the second location;
>
> setting a second density value based on the second sensed density;
>
> the stud sensing device determining if it was calibrated over or near a stud; and
>
> the stud sensing device recalibrating itself if it determined that the stud sensing device was calibrated over or near the stud.
>
> * * *
>
> 6. The method of claim 1, wherein the act of recalibrating the stud sensing device includes the stud sensing device resetting the **calibration value** based on the second density value.
>
> * * *
>
> 9. The method of claim 1, further comprising the acts of:
>
> moving the stud sensing device to a new location on the surface;
>
> sensing a new density at the new location;
>
> resetting the second density value based on the new sensed density;

the stud sensing device determining if it was recalibrated over or near the stud; and

the stud sensing device recalibrating itself if it determined that the stud sensing device was calibrated over or near the stud.

* * *

12. A stud sensing device capable of automatically recalibrating if it has erroneously been calibrated at a location over or near a stud, the stud sensing device comprising:

a first memory adapted to hold a **calibration value**;

a second memory adapted to hold a sensed value;

a sensor adapted to be applied to a surface, thereby determining a density behind the surface and providing the sensed value, wherein the sensor is operationally coupled to the second memory;

**a comparator adapted to compare the first memory location to the second memory location, thereby determining if the calibration value represents a value sensed over or near the stud, wherein the comparator is operationally coupled to the first and second memories**; and

an updater adapted to update the first memory with an updated calibration value, wherein the updater is operationally coupled to an output of the comparator.

13. The sensor of claim 12, further comprising a controller adapted to coordinate operation of the sensor, the comparator and the updater.

* * *

15. The sensor of claim 12, wherein the stud sensing device updates the calibration value without operator intervention.

16. The method of claim 1, wherein the device recalibrates itself by updating a calibration value without user intervention.

17. A method of recalibrating a stud sensing device for finding a location of a stud positioned behind a surface, the method comprising the acts of:

holding the stud sensing device at a first location on the surface;

placing the stud sensing device in an [*sic*] calibration mode;

> sensing a first density at the first location in the calibration mode;
>
> setting a **calibration value** based on the first sensed density;
>
> placing the stud sensing device in an operating mode;
>
> moving the stud sensing device to a second location on the surface;
>
> sensing a second density at the second location;
>
> setting a second density value based on the second sensed density;
>
> determining whether the stud sensing device was calibrated over or near a stud;
>
> recalibrating the stud sensing device if the stud sensing device was calibrated over or near the stud;
>
> wherein the act of determining whether the stud sensory device was calibrated over or near a stud includes:
>
> **comparing the calibration value to the second density value**; and
>
> determining that the stud sensing device was calibrated over or near the stud if the second density value is more than a threshold amount less than the calibration value.

JX-1 at Cls. 1, 6, 9, 12, 13, 15, 16 and 17.[12] The ID's findings concerning infringement, the technical prong of the domestic industry requirement, and invalidity with respect to the '662 patent are under review.

### 1. *Infringement*

Zircon asserted that the accused Craftsman/Dewalt products infringe the asserted claims of the '662 patent. The accused Craftsman/Dewalt products are electronic stud finders with left and right capacitive plates used for taking measurements on a wall. RX-675C at Q/A 20. The measurements taken by these sensors are stored as [redacted] values in the source code for the

[12] All of the '662 patent claim terms construed in the ID were the subject of agreed-upon constructions jointly proposed by the parties. *See* ID at 20–21.

accused Craftsman/Dewalt products.[13] *Id.* The accused Craftsman/Dewalt products perform a series of calculations [redacted] values as they search for a stud. These values include the variables [redacted] as well as [redacted] values [redacted] *See id.* at Q/A 29–39. [redacted] is a value that is [redacted].[14] *See id.* at Q/A 31. [redacted] and [redacted] are [redacted] values that [redacted] as the stud finder scans a wall and generates new values for [redacted][15] *See id.* at Q/A 30, 39.

Following initialization of the variables [redacted] the stud finders perform a [redacted] process. During that process, [redacted][16] *See id.* at Q/A 33. The variable [redacted] is then set [redacted]. *See id.* In that expression, [redacted] *See id.* at Q/A 36. The value [redacted] is then used in a [redacted] with the value [redacted] to compute a new value for [redacted] *See id.* at Q/A 39. Thus, with the exception of the initial [redacted] value, [redacted] is generally a [redacted]. If the value of [redacted] ever

---

[13] While the accused Craftsman/Dewalt products track left and right [redacted] values [redacted], that distinction is not germane to any of the issues under review in connection with the ’662 patent. Accordingly, this opinion refers to [redacted] values generically without specifying left or right.

[14] The first value for [redacted] is set [redacted] *See* RX-675C at Q/A 29.

[15] [redacted] and [redacted] are initially set at [redacted] and [redacted], respectively. *See* RX-675C at Q/A 29.

[16] [redacted] like the first value of [redacted] is initially set [redacted] *See* RX-675C at Q/A 29.

[redacted] value [redacted] then the stud finder effectively concludes that it was erroneously calibrated and reinitiates this calibration and measurement process from the beginning.[17] *See id.*

### *a) The "Calibration Value" Limitations*

Before the ALJ, the parties disputed whether the accused Craftsman/DeWalt products set a "calibration value" as required by independent claims 1 and 12 of the '662 patent. ID at 24–29. The parties' dispute invokes, in part, their agreement to construe "calibration value" to mean "a reference value resulting from a calibration." ID at 20–21; *see also id.* at 24–25. The ID further refined that construction by explaining that the claimed "calibration value" "must be a reference value for future measurements." ID at 27. Referring to the source code for the accused Craftsman/DeWalt products, Zircon identified two values that it asserted were the claimed "calibration values." ID at 24. The first was [redacted] and the second value was [redacted] *Id.*

The ID found that the value [redacted] in the accused Craftsman/DeWalt products meets the "calibration value" limitation because "the value of [redacted] is used as a reference for the [redacted]." ID at 29. The Commission now affirms that finding, subject to the following supplemental reasoning.

In their petition for review of the ID, Respondents argued that the ID erred by applying an overly broad construction for "calibration value" to find that the [redacted] accused Craftsman/DeWalt products practices that limitation. However, Respondents' argument depends on the application of an overly restrictive interpretation of "calibration value" that departs from

---

[17] The actual comparison performed by the accused Craftsman/DeWalt stud finders is between "[redacted]

the parties' agreed-upon construction for that term. Specifically, Respondents' argument requires that the claimed "calibration value" be used as part of a decision whether to recalibrate. *See* Resp. Pet. at 50–51; *see also* Resp. Br. on Rev. at 5 (Respondents argue that they "have repeatedly and consistently stated that, for a value to be a 'reference value' as required by the parties' agreed claim construction, the value must be used as a reference for future measurements in the recalibration decision, not merely used in a calculation and then immediately overwritten."). That requirement, however, is inconsistent with the intrinsic evidence and the parties' stipulated construction for "calibration value."

The language of the asserted claims of the '662 patent does not require the claimed "calibration value" to be used as part of a comparison to make a recalibration decision. For example, the method of asserted claim 1 recites the step of "setting a calibration value," but the subsequent step of determining whether to recalibrate does not refer back to the previously set "calibration value." '662 patent at Cl. 1. Instead, the method of claim 1 requires only that:

> the stud sensing device determining if it was calibrated over or near a stud; and
>
> the stud sensing device recalibrating itself if it determined that the stud sensing device was calibrated over or near the stud.

*Id.*

Subsequent claims 2 and 3, which depend from independent claim 1, are consistent with the understanding that a "calibration value" need not necessarily be used in a recalibration determination. In those dependent claims, "comparing the calibration value to the second density value" and "determining that the stud sensing device was calibrated over or near the stud [based on that comparison]" are recited as additional steps beyond the method of claim 1. Thus, it follows that the "calibration value" of claim 1 need not necessarily be used in a subsequent comparison with a second density value to determine if recalibration is necessary.

Similarly, the specification's use of the terms "calibration value" and "reference value" (or "reference") does not indicate that those terms are necessarily involved in a recalibration determination. While a "calibration value" may be used as a reference for a recalibration decision, it may also simply be used as a reference value for locating a stud. *Compare* '662 patent at 1:50–54 (calibration value used as reference value representing wall covering in absence of a stud) *with id.* at 4:53–67 (calibration valued used in conjunction with subsequent capacitance measurements to determine if recalibration is necessary). Indeed, the specification describes "calibration values" and "reference values" in prior art stud finders without any automatic recalibration features. *See* '662 patent at 1:52–54. Accordingly, a person of ordinary skill in the art would understand the term "calibration value" (or "reference value") to be broad enough to encompass values that are used in an automatic recalibration decision as well as those that are not utilized to determine whether recalibration is needed, but are reference values for other measurements.

Respondents' narrow construction of "calibration value" is also at odds with the parties' stipulated construction of that term. The parties agreed that "calibration value" should mean "a reference value resulting from a calibration." RX-83 at Ex. A, p.3. That stipulated construction, which is consistent with the intrinsic evidence of the '662 patent, does not constrain the meaning of "calibration value" by excluding reference values that are not part of a recalibration decision. There is no evidence that the parties intended for "calibration value" to take on such a limited meaning. Accordingly, the term "calibration value," as used in the asserted claims of the '662 patent, is not limited to values that are subsequently used to make a recalibration determination in a stud finder.

Having rejected the interpretation of "calibration value" upon which Respondents' noninfringement argument rests, the Commission affirms the ID's determination that [redacted]

is a "calibration value." Respondents do not dispute the ID's factual findings that [redacted] results from a calibration or that [redacted] is a reference for [redacted]. *See* Resp. Pet. at 50. Under the parties' stipulated construction of "calibration value," those findings are sufficient to support the ID's determination that [redacted] is a "calibration value" and that the accused products practice that limitation.[18]

Concerning the second value that Zircon identified as the claimed "calibration value," *i.e.*, the [redacted] value, the ID found that [redacted] "calibration value." ID at 27. As the Commission has already affirmed the ID's finding that the value [redacted] practices the "calibration value" limitation, it need not determine whether the ID correctly found that the [redacted] value is not also a "calibration value" in the accused Craftsman/DeWalt products. As such, the Commission takes no position on that issue.

***a) The "Comparator" and "Comparing" Limitations***

The parties' other major infringement dispute concerning the '662 patent involves the "comparator" and "comparing" limitations, which appear in claims 12 and 17, respectively. The ID resolved those disputes in Respondents' favor and found that Complainant failed to show that the accused products include "a comparator adapted to compare the first memory location to the second memory location, thereby determining if the calibration value represents a value sensed over or near the stud," as required by claim 12, or perform the step of "comparing the calibration value to the second density value," as required by claim 17. '662 patent at Cls. 12 and 17; *see also* ID at 36–37, 40.

---

[18] In its discussion of the "calibration value" limitation, the ID found that the "calibration value" does not require a "direct comparison." *See* ID at 28–29. The Commission has determined to take no position on that finding, and it is unnecessary to support the ID's greater finding that [redacted] is a "calibration value" in the accused Craftsman/DeWalt products.

On review, the Commission has determined to take no position on those issues. As explained *infra*, the Commission has determined that all of the asserted claims of the ’662 patent are invalid as obvious, and thus the Commission need not determine whether the ID correctly found that the accused Craftsman/DeWalt products do not practice the “comparator” and “comparing” limitations.

#### *b) Specific Intent to Induce Infringement*

In connection with its finding that the accused Craftsman/DeWalt products can be used to infringe the methods of asserted claims 1, 9, and 16, the ID found that Zircon established that Respondents induced their customers to infringe those claims. In support of that finding, the ID found that “Respondents have had knowledge of Zircon’s infringement allegations with respect to the ’662 patent since at least the filing of the amended complaint in [a related] District Court action” and that Respondents’ “user manuals show that Respondents intended for their customers to use the Accused Craftsman/DeWalt Products to find studs behind walls.” ID at 43. Respondents petitioned for review of the ID’s finding of induced infringement on the basis that the ID failed to find that Respondents possessed a specific intent to induce their customers to infringe claims 1, 9, and 16 of the ’662 patent.

On review, the Commission has determined to take no position on whether Zircon established that Respondents possessed the necessary intent to support a finding of induced infringement. The Commission’s determination, *infra*, that the asserted claims are invalid obviates the need to reach this issue.

### *2. Domestic Industry – Technical Prong*

Turning to section 337’s domestic industry requirement, the ID found that Zircon’s domestic industry products practice claims 1, 6, 8, 12, 13, 15, 16, and 17 of the ’662 patent. On

review, the Commission has determined to take no position on that finding. The Commission's determination, *infra*, that the asserted claims are invalid obviates the need to reach this issue.

### ***3. Invalidity***

Obviousness was the sole invalidity issue raised by Respondents in connection with the '662 patent. The primary prior art reference Respondents relied on was U.S. Patent No. 6,593,754, entitled "Compact Subsurface Object Locator," naming inventor George R. Steber, *et al.* ("Steber") (RX-171). The ID found that Respondents met their burden to show that the asserted claims of the '662 patent would have been obvious only as to claim 17. *See* ID at 161. Respondents petitioned for review of the ID's findings that the other asserted claims are not obvious, while Complainant petitioned for review of the ID's finding that claim 17 is obvious. The Commission determined to review all of the ID's obviousness findings as to the '662 patent, and, in its Notice of Review, sought briefing on the level of ordinary skill in the art with respect to the '662 patent and whether the claims of the '662 patent were obvious according to the framework discussed in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007). On review, the Commission has determined to reverse the ID's findings that claims 1, 6, 9, 12, 13, 15, and 16 are not obvious in view of the prior art and to affirm the ID's finding that claim 17 is obvious.

Before making a determination on obviousness, the Commission, like any other tribunal, must make findings on the four factors laid out in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966). *See id.* at 17. Those factors are: (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) any differences between the prior art and the claims at issue; and (4) any secondary indicia of obviousness (or nonobviousness). *Graham*, 383 U.S. at 17–18. Against the backdrop of those findings, the Commission can determine whether the asserted claims would have been obvious in view of the prior art to a person of ordinary skill in the art at the time of the invention. *See id.* at 17.

The Commission sought briefing from the parties on the level of ordinary skill in the art for the ’662 patent. In response, the parties explained that while the ID does not explicitly address the level of ordinary skill in the art with respect to the ’662 patent, the parties proposed identical levels of ordinary skill in the art for the ’662 patent as they did for the ’703 patent, which was previously terminated from this investigation and for which the ALJ did make a finding on the level of ordinary skill in the art. During the *Markman* phase of this investigation, the ALJ found that a “person of ordinary skill in the art for the ’703 patent would have had at least a bachelor’s degree in mechanical or electrical engineering (or equivalent degree/experience) plus two years of industry experience working with electronic hardware devices.” Order No. 20 at 9–10. The parties now indicate that they both applied that level of skill in the art to the ’662 patent and the ’703 patent. Accordingly, there is no dispute that the ALJ’s finding on the level of skill in the art for the ’703 patent is equally applicable to the ’662 patent. To the extent the ID did not explicitly make a finding on the level of ordinary skill in the art for the ’662 patent, the Commission does so now and finds that a person of ordinary skill in the art for the ’662 patent would have had at least a bachelor’s degree in mechanical or electrical engineering (or equivalent degree/experience) plus two years of industry experience working with electronic hardware devices. *See* Order No. 20 at 9–10 (finding same level of skill in the art for the ’703 patent).

The effect of that finding is to foreclose a challenge directed at Respondents’ expert by Zircon based on his own industry experience. Specifically, Zircon argued that Dr. Messner lacks experience “working on devices for detecting objects behind walls.” Comp. Br. on Rev. at 38–39. The implication of Zircon’s argument is that Dr. Messner is not qualified to testify about how a person of ordinary skill in the art would interpret the prior art. However, Zircon cannot undermine Dr. Messner’s qualifications by narrowly redefining the level of ordinary skill in the art. Dr.

Messner has a master's degree and a doctorate in mechanical engineering from the University of California at Berkeley, substantially more than two years of experience working with electronic hardware devices, and particularized experience with systems that perform their function or functions automatically. *See* RX-674C at Q/A 3–10. When Dr. Messner's credentials are compared to the level of skill in the art that Zircon agreed to, there is no question that Dr. Messner is qualified to offer an opinion on whether the asserted claims of the '662 patent would have been obvious to a person of ordinary skill in the art at the time of the invention.

Concerning the scope and content of the prior art, the ID found that Steber teaches all but one of the limitations in the asserted claims. *See* ID at 53–57, 64–67. The Commission agrees and adopts that finding. The only limitation that the ID found that Steber does not disclose is the automatic recalibration of a sensor once it has been determined that the initial calibration was erroneous. *See id.* at 58 (acknowledging Respondents' concession that Steber requires user-initiated recalibration). To satisfy that limitation, Respondents relied on three secondary prior art references: German Patent Publication No. DE10159336 ("DE336") (RX-493); U.S. Patent Application Publication No. US 2001/0010460 A1, naming the same inventors as the '662 patent, Lawrence F. Miller and Charles E. Heger ("Miller") (RX-184); and U.S. Patent Application Publication No. 2004/0000918 A1, naming inventor Hughes Sanoner, *et al.* ("Sanoner") (RX-609). Each of those references teaches a sensor for the detection of objects behind walls that can recalibrate automatically.

The first reference, DE336, describes "a method for the self-adjustment of a sensor as well as a self-adjusting sensor, in particular for the capacitive detection of the fill level of a medium in a container as well as for distance monitoring." RX-493 at ¶¶ [0001]. DE336 explicitly states that its invention is not limited, however, to detecting fill levels. RX-493 at ¶¶ [0035] ("A sensor

according to the invention can be used for any application for which a conventional sensor can be used.”). The second reference, Miller, teaches a method for detecting live wires behind walls with a device that, when “initially positioned directly over a concealed energized electric conductor is automatically re-calibrated.” RX-184 at Abstract. The third reference, Sanoner, teaches a capacitance-based stud finder with a calibration step that automatically repeats until calibration is successful. RX-609 at ¶¶ [0002], [0132]–[0133]; ID at 62-63 (citing RX-674C at Q/A 170–71). Sanoner also explicitly recognizes that stud finders and live wire detectors are similar devices under the umbrella of “apparatus for locating objects behind a wall lining.” RX-609 at [0002].

The Commission finds that Steber, DE336, Miller, and Sanoner are within the scope of prior art that is relevant to the obviousness of the asserted claims of the ’662. The Commission also finds that those four references share a common field of endeavor insomuch as each is directed to devices and methods for detecting objects behind walls. RX-171 at 1:15–17; RX-493 at [0035]; RX-609 at ¶¶ [0002]; RX-184 at ¶¶ [0001]. Zircon’s argument that these four references are not from the same field is unpersuasive in the face of the broad statements of applicability in the references themselves. Zircon would limit the field of each reference to the specific exemplary embodiment described in each reference, notwithstanding that the references themselves recognize the commonality between fill sensors (DE336), live wire detectors (Miller), and stud finders (Steber and Sanoner). The Commission finds, however, that a person of ordinary skill in the art would recognize these references as sharing a common field of endeavor with the ’662 patent, *i.e.*, sensors for the detection of objects or materials hidden behind a wall. *See, e.g.*, ’662 patent at 1:7–10 (describing its field as “sensors that detect objects, such as studs, behind a wall covering, such as sheetrock, and more particularly to sensors that detect and correct a miscalibration”); RX-674C at Q/A 154 (“[T]he concept of recalibrating a sensor is independent of whether the sensor is moved

to detect a stationary object behind a wall, like a stud, or whether the sensor is stationary and detects an object moving behind a wall, like liquid or particles."); *see also* RX-674C at Q/A 140–41, 143–45, 147–50, 153–55, 163–64, 170–175. The Commission finds that all of the limitations of the asserted claims are disclosed by Steber in combination with DE336, Miller, and/or Sanoner. *See* RX-674C at Q/A 92–95, 109–139. This point was undisputed in the parties' petitions for review of the ID. *See* Comp. Pet. at 98–99; Comp. Pet. Resp. at 18–34; Resp. Pet. at 23–24.

Nonetheless, in its briefing on review, Zircon now argues that Steber fails to disclose numerous limitations recited in the asserted claims of the '662 patent. *See* Comp. Br. on Rev. at 47–48 ("Respondents also have failed to show by clear and convincing evidence that Steber discloses at least claim elements 1[c], 1[d], 1[e], 1[k], 6, 9[f], 12[b], 12[e], 12[f] 13, 15, 16, 17[a], 17[c], 17[d] 17[e], 17[k], and 17[n]."). The Commission finds that Zircon's belated argument is waived because it was not presented in Zircon's petition for review, and furthermore that it lacks explanation or support. To the extent the Commission can discern the reasoning behind Zircon's argument, it appears to be that Zircon believes Steber would lack certain claim limitations if certain of Respondents' noninfringement arguments based on the interpretation of those limitations were adopted, such as for the "calibration mode," "calibration value," and "comparator" limitations. The Commission, however, has not adopted Respondents' interpretation for any of those terms. As Zircon has offered no additional explanation for why Steber fails to disclose those limitations, the Commission declines to alter the ID's original finding that Steber discloses all of the limitations of the asserted claims except for automatic recalibration, which was not challenged in the parties' petitions for review of the ID.

With respect to objective indicia of nonobviousness, Zircon asserted several such indicia before the ALJ, all of which the ID found did not support the nonobviousness of the '662 patent.

ID at 67–71. Zircon has not challenged those findings and the Commission affirms the ID's finding that Zircon has not established any objective indicia that support the nonobviousness of the '662 patent. *See id.*

Having made findings on the four *Graham* factors, the Commission now turns to the ID's finding that only claim 17 of the asserted claims of the '662 patent is invalid. The ID found that the combination of Steber with DE336, Miller, and/or Sanoner disclosed every element of the asserted claims of the '662 patent, and "agree[d] with Respondents that these references in combination show that it would have been possible for one of ordinary skill in the art to implement automatic recalibration in Steber's stud finder and that this modification would have likely succeeded." ID at 63–64.

Nonetheless, for every claim the ID found nonobvious, it rested its conclusion on a finding that Respondents failed to establish that a person of ordinary skill in the art would have been "motivated to modify" the manual recalibration of Steber to perform automatic recalibration as disclosed in DE336, Miller, or Sanoner. ID at 59–62, 64–66.

The Supreme Court in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), explained that "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 417. In this investigation, DE336, Miller, and Sanoner all disclose electronic devices for sensing objects behind walls that have been improved over the prior art by the addition of automatic recalibration to eliminate an additional task that the user would otherwise have to perform manually. *See* RX-674C at Q/A 71–76. Steber discloses a similar device in the form of a stud finder but with manual calibration. *See id.* at Q/A 64–65, 92–93, 138. The Commission finds that a person of ordinary skill in the art would

recognize the benefit of adding automatic calibration to Steber to improve its stud finder in the same way. *See id.* at Q/A 151–152, 155–156, 170–171; *see also infra* (discussing DE336 and Miller in detail).

The Commission finds none of Zircon's arguments to the contrary to be persuasive. As a general matter, Zircon's reading of *KSR* is flawed insomuch as it focuses primarily on a paragraph therein explaining that the Federal Circuit's teaching, suggestion, or motivation ("TSM") test's original underpinnings rested on the "helpful insight" that:

> Although common sense directs one to look with care at a patent application that claims as innovation the combination of two known devices according to their established functions, it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does.

*KSR*, 550 U.S. at 418. The paragraph immediately following the one on which Zircon chiefly relies, however, cautions against the extension of that "helpful insight" into a "rigid and mandatory formula[]." *Id.* at 419. *KSR*'s observation that the TSM test may provide a sound basis for analyzing obviousness under the facts of certain cases should not be read to overshadow the overarching holding of *KSR*, which is that the determination of obviousness is not subject to a rigid formula but instead is made using a flexible approach guided by the *Graham* factors. *See KSR*, 550 U.S. at 415 ("Throughout this Court's engagement with the question of obviousness, our cases have set forth an expansive and flexible approach inconsistent with the way the Court of Appeals applied its TSM test here.").

When the Commission applies *KSR*'s flexible approach to the facts here, it finds that a person of ordinary skill in the art considering Steber in combination with DE336 and/or Miller[19]

---

[19] Respondents do not assert that Steber in combination with Sanoner alone renders the asserted claims obvious. *See* RX-674C at Q/A 175 (Dr. Messner explaining "Sanoner '918 considered

would recognize that automatic recalibration was advantageously employed in prior art sensors to simplify their operation and that the same advantage could be readily applied to an electronic stud finder like Steber's to achieve the same benefit. *See* ID at 63–64.

***a) Motivation to Combine Steber and DE336.***

The ID concludes that Respondents failed to show a motivation to "modify the manual recalibration in Steber to implement the automatic recalibration of DE336," citing three grounds. ID at 59–60. First, the ID states that "[t]he DE3[3]6 sensor is designed for applications where manual calibration would be difficult, while Steber discloses a handheld tool where recalibration is easily triggered with a switch." *Id.* at 60. But DE336 itself touts that one of the advantages of the invention claimed therein is that "a large number of conventional sensors can be readily retrofitted . . . according to the invention." *See, e.g.*, RX-493 at [0034]; *id.* at ¶ [0035] ("[A] sensor according to the invention can be used for any application for which a conventional sensor can be used."); RX-674C at Q/A 72, 141, 152. The ID references this disclosure in DE336, but offers no explanation for discounting it. *See* ID at 58–59. The Commission finds that disclosures throughout DE336 teach modifying other sensors to use the disclosed automatic recalibration function.

Second, the ID cites Complainant's expert Dr. Chrissan for the point that "the maximum and minimum calibration values used for the sensor in DE336 are different from the single calibration value used in Steber." ID at 59, 60. But Dr. Chrissan offers no explanation as to why this distinction would deter a POSA from combining DE336 with Steber, or why such a combination would not be expected to succeed. Dr. Messner explained in detail why "it would be

---

together with either Miller or DE336 or both provides even more reason" the claims would have been obvious). The Commission therefore addresses only the motivation to combine Steber with DE336 and/or Miller.

straightforward for a [POSA] to program Steber according to the automatic recalibration of DE336." *See* RX-674C at Q/A 159; *see also id.* at Q/A 156.

Third, the ID faults Respondents for "rely[ing] on citations to the specification of the '662 patent, rather than teachings in the prior art," rejecting the argument as "hindsight." ID at 60. Even disregarding the statements in the '662 patent, DE336 notes the advantages of recalibration that does not require any external controls or intervention by the user. *See, e.g.*, RX-493 at [0027], [0028]; RX-674C at Q/A 152. Considering the record as a whole, the Commission disagrees with the ID, and finds that Respondents met their burden to show that it would have been obvious to combine Steber and DE336.

#### *b) Motivation to Combine Steber and Miller*

The ID found Respondents failed to prove a motivation to combine Steber and Miller because "Respondents do not cite any statements in Steber or in Miller identifying a need for automatic recalibration or citing any benefits of automatic recalibration." ID at 61–62. Specifically, the ID stated that "Miller merely describes the benefits of recalibration generally, which are also disclosed in Steber." *Id.* (citing RX-184 at [0039]). The ID reads Miller too narrowly. The paragraph at issue reads:

> **[0039]** In one embodiment, the instrument is *automatically* recalibrated when the original calibration is performed at or near the point of maximum electric field, i.e., the instrument is very near or directly over the concealed conductor. Without recalibration, the instrument may fail to detect a hidden electric conductor since calibration occurred at the point of maximum signal, and no larger signal will be found. In one embodiment, as the instrument moves away from the concealed conductor, the electric field level decreases and when there is a sufficient decrease, the instrument recalibrates and alerts the user that the instrument is moving away from the concealed conductor by either a visual display or an audible indication. When the user returns the instrument to the original location where the first calibration occurred, the electric field would have increased sufficiently compared to the new calibration to trigger an indication indicating the presence of a concealed conductor.

RX-184 at [0039] (emphasis added). In context, it is clear Miller is discussing the need for *automatic* recalibration. Absent an *automatic* trigger for recalibration, the user would not know that the initial calibration was erroneous, and recalibration was even needed. This is true whether the device is detecting electrical wires or studs. *See* RX-674C at Q/A 149. The Commission agrees Miller and Dr. Messner's testimony regarding Miller demonstrate the POSA would be motivated to combine Steber and the automatic recalibration disclosed in Miller.

Moreover, the Commission finds, as the ID did, that the modification of Steber to employ automatic recalibration would not have required undue experimentation and the person of ordinary skill would have had a reasonable expectation of success. *See* ID at 63–64 ("[Steber, DE336, Miller, and/or Sanoner] show that it would have been possible for one of ordinary skill in the art to implement automatic recalibration in Steber's stud finder and that this modification would have likely succeeded."); *see also* RX-674C at Q/A 151, 155–156. The Commission therefore finds that claims 1, 6, 9, 12, 13, and 15-17 are invalid under 35 U.S.C. § 103 because they would have been obvious to a person of ordinary skill in the art at the time of the invention based on the prior art combination of Steber with DE336, Miller, and/or Sanoner. Accordingly, the Commission finds that there has been no violation of section 337 with respect to the '662 patent.

### B. The '771 Patent

In this investigation, Zircon asserted claims 1, 5, 9, 10, 13, 14, 15, and 22 of the '771 patent. Those claims provide (with the disputed limitations in bold):

> 1. A hand tool for sensing a measurement behind a target surface, the hand tool comprising:
>
> a housing;
>
> a sensor coupled in the housing; and
>
> a grip having a pair of three-dimensional concave finger holds positioned at opposite sides of the grip to provide **an axis of rotation**.

5. The hand tool of claim 1, further comprising:

a power button;

wherein the power button is positioned in one of the pair of three-dimensional concave finger holds.

9. The hand tool of claim 1, wherein the hand tool comprises a stud finder.

10. The hand tool of claim 1, wherein the sensor comprises a capacitive sensor.

13. A hand tool for sensing a measurement behind a target surface, the hand tool comprising:

housing means for providing a housing to the hand tool;

sensing means for sensing a hidden characteristic, wherein the sensing means is coupled in the housing means; and

**gripping means for gripping and for providing an axis of rotation**.

14. The hand tool of claim 13, further comprising a switching means to energize the tool.

15. The hand tool of claim 14, wherein the switching means is mechanical.

17.[20] A method for using a hand tool against target surfaces, wherein the hand tool comprises **a grip having a pair of three-dimensional concave finger holds positioned on the grip to provide an axis of rotation**, the method comprising:

providing the hand tool;

holding the hand tool with a thumb at a first three-dimensional concave finger hold of the pair of three-dimensional concave finger holds and with a finger at a second three-dimensional concave finger hold of the pair of three-dimensional concave finger holds;

positioning the hand tool against a first target surface; and

**rotating the hand tool about the axis of rotation relative to the finger and thumb**.

[20] Zircon did not assert infringement of claim 17. However, claim 17 is the independent claim from which asserted claim 22 depends and is thus reproduced here and discussed in connection with the Commission's analysis of the '771 patent.

> 22. The method of claim 17, further comprising detecting a hidden object behind the first target surface; and indicating to an operator detection of the hidden object.

JX-3 at Cls. 1, 5, 9, 10, 13, 14, 15, 17, 22. The ID's findings concerning infringement, anticipation, and obviousness with respect to the '771 patent are under review.

### 1. *Infringement*

Zircon asserted that the accused Stanley products infringe the asserted claims of the '771 patent. The central feature of the Stanley products around which the parties' infringement dispute revolves is the shape of the finger holds on either side of the products:




ID at 3 (green circles added by Commission). Though the accused Stanley products differ in how much of their finger holds is covered in black rubber, that difference is immaterial to the issues surrounding whether the accused Stanley products practice the asserted claims of the '771 patent. Rather, the parties' infringement dispute centers primarily on the lateral ridge that forms the upper boundary of each finger hold:



**PUBLIC VERSION**

RX-677C at Q/A 66 (annotation in original). The Commission's findings concerning this lateral ridge in the context of infringement are applicable to each of the accused Stanley products.

Before the ALJ, the parties disputed whether the accused products practice the "axis of rotation" limitation that appears in every asserted claim of the '771 patent. The "axis of rotation" term was construed by the ALJ in his *Markman* order to mean "an imaginary line between two points about which a body is allowed to rotate, excluding finger holds that are designed to resist rotational movement." *See* Order No. 20, at 27–31. The ALJ adopted the latter portion of that construction—"excluding finger holds that are designed to resist rotational movement"—based on statements made during prosecution to distinguish the claims of the '771 patent over a prior art patent also owned by Zircon, U.S. Patent No. 6,249,113, naming inventors Norman L. Krantz and Donald D. Kook ("Krantz"). As seen in the following image, Krantz disclosed a stud finder with a series of finger holds on each side:



FIG. 2

ID at 23. The examiner initially rejected the asserted claims of the '771 patent on the basis that Krantz anticipated the claims. Order No. 20, at 30. The applicant eventually overcame that rejection by, among other things, distinguishing the finger holds of Krantz. Key to the applicant's successful distinction of Krantz was its argument that the finger holds of Krantz were designed to resist rotational movement. *See id.* (summarizing arguments overcoming rejection). The ALJ

incorporated that distinction of Krantz into the construction of "axis of rotation" by including the provision "excluding finger holds that are designed to resist rotational movement." Neither party petitioned for review of the ALJ's construction of "axis of rotation," and the Commission now affirms that construction.

The ID found that the accused Stanley products do not have an "axis of rotation" because the lateral ridge at the top of their finger holds is "designed to resist rotational movement." ID at 80. The ID's explanation for why that ridge prevents rotation was based on the testimony of both sides' experts. *See id.* The ID relied on Zircon's expert's testimony that "the top ridge of the Accused Stanley Products is designed to prevent the device from slipping out of the user's hand," *id.* (citing CX-802 at Q/A 76; Tr. at 247–48), and on Respondents' expert's testimony that "a ridge that prevents the device from slipping out of the user's hand will necessarily resist rotational movement when the device is held with multiple fingers extending along the length of the ridge, which is how the Accused Stanley Products are designed to be held," *id.* (citing RX-677C at Q/A 66). The ID went on to support its finding by analogizing the accused devices to the device of Krantz and to the prior art devices described in Figure 1 of the '771 and '185 patents. ID at 80–81.

The Commission has determined to reverse the ID's finding that the accused products do not practice the "axis of rotation" limitation due to the presence of the lateral ridge in the accused Stanley products. The Commission finds ample evidence in the record showing that the accused products may be rotated about an axis between a user's thumb and forefinger with no apparent encumbrance from the top ridge. For example, a tear-down report of the accused devices includes the following images showing the user's hand rotate while moving one of the accused products:

**PUBLIC VERSION**


Figure 6: Right View, S150 downward movement


Figure 7: Right View, S150 upward movement


Figure 8: Left View, S150 downward movement


Figure 9: Left View, S150 upward movement

CX-109.5C at 13–14. As seen in these images, the top ridge of the accused products does not encumber rotational movement of the user's hand. As another example, the record includes four promotional videos, one for each accused Stanley product, produced by Respondents, that show the accused products being held in the same manner as the above photos and with the tool in different orientations along the axis connecting the user's thumb and index finger. *See* CX-540C, CX-541C, CX-542C, and CX-543C. And still further, Zircon's expert testified that he confirmed via his own testing of the accused Stanley products that "[t]here is nothing about the design of the Stanley grips which limits or restricts rotation in any way." CX-802C at Q/A 69; *see also id.* at Q/A 71 (describing observations of multiple users rotating the accused Stanley products about an axis of rotation without restriction). The Commission finds that collectively this evidence

**PUBLIC VERSION**

persuasively supports a finding that the accused Stanley products have an “axis of rotation” and that the lateral ridge in the accused Stanley products does not restrict or limit rotation of the device.

The ID’s contrary finding concerning the lateral ridge largely tracks a flawed argument advanced by Respondents through their expert witness. Specifically, the ID, like Respondents’ expert, reasoned that the lateral ridge resists rotation because, when the accused Stanley products are held with additional fingers beyond the thumb and index finger, those additional fingers contact the lateral ridge and encumber rotation. *See* ID at 80 (citing CX-802C at Q/A 76; Tr. at 247–48; RX-677C at Q/A 66). Indeed, the ID explicitly found that “a ridge that prevents the device from slipping out of the user’s hand will necessarily resist rotational movement when the device is held with multiple fingers extending along the length of the ridge, which is how the Accused Stanley Products are designed to be held.” *Id.* However, this finding is contradicted by Respondents’ own product videos. Those videos show the accused Stanley products being held with multiple fingers without precluding the user’s thumb and index finger from gripping the devices at different angles about an axis of rotation:







CX-540C at 00:14, 00:35. Neither the ID nor Respondents offer any explanation of why or how the lateral ridges on the accused Stanley products resist the rotation of a user’s hand between the two positions shown in the screen captures reproduced above.

Ultimately, the ID's finding that the accused devices resist rotation is dependent on a user holding the devices with multiple fingers. The asserted claims of the ’771 and ’185 patents, however, do not require holding the claimed stud finders with multiple fingers, and thus the fact that it is possible, but not required, to hold the device in a way that may resist rotation does not preclude a finding infringement. "[I]nfringement is not avoided merely because a non-infringing mode of operation is possible." *Core Wireless Licensing S.A.R.L. v. Apple Inc.*, 899 F.3d 1356, 1363 (Fed. Cir. 2018). Still further, whether Respondents intended for the accused devices to be held with multiple fingers is wholly irrelevant to direct infringement. *See Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832–33 (Fed. Cir. 1991) (affirming Commission's finding of infringement for microchips that were capable of infringement even though Respondent professed no intent for them to be so used). When the inapposite "multiple finger" reasoning is set aside, little other than the conclusory testimony of Respondents' expert is left to support the ID's finding that the accused devices do not practice the "axis of rotation" limitation.[21]

For these reasons, the Commission has determined to reverse the ID's finding that the accused Stanley products do not practice the "axis of rotation" limitation in the asserted claims of the ’771 patent. The Commission finds that the record demonstrates that Complainant met its burden to show the accused products infringe the asserted claims of the ’771 patent by a preponderance of the evidence. Because the absence of the "axis of rotation" limitation was the sole basis for the ID's finding that the accused products do not practice claims 1, 5, 9, and 10 of

[21] The Commission acknowledges that the ID also concluded that the lateral ridges in the accused Stanley products were analogous to features of prior art stud finders described in the ’771 patent specification and in Krantz that resist rotation. *See* ID at 80–81. However, neither Krantz nor the prior art described in the ’771 patent includes a feature like the lateral ridge in the accused Stanley products. Accordingly, those prior art references are not probative of whether the accused Stanley products resist rotation due to their lateral ridge.

the ’771 patent, the Commission’s determination to reverse the ID’s finding that the accused Stanley products lack an “axis of rotation” necessarily requires reversal of the ID’s findings that claims 1, 5, 9, and 10 are not infringed by the accused Stanley products.

The same conclusion does not follow for claims 13, 14, and 15, which the ID found not infringed for the additional reason that Zircon “failed to offer any infringement analysis under the means-plus-function construction for ‘gripping means.’” ID at 84. Accordingly, the Commission affirms the ID’s finding that claim 13, 14, and 15 are not infringed by the accused Stanley products. Similarly, for claim 22, the Commission affirms the ID’s finding of noninfringement based on the ID’s finding that Zircon failed to present evidence showing that anyone other than Zircon’s expert (and his associates) ever actually performed the methods of claim 22 (and unasserted claim 17 from which it depends) and failed to present evidence showing that Respondents induced anyone to infringe those methods. *See* ID at 86–87.

***2. Invalidity***

Respondents argued before the ALJ that all of the asserted claims of the ’771 patent were invalid as anticipated by Zircon’s original stud finder, the “Zircon 1.” The ID found that the Zircon 1 did not anticipate independent claim 1 solely because it lacked an “axis of rotation.” ID at 94. The ID’s reasoning in support of that finding parallels its reasoning in the context of infringement insomuch as it observes that the finger holds in the Zircon 1 “extend down the length of the device for gripping with the user’s entire hand,” and “[a]long the length of these finger holds there is a narrow top edge, which is an encumbrance that is designed to resist rotational movement.” ID at 94–95. In a footnote, the ID expressly likens the top edge of the Zircon 1 finger holds to the lateral ridge in the accused products. ID at 95, n.11. The ID cites no other evidence in support of its statement that the top edge of the Zircon 1 resists rotational movement. *See* ID at 95.

As explained, *supra*, the Commission has determined to reverse the ID's finding that the lateral ridges in the accused Stanley products resist rotation and thus preclude the accused products from practicing the "axis of rotation" limitation. So too here, in the context of invalidity, the Commission has determined to reverse the ID's finding that the Zircon 1 stud finder lacks an "axis of rotation" based on a substantially less pronounced lateral ridge than what is present in the accused products. The finger holds and lateral ridge of the Zircon 1 on which the ID focused are visible in the following images reproduced in the ID:

Zircon 1




ID at 93 (citing RDX-4C at 6). The Commission finds that the presence of these lateral ridges in the Zircon 1 do not resist rotation and thus cannot support the ID's finding that the Zircon 1 device lacks an "axis of rotation." The Commission's conclusion is consistent with the testimony of Respondents' expert, who testified that the finger holds of the Zircon 1 are not designed to resist rotational movement. *See* RX-676C at Q/A 115; Tr. at 561:4-562:1. Moreover, Zircon conceded in its response to the Commission's Notice of Review that there is no evidence supporting the ID's

finding that the lateral ridge in the Zircon 1 device prevents rotation. *See* Comp. Br. on Rev. at 60 (stating that "there is no affirmative evidence supporting such a finding").[22]

The Commission's finding that the Zircon 1 device teaches the "axis of rotation" limitation necessarily requires finding that claims 1, 5, 9, and 10 of the '771 patent are anticipated by Zircon 1, since the ID's contrary findings were based solely on the absence of the "axis of rotation" limitation in the Zircon 1 stud finder. The ID's findings that claims 13, 14, 15, 17[23], and 22 of the '771 patent are not anticipated by the Zircon 1 are supported by additional grounds beyond the absence of an "axis of rotation" and thus the Commission affirms the ID's finding of no anticipation as to those claims.

**C. The '185 Patent**

In this investigation, Zircon asserted claims 1, 2, 5-11, 13-15, 17, and 20-22 of the '185 patent. Those claims provide (with the disputed limitations in bold):

> 1. A stud finder for sensing a measurement behind a target surface, the stud finder comprising:
>
> a housing;
>
> a sensor coupled in the housing; and
>
> only two depressed finger holds positioned at opposite sides of a grip allowing pivoting to provide an **axis of rotation**.
>
> 2. The stud finder of claim 1, further comprising:

---

[22] Zircon spends substantial portions of its brief on review addressing issues beyond the scope of the questions in the Commission's Notice of Review, such as whether the Zircon 1 has "finger holds" and whether it meets the separate "running board" limitation that appears in a subset of the asserted claims of the '771 patent. *See* Comp. Br. on Rev. at 59–62. These arguments are unresponsive to the Commission's Notice of Review and thus fail to show that the lateral ridge in the Zircon 1 resists rotational movement.

[23] Claim 17 was not asserted but is relevant to invalidity because claim 22 depends from it, and in order to determine whether or not claim 22 is anticipated, an analysis of claim 17 is necessary.

a power button;

wherein the power button is positioned in one of the two depressed finger holds.

5. The stud finder of claim 1, further comprising a running board.

6. The stud finder of claim 5, wherein the running board isolates a thumb and a finger from the target surface.

7. The stud finder of claim 5, wherein the running board distances a thumb and a finger from the target surface.

8. The stud finder of claim 5, wherein the running board inhibits a thumb and a finger from inadvertently touching the target surface.

9. The stud finder of claim 5, wherein the running board provides a barrier between:

a thumb and a finger; and

the target surface.

10. The stud finder of claim 1, wherein the housing forms an acute angle at a front edge in a side view for a side comprising one of the two depressed finger holds.

11. The stud finder of claim 10, wherein the acute angle is 70 degrees or less.

13. The stud finder of claim 1, wherein the housing forms a V-notch at a center of a front side in a top-down view.

14. A stud finder for sensing a measurement behind a target surface, the stud finder comprising:

housing means for providing a housing to the stud finder;

sensing means for sensing a hidden characteristic, wherein the sensing means is coupled in the housing means;

**gripping means for gripping and for providing an axis of rotation, wherein the gripping means comprises only two depressed finger holds positioned at opposite sides allowing pivoting to provide an axis of rotation**; and

a running board means to distance a thumb and a finger from the target surface.

15. The stud finder of claim 14, further comprising a switching means, within the gripping means, to energize the stud finder.

17. A method for using a stud finder against target surfaces, wherein the stud finder comprises a grip having only two depressed finger holds allowing pivoting to provide **an axis of rotation**, the method comprising:

providing the stud finder with the only two depressed finger holds;

holding the stud finder with a thumb at a first depressed finger hold of the two depressed finger holds and with a finger at a second depressed finger hold of the two depressed finger holds;

positioning the stud finder against a first target surface; and

rotating the stud finder about the axis of rotation relative to the thumb and the finger.

20. The method of claim 17, further comprising:

detecting a hidden object behind the first target surface; and

indicating to an operator detection of the hidden object.

21. The method of claim 17, wherein holding the stud finder comprises energizing the stud finder with at least one of the thumb and the finger using one of the two depressed finger holds.

22. The method of claim 17, further comprising distancing the thumb and the finger from the target surfaces with a running board.

JX-4 at Cl. 1, 2, 5-11, 13-15, 17, 20-22. The ID's findings concerning claim construction, infringement, anticipation, and obviousness with respect to the '185 patent are under review.

### *1. Infringement*

#### *a) The "Axis of Rotation" Limitation*

Zircon alleged that the accused products infringe claims 1, 2, 5–11, 13–15, 17, and 20–22 of the '185 patent. As expressly noted by the ID, the disputes over infringement of the asserted claims of the '185 patent are co-extensive with the infringement disputes over the asserted claims of the '771 patent. ID at 117. The parties appear to agree as their petitions for review of the ID addressed the '771 and '185 patents jointly. Accordingly, for the same reasons that the

Commission has determined to reverse the ID's findings that the accused Stanley products do not practice the "axis of rotation" limitation of the asserted claims of the '771 patent, the Commission has likewise determined to reverse the ID's finding that the accused Stanley products do not practice the "axis of rotation" limitation in the asserted claims of the '185 patent. That determination requires a concomitant reversal of the ID's findings that claims 1, 2, 5–9, and 13 are not infringed by the accused products. For claims 10 and 11, the Commission's determination on the "axis of rotation" limitation requires reversal of the ID's findings that the S100 and S150 accused Stanley products do not infringe those claims. The ID's findings that the S200 and S300 accused Stanley products do not infringe claims 10 and 11are supported by additional alternative grounds supporting noninfringement that are specific to those products, and which we affirm. *See* ID at 122. The ID's findings that the accused products do not infringe the methods of claims 17 and 20–21 likewise remain supported regardless of whether the accused products have an "axis of rotation." *See* ID at 126–28. We affirm those findings. The ID's infringement findings for claims 14 and 15 turn on the separate limitation "gripping means," which is discussed in the following section.

***b) The "Gripping Means" Limitation***

Claims 14 and 15 of the '185 patent include a "gripping means" limitation. The ID stated that the parties "agreed to construe 'gripping means' in claim 14 to be subject to means plus function interpretation." ID at 115–16 (citing RX-83). But the stipulation the ID cited says the opposite: "The parties agree that the 'gripping means' in claim 14 (and claim 15 dependent therefrom) is not subject to a means plus function interpretation." RX-83 at Ex. A, p.3. The ID appears to have conflated the means-plus-function construction for "gripping means" the parties agreed to apply for the '771 patent with the parties' opposite agreement for "gripping means" in the '185 patent. Accordingly, the ID erred in stating that the parties assigned "gripping means" a

means-plus-function construction in the ’185 patent. The consequence of that error was that the ID wrongly criticized Zircon for failing to supply a means-plus-function construction and infringement analysis for “gripping means” in connection with claims 14 and 15 of the ’185 patent. *See* ID at 123–24.

The parties agreed, in response to the Commission’s Notice of Review, that they did not stipulate to give “gripping means” a means-plus-function construction. Still further, the parties’ briefs on review show that there is no dispute among them that the accused products include the claimed “gripping means,” which Complainant construes as a “grip” with a “concave design,” *see* Comp. Reply Br. on Rev. at 69–70, and which Respondents construe merely as a “grip” or “handle,” Resp. Br. on Rev. at 80. The Commission agrees and finds that, under either formulation, the accused products include the claimed “gripping means.” Because the Commission has also found that the accused Stanley products include an “axis of rotation,” and because there are no other disputes concerning infringement of claims 14 and 15 by the accused Stanley products, the Commission has determined to reverse the ID’s finding that the accused products do not infringe claims 14 and 15 of the ’185 patent.

***2. Invalidity***

Just as with the ’771 patent, Respondents asserted that all of the asserted claims of the ’185 patent are anticipated by the prior art Zircon 1 stud finder. And, as with the ’771 patent, the ID relied extensively on its finding that the lateral ridge in the Zircon 1 resisted rotational movement, thus precluding it from teaching the “axis of rotation” limitation. As explained above in the context of the ’771 patent, the Commission found that the lateral ridge of the Zircon 1 stud finder does not resist rotation and thus found that the Zircon 1 stud finder includes the claimed “axis of rotation.” Those findings require reversal of the ID’s findings that claims 1 and 2 of the ’185 patent are not anticipated by the Zircon 1 stud finder. The ID’s findings of no anticipation as to the remaining

asserted claims of the ’185 patent remain intact because those findings are supported by additional grounds other than the absence of an “axis of rotation” in the accused products.

Turning to obviousness, given the Commission’s findings that claims 1 and 2 of the ’185 patent are anticipated by the Zircon 1 stud finder, the Commission takes no position on whether the combination of Zircon 1 with other prior art, such as U.K. Patent Application No. GB 2188432 (RX-188, “GB432”), renders those same claims obvious.

For claims 5–9 of the ’185 patent, the ID found “that the limitations of claims 5-9 are disclosed in GB432 and it would have been obvious to one of ordinary skill in the art to modify prior art stud sensors to add running boards meeting the limitations of these claims.” ID at 142. Nonetheless, the ID found that claims 5–9 were not obvious in view of Zircon 1 and GB432 because neither disclosed the “axis of rotation” limitation. *Id.* Because the Commission has determined to reverse the ID’s finding that Zircon 1 does not teach an “axis of rotation,” the sole ground on which the ID found claims 5–9 nonobvious no longer applies. Accordingly, the Commission finds that claims 5–9 of the ’185 patent are invalid as obvious.

The situation is similar for claims 10, 11, and 13. For those claims, the ID found that U.S. Design Patent No. D455,430, naming inventor Norman L. Krantz (RX-511, “Krantz ’430)” teaches the acute angle required by the additional limitations of claims 10 and 11 and the v-notch required by claim 13. ID at 142–43; *see also* RX-676C at Q/A 282–84. The ID further found that Zircon “[did] not dispute Respondents’ argument that a person of ordinary skill in the art would have been motivated to add a V-notch and acute angle to a stud finder.” ID at 142. Nonetheless, the ID found that claims 10, 11, and 13 were not obvious in view of Zircon 1 and Krantz ’430 due to the absence of an “axis of rotation” in either prior art reference. *Id.* at 143. Because the Commission has determined to reverse the ID’s finding that Zircon 1 does not teach an “axis of rotation,” the

sole ground on which the ID found claims 10, 11, and 13 nonobvious no longer applies. Accordingly, the Commission finds that claims 10, 11, and 13 of the ’185 patent are invalid as obvious.

For claim 14, the ID rejected Respondents’ obviousness argument based on Zircon 1 and GB432 due to the absence of the axis of rotation limitation and because Respondents did not provide a means-plus-function meaning and analysis to the “gripping means” limitation. ID at 144. As discussed above, neither of those grounds for rejecting Respondents’ obviousness argument remains valid. Zircon 1 clearly teaches a “gripping means” with two depressed finger holds, and as explained above in the context of claims 5–9, GB432 discloses a running board, and a person of ordinary skill would have found it obvious to modify Zircon 1 by adding a running board like that in GB432. *See* ID at 141–142; RX-676C at Q/A 235–237. Based on those findings, as well as the finding that Zircon 1 discloses an “axis of rotation,” the Commission finds that claim 14 of the ’185 patent is invalid as obvious in view of Zircon 1 and GB432. That finding also leads to the related finding that claim 15 is obvious based on the combination of Zircon 1 and GB432 given that the ID’s sole reason for finding claim 15 nonobvious was that claim 14 was not obvious. ID at 144. The Commission affirms the ID’s findings that the methods of claims 17 and 20–22 are not obvious.

### D. Domestic Industry

A complainant must establish that “an industry in the United States, relating to the articles protected by the patent, … exists or is in the process of being established” to receive relief under section 337 based on patent infringement. 19 U.S.C. § 1337(a)(2). Section 337 explains that a complainant can make that showing by demonstrating, “with respect to the articles protected by the patent … — (A) significant investment in plant and equipment; (B) significant employment of labor or capital; or (C) substantial investment in its exploitation, including engineering, research

and development, or licensing." *Id.* § 1337(a)(3). The Commission has typically referred to its analysis of whether a complainant's investments meet the statutory requirement for significance or substantiality as the "economic prong" of the domestic industry requirement.[24]

Before the ALJ, Zircon attempted to show that it satisfied the economic prong of the domestic industry requirement under each of the three subparagraphs of section 337(a)(3), that is, significant investment in plant and equipment; significant employment of labor or capital; and substantial investment in its exploitation, including engineering, research and development, or licensing. *See* Comp. Post-Hr'g Br. at 184–95. However, the ID found that Zircon's evidence was insufficient to carry its burden, and thus found that Zircon had not established that it satisfied the domestic industry requirement.

With respect to Zircon's investments in plant and equipment, the ID first recognized that Zircon's expert aggregated the domestic industry products for the '662 patent, the '771 patent, and the '185 patent for the purpose of addressing the significance of Zircon's investments. ID at 148, n.15. Notwithstanding that failing, the ID considered Zircon's aggregated investments across all of the domestic industry products and concluded that those investments were not significant. In so finding, the ID reasoned that Zircon's aggregated expenditures on plant and equipment amounted to between [redacted] of Zircon's revenues for each year. *Id.* at 149. Using those percentages, the ID reasoned that Zircon's plant and equipment investments amounted to a domestic "value added" of [redacted] of the value of its domestic industry products, which the ID found was not a quantitively significant amount. *Id.* at 149–50. The ID went on to acknowledge that Zircon offered an alternative quantification of its plant and equipment investments based on a

[24] The Commission's analysis of whether a complainant has established the existence of "articles protected by the patent" is typically referred to as the "technical prong" of the domestic industry requirement.

comparison to its profits. *Id.* at 150. However, the ID rejected that approach based on a lack of precedential support. *Id.*

With respect to Zircon's investments in labor and capital, the ID again recognized that Zircon's expert aggregated the domestic industry products for the '662 patent, the '771 patent, and the '185 patent for the purpose of addressing the significance of Zircon's investments. *See id.* at 150, n.18 (citing n.15). Nonetheless, the ID went on to analyze Zircon's aggregate investments across all of its domestic industry products. In its analysis, the ID explained that Zircon's expert used a revenue-based allocation to conclude that Zircon expended approximately [redacted] on labor in connection with its domestic industry products between 2015 and 2020, which amounted to [redacted] of Zircon's domestic industry product revenue each year over the same period. *Id.* at 150–51. The ID rejected Zircon's calculations on the basis that Zircon "improperly aggregated its expenditures for all domestic employees, including those engaged in sales and marketing and administrative overhead for these activities," which the ID explained "are typically excluded from a domestic industry analysis." *Id.* at 151 (citing *Certain Kinesiotherapy Devices and Components Thereof*, Inv. No. 337-TA-823, Comm'n Op. at 29-30 n.8 (July 12, 2013), *rev'd on other grounds sub nom.*, *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879 (Fed. Cir. 2015)). Per the ID, if sales and marketing expenditures had been excluded, Zircon's labor investments would be similar in amount to its investment in plant and equipment and would therefore not be significant. *Id.* at 152. Further, the ID found Zircon's expert's revenue-based allocation of labor costs to domestic industry products unreliable in the context of engineering activities because "the critical investments for the domestic industry products were likely to have occurred years in advance of the products being sold." *Id.* And, still further, the ID found Zircon's expert's analysis of Zircon's

payments to U.S. vendors to be unreliable and found that Zircon failed to tie its payments to such vendors to the domestic industry products. *Id.*

With respect to Zircon's investments in engineering and research and development, the ID again recognized that Zircon's expert aggregated the domestic industry products for the '662 patent, the '771 patent, and the '185 patent for the purpose of addressing the significance of Zircon's investments. *See id.* at 153, n.19 (citing n.15). As with Zircon's plant and equipment expenses and labor expenses, the ID nonetheless went on to consider the substantiality of Zircon's aggregated engineering and research and development investments. For those aggregated investments, however, the ID explained that Zircon failed to establish a nexus between those investments and any of its asserted patents. *Id.* at 155.

The ID also addressed an alternative theory advanced by Zircon that would apply only to the '662 patent. Zircon's alternative theory for showing substantial investments in research and development focused on the engineering costs associated with a specific project for the development of the [redacted] *Id.* at 153–54. Zircon asserted that the [redacted] incorporates the functionalities of the '662 patent and accounted for [redacted] of Zircon's research and development spending since 2010. *Id.* at 154. While the ID agreed that the [redacted] implements functionalities that practice the '662 patent, the ID found that the evidence Zircon relied on for allocating [redacted] of Zircon's research and development costs to the [redacted] was unreliable. *Id.* at 156. Specifically, the ID found that the testimony of Zircon's President and Chief Operating Officer, Mr. Bourque, as to the [redacted] figure lacked the support of corroborating evidence and was unreliable. *Id.* The ID further found that Zircon's expert relied solely on Mr. Bourque's assertion of the [redacted] value in his own analysis. *Id.* Accordingly, the ID found that the evidence of record was insufficient to conclude that Zircon's investments in the [redacted] were substantial. *Id.* at

156–57. The ID's findings on the economic prong of the domestic industry requirement are now on review.

On review, the Commission has determined to affirm, with modified reasoning, the ID's finding that Zircon failed to establish that it satisfies the economic prong of the domestic industry requirement. As recognized by the ID, Zircon's attempt to show the investments it has made in each of the three statutory categories and whether these investments are significant or substantial investments in a domestic industry related to the articles protected by its patents is marred by its aggregation of its investments across all of its domestic industry products. *Id.* at 148 n.15. Such aggregation is problematic here where multiple patents and numerous domestic industry products are at issue and where many of those domestic industry products practice less than all of the asserted patents. Under such facts, aggregating investments in different domestic products that practice different patents effectively precludes the Commission from quantifying the amounts of the investments in each statutory category and determining the significance of Zircon's investments with respect each of its asserted patents. By way of example, 90% of Zircon's investments in its domestic industry products could be attributable to products that practice the '662 patent, and only 10% could be attributable to products that practice the '771 and '185 patents. The opposite could also be true, or the distribution could be fifty-fifty. The point is that, by aggregating all of its investments across domestic industry products that practice different asserted patents, Zircon has failed to provide the Commission with an adequate basis to evaluate the investments and the significance of those investments with respect to each asserted patent.

Despite recognizing the error in Zircon's aggregation of its investments across distinct groups of domestic industry products, the ID nonetheless attempted to evaluate the significance of those aggregated investments. On review, the Commission has determined to take no position on

that portion of the ID's analysis because that analysis does not address whether Zircon has met the statutory requirement to show the existence of "an industry in the United States, *relating to the articles protected by the patent*." 19 U.S.C. § 1337(a)(2). Given the differences between the patents and covered products in this case, Zircon cannot show the existence of an industry in the United States relating to the article protected by the '662 patent by including investments in articles protected only by the '771 and '185 patents and vice versa. And yet, that is precisely what Zircon has attempted to do in this investigation. By Zircon's own admission, substantial numbers of the domestic industry products it has relied on practice only the '662 patent or only the '771 and '185 patents. *See* Comp. Reply on Rev. at 123–24. The following diagram from Zircon's reply brief on review shows the breakdown of how many domestic industry products practice each patent:




*Id.* at 124. As seen in this diagram, of fifty-seven domestic industry products relied on by Zircon in this investigation, only fourteen practice all three of the asserted patents. Thirty-seven practice

the ’771 patent, thirty-five practice the ’185 patent, and thirty practice the ’662 patent. Per the plain language of section 337, Zircon was required to establish the existence of a domestic industry through significant or substantial investments with respect to articles protected by the ’771 patent in order to establish a violation of section 337 based on infringement of that patent. So too it was required to establish the existence of a domestic industry through significant or substantial investments with respect to articles protected by the ’185 patent to show a violation based on that patent and the existence of a domestic industry through significant or substantial investments with respect to articles protected by the ’662 patent to show a violation based on that patent. But Zircon did not do that. Instead, it aggregated its domestic industry products without regard for whether or which patents they practiced and then argued that a domestic industry in all of its products exists.[25] That is not what section 337 requires, and it does not provide the Commission with adequate information to discern retrospectively whether Zircon could have established a domestic industry for any of its asserted patents under the proper legal framework.

The Commission notes that this is not the first time that it has explained that aggregating investments in articles that *are* protected by a particular patent with investments in articles that *are*

[25] In its responses to the Commission’s notice of review, Zircon reproduces a chart that purports to show a patent-by-patent breakdown of its domestic industry investments. *See, e.g.*, Comp. Br. on Rev. at 75 (citing RX-79C at 9 and CDX-22C and CDX-25C). Zircon does not contend that it relied on this chart before the ALJ in support of its domestic industry case and the Commission can find no instance of it in Zircon’s post-hearing briefs before the ALJ. Zircon has thus abandoned reliance on it. Still further, the underlying document in which the table appears—a declaration of Zircon’s President, Mr. Bourque—was specifically excluded from evidence by the ALJ in Order 37. Zircon has not sought review of Order 37 and the Commission declines to review it *sua sponte*. Zircon cannot now rely on Mr. Bourque’s declaration as substantive evidence in direct contravention of Order 37. Zircon appears to recognize the difficulty it faces in relying on Mr. Bourque’s declaration as it argues in a footnote that the ALJ admitted the declaration in Order 41 as evidence without a sponsoring witness. Comp. Br. on Rev. at 75, n.22. Zircon misreads Order 41, which states that Mr. Bourque’s declaration is part of the administrative record of this investigation by virtue of its attachment to the complaint. Order 41 did not admit Mr. Bourque’s declaration as evidence.

*not* protected by that patent may preclude meaningful consideration of those investments under the statutory framework required by section 337. In *Certain Electronic Imaging Devices*, Inv. No. 337-TA-850 ("*Electronic Imaging Devices*"), the Commission explained that, because the articles that practiced each of the asserted patents did not overlap, the complainant was required to show that the investments in each of those products, separately, were significant. *Electronic Imaging Devices*, Comm'n Op. at 89 (Apr. 21, 2014) (public version). The Commission made the same point in *Certain Audio Digital-to-Analog Converters and Prods. Containing Same*, Inv. No. 337-TA-499 ("*Audio Digital-to-Analog Converters*"), Final Initial Determination at 113 (Jan. 13, 2005) (public version) (unreviewed in relevant part) ("Because complainant is asserting the '928 patent and the '501 patent, and the articles that practice said patents do not overlap, complainant must demonstrate the existence of two domestic industries."). The Commission has acknowledged that a complainant may not track its investments in a manner that is specific to each of the patents that are practiced by its DI products. Thus, the Commission has accepted reasonable allocation methods to estimate the amount of complainant's investments that can be attributed to each asserted patent, as for example, an allocation based on sales. Here, Zircon failed to present such an analysis.

Zircon argues that the Commission's reasoning in *Electronic Imaging Devices* and *Audio Digital-to-Analog Converters* should be limited only to investigations where there is no overlap at all between articles that are protected by different asserted patents. *See* Comp. Reply on Rev. at 119–129. The Commission is not persuaded. While it is true that there were no articles in *Electronic Imaging Devices* and *Audio Digital-to-Analog Converters* that were protected by all of the asserted patents, the same impediments to Commission review from the aggregation of investments across different domestic industry articles exist even if some portion of those articles

practice all of the asserted patents. The Commission would still in effect be inflating the investments in articles that are protected by a given patent with investments in articles that are not, in contravention of the statutory requirement that the Commission evaluate domestic industry "with respect to the articles protected by the patent." 19 U.S.C. § 1337(a)(2)–(3).[26]

Zircon's reliance on *Certain Laser Bar Code Scanners and Scan Engines, Components Thereof and Products Containing Same,* Inv. No. 337-TA-551 ("*Laser Bar Code Scanners*") is similarly misplaced because, in that investigation, the ALJ observed that the complainant could establish a domestic industry based on either of two articles that were covered by *all* of the asserted patents. *See Laser Bar Code Scanners*, Order 25 at 10 (Aug. 1, 2006) (unreviewed in relevant part) (public version) ("[P]roducts [redacted product name 1] and [redacted product name 2] in this investigation are allegedly covered by each of the Symbol Patents. Therefore, Symbol does not need to establish a separate domestic industry for all three product groupings presented in its Motion if it is able to establish domestic industry for either [redacted product name 1 or redacted product name 2]."). Significantly, while *Laser Bar Code Scanners* also involved articles that practiced only some of the asserted patents, the ALJ did not rely on those articles as part of the analysis for the articles that did practice all of the asserted patents. *See id.* Applied to the facts of this investigation, *Laser Bar Code Scanners* stands only for the uncontroversial proposition that Zircon could have attempted to establish a domestic industry based only on its investments in articles that practice all of the asserted patents. Zircon has made no such attempt. Indeed, while

[26] To be clear, the Commission has consistently held that investments in articles that are not themselves protected by the asserted patent, but that are necessary for the use of or essential to the articles that are protected, may be considered as part of its domestic industry analysis. *See Certain Magnetic Tape Cartridges & Components Thereof*, Inv. No. 337-TA-1058, Comm'n Op. at 48–50 (Apr. 9, 2019) (public version). Those holdings, however, are irrelevant here where the issue is that Zircon aggregated its investments across different stud finder with different features that practice different patents.

there are 14 domestic industry products that practice all three asserted patents, Zircon has not identified what portion of its investments are attributable to those products and the Commission lacks sufficient information to perform such an allocation *sua sponte*.

Zircon similarly misapplies the Commission's opinion in *Certain Air Mattress Systems*, Inv. No. 337-TA-971 ("*Air Mattress Systems*"), to find support for the proposition that it need not allocate its investments between articles that practice different asserted patents. *See* Comp. Reply on Review at 121. But again, as in *Laser Bar Code Scanners*, all of the investments at issue were with respect to articles that practiced the particular asserted patent. *See Air Mattress Systems*, Comm'n Op. at 43–44 (June 20, 2017) (public version) ("[T]he record shows that the 'articles protected by the patent' are properly defined as 'air mattress systems,' all of which contain control systems for air controllers covered by the '172 patent, and therefore Complainants properly accounted for their investments with respect to the '172 patent.").

Zircon's reliance on *Certain Dynamic Random Access Memories*, Inv. No. 337-TA-242 ("*DRAMs*") is also unpersuasive. Comp. Reply on Rev. at 123. In that investigation, which applied the pre-1988 domestic industry standard, the Commission found that "substantial overlap" between the various sizes of memory modules that practiced each asserted patent justified the conclusion that they were part of a single domestic industry. *DRAMs*, USITC Pub. No. 2034, Comm'n Op. at 67 (Nov. 1987) (public version). Without deciding whether the reasoning of *DRAMs* is applicable to the post-1988 amendments domestic industry standard that now controls the Commission's analysis, the Commission finds the reasoning of *DRAMs* is inapplicable here where there is no record to show "substantial overlap" of the articles that practice each of Zircon's asserted patents. Only fourteen of the fifty-seven articles Zircon relies on, a little less than a

quarter of them, practice all of the asserted patents. *See* diagram, *supra*. Absent more, there is no "substantial overlap."

The sole exception to Zircon's aggregated approach to establishing domestic industry is its argument related to its research and development expenditures on the [redacted]. The ID found that the [redacted] implements the functionalities of the '662 patent and that Zircon's research and development investments in the [redacted] can be reasonably characterized as investments in articles protected by the '662 patent. ID at 156, n.20. However, the ID found that Zircon's reliance on its investments in the [redacted] failed for the separate reason that the evidence on which it relied to allocate [redacted] of its research and development investments to the [redacted] was unreliable. *Id.* at 156–57. The Commission sees no error in the ID's finding of unreliability, which is based on its related finding that Zircon's expert's testimony on the issue lacked credibility. ID at 156 ("Mr. Bratic did not conduct any independent investigation or review any documents regarding R&D investments for the [redacted], relying solely on Mr. Bourque's representation. . . . The undersigned finds this testimony to be unreliable, and Mr. Bourque's unexplained [redacted] estimate is insufficient to show that Zircon's R&D investments in the [redacted] were 'substantial.'") (citation omitted). Accordingly, the Commission declines to disturb the ID's finding that Zircon's allocation of [redacted] of its research and development investments to the [redacted] is based on unreliable evidence.

The Commission agrees with the ID's ultimate conclusion, and thus finds that Zircon has failed to establish that it satisfies the economic prong of the domestic industry requirement as discussed herein. The Commission, however, takes no position on the ID's analysis of the economic prong, with the exception of those findings noted above with respect to the [redacted].

## V. CONCLUSION

As explained above, each asserted claim of the ’662, ’771, and ’185 patents is either not infringed or is invalid. Moreover, Zircon has failed to demonstrate that it satisfies the domestic industry requirement of section 337 for any of those patents. Accordingly, and consistent with the reasoning herein, the Commission affirms the ID’s ultimate determination that there has been no violation of section 337 shown in this investigation.

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: March 14, 2022

## CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached document has been served via EDIS upon the Commission OUII Investigative Attorney and the following parties as indicated, upon the date listed below.

| Document | Security | Document Type | Official Rec'd Date | Title |
|---|---|---|---|---|
| 765331 | Public | Opinion, Commission | 03/14/2022 02:53 PM | Commission Opinion |

Service Date: March 14, 2022

/s/

Lisa R. Barton
U.S. International Trade Commission
500 E Street, S.W.
Suite 112
Washington, D.C. 20436

CX - 0001
RX - 0001
JX - 0001

U 8042612

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

May 04, 2020

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *6,989,662*
ISSUE DATE: *January 24, 2006*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

SYLVIA HOLLEY
Certifying Officer

US006989662B2

(12) **United States Patent**
**Heger et al.**

(10) **Patent No.:** **US 6,989,662 B2**
(45) **Date of Patent:** **Jan. 24, 2006**

(54) **SENSOR AUTO-RECALIBRATION**

(75) Inventors: **Charles E. Heger**, Saratoga, CA (US); **Lawrence F. Miller**, Los Gatos, CA (US)

(73) Assignee: **Zircon Corporation**, Campbell, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/835,654**

(22) Filed: **Apr. 29, 2004**

(65) **Prior Publication Data**

US 2005/0242800 A1 Nov. 3, 2005

(51) **Int. Cl.**
*G01R 27/26* (2006.01)
*G01R 19/00* (2006.01)

(52) **U.S. Cl.** ....................................... **324/67**; 324/202

(58) **Field of Classification Search** .................. 324/67, 324/228–243, 326, 658, 662, 686, 66, 601, 324/663, 671–672, 676
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,464,622 | A | 8/1984 | Franklin | |
| 5,619,128 | A * | 4/1997 | Heger | 324/67 |
| 6,023,159 | A | 2/2000 | Heger | |
| 2001/0010460 | A1 | 8/2001 | Miller et al. | |
| 2004/0000918 | A1 | 1/2004 | Sanoner et al. | |

OTHER PUBLICATIONS

International Search Report mailed Aug. 1, 2005, for PCT Application No. PCT/US2005/015298 filed Apr. 29, 2005, 7 pages.
Written Opinion mailed Aug. 1, 2005, for PCT Application No. PCT/US2005/015298 filed Apr. 29, 2005, 6 pages.

* cited by examiner

*Primary Examiner*—Bot Ledynh
(74) *Attorney, Agent, or Firm*—Morrison & Foerster LLP

(57) **ABSTRACT**

A sensor and method that detects a mis-calibration and automatically recalibrates itself without operator intervention. If the sensor determines that it was calibrated over an object such as a stud, the sensor may automatically update the calibration value with a new lower value without operator intervention. This process may repeat until the calibration value is set to a value that represents the wall covering alone without hidden objects behind it.

**20 Claims, 5 Drawing Sheets**






Copy provided by USPTO from the PIRS Image Database on 04-23-2020

1/5




FIGURE 1A (Prior Art)




FIGURE 1B (Prior Art)




FIGURE 1C (Prior Art)



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIGURE 2



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIGURE 3




FIGURE 4



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIGURE 5




FIGURE 6



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIGURE 7




FIGURE 8



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

# SENSOR AUTO-RECALIBRATION

## BACKGROUND OF THE INVENTION

1. Field of Invention

The present invention relates to sensors that detect objects, such as studs, behind a wall covering, such as sheetrock, and more particularly to sensors that detect and correct a miscalibration.

2. Description of Related Art

U.S. Pat. No. 4,464,622 entitled "Electronic wall stud sensor," issued Aug. 7, 1984, and incorporated in its entirety by reference herein, discloses an electronic wall stud sensor particularly suitable for locating a stud positioned behind a wall surface. (A "stud" is a structural member of a building to which an interior wall surface such as wall board or paneling is affixed.) Typically in the U.S., "2-by-4" wooden studs are used in construction. Nominally, a 2-by-4 stud is 51 mm (2 inches) wide and 102 mm (4 inches) deep and of any suitable length. The actual dimensions of a 2-by-4 are more typically 38 mm (1½ inches) wide and 89 mm (3½ inches) deep. Use of English units (inches) and U.S. stud sizes here is in conformance with U.S. construction practice and is not intended to be limiting, but is only illustrative. Finding studs is a typical problem for building repairs, picture hanging, etc.

The sensor detects the stud by measuring a change in capacitance due to a change in the dielectric constant along the wall. Due to the placement of the studs, a wall surface exhibits changing dielectric constants while the sensor is moved along the wall's surface. The sensor includes a plurality of capacitor plates, a circuit for detecting changes in the capacitance, and an indicator.

The plurality of capacitor plates is mounted in the sensor such that they can be positioned close to a wall's surface. In operation, an operator places a sensor over a covering surface (such as a wall, floor or ceiling). When the capacitor plates are drawn along the surface, the circuit detects a change in the capacitance of the plates due to a change in the average dielectric constant of the surface. A combination of a wall or other surface covering and an underlying stud or other member has a larger capacitance than a wall covering alone without a stud. The capacitor plates are used to measure the effective capacitance or change in capacitance of a wall.

After the sensor is placed against the wall and before detection begins, the sensor first performs a calibration to null out the effect of a wall in the absence of a stud. The sensor initially calibrates itself by determining a calibration value that may be used as a reference value. If an operator placed the sensor over an object (such as a stud or joist) hidden behind the covering surface during calibration, the sensor may detect a capacitance greater than a capacitance representing just the wall covering. As a result, the sensor may store an erroneous calibration value.

A sensor may detect the erroneous calibration value, alert the operator to begin the calibration process again, and halt the capacitance measurement process. Thus, the operator is forced to recognize the alert and know to reinitialize the calibration process by restarting the sensor over a new area of the wall covering. It may be desirable to automatically recalibrate a sensor that was erroneously calibrated over a hidden object.



## SUMMARY

Some embodiments provide a method of recalibrating a stud sensing device for finding a location of a stud positioned behind a surface, the method comprising the acts of: holding the stud sensing device at a first location on the surface; placing the stud sensing device in an calibration mode; sensing a first density at the first location in the calibration mode; setting a calibration value based on the first sensed density; placing the stud sensing device in an operating mode; moving the stud sensing device to a second location on the surface; sensing a second density at the second location; setting a second density value based on the second sensed density; determining whether the stud sensing device was calibrated over a stud; and recalibrating the stud sensing device if the stud sensing device was calibrated over the stud.

Some embodiments provide a stud sensing device capable of automatically recalibrating if it has erroneously been calibrated at a location over a stud, the stud sensing device comprising: a first memory adapted to hold a calibration value; a second memory adapted to hold a sensed value; a sensor adapted to be applied to a surface, thereby determining a density behind the surface and providing the sensed value, wherein the sensor is operationally coupled to the second memory; a comparator adapted to compare the first memory location to the second memory location, thereby determining if the calibration value represents a value sensed over the stud, wherein the comparator is operationally coupled to the first and second memories; and an updater adapted to update the first memory with an updated calibration value, wherein the updater is operationally coupled to an output of the comparator.

Other features and aspects of the invention will become apparent from the following detailed description, taken in conjunction with the accompanying drawings which illustrate, by way of example, the features in accordance with embodiments of the invention. The summary is not intended to limit the scope of the invention, which is defined solely by the claims attached hereto.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A–1C illustrate a plan view of a prior art single plate capacitive sensor positioned against a wall at a lateral distance away from a hidden stud and the capacitance produced by the sensor and the wall.

FIG. 2 shows a flow chart of an auto-recalibration process, in accordance with the present invention.

FIGS. 3–6 each illustrate a capacitance curve and an overlying calibration capacitance of an auto-recalibration system, in accordance with the present invention.

FIGS. 7–8 both show a system block diagram of an auto-recalibration system, in accordance with the present invention.

## DETAILED DESCRIPTION

In the following description, reference is made to the accompanying drawings, which illustrate several embodiments of the present invention. It is understood that other embodiments may be realized and mechanical, compositional, structural, electrical, and operational changes may be made without departing from the spirit and scope of the present disclosure. The following detailed description is not to be taken in a limiting sense, and the scope of the embodiments of the present invention is defined only by the claims of the issued patent.



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

Some portions of the detailed description which follows are presented in terms of procedures, steps, logic blocks, processing, and other symbolic representations of operations on data bits that can be performed on computer memory. A procedure, computer executed step, logic block, process, etc., are here conceived to be a self-consistent sequence of steps or instructions leading to a desired result. The steps are those utilizing physical manipulations of physical quantities. These quantities can take the form of electrical, magnetic, or radio signals capable of being stored, transferred, combined, compared, and otherwise manipulated in a computer system. These signals may be referred to at times as bits, values, elements, symbols, characters, terms, numbers, or the like. Each step may be performed by hardware, software, firmware, or combinations thereof.

In operation, an operator places a sensor over a covering surface (such as a wall, floor, or ceiling). The sensor initially calibrates itself by determining a calibration value that may be used as a reference value. The operator may have unknowingly placed the sensor over an object (such as a stud or joist) hidden behind the covering surface. If the operator placed the sensor over an object hidden behind the covering surface, the sensor may measure a capacitance greater than a capacitance representing just the wall covering. As a result, the sensor may store an erroneous calibration value.

With time, the sensor takes additional capacitance measurements. As the operator slides the sensor across the surface, resulting capacitance measurements may be larger or smaller than the stored calibration value. If the calibration value is too high in comparison to the additional capacitance measurements, the sensor may not detect a stud or may identify the stud as narrower than its actual width.

In accordance with the present invention, if the sensor determines that it was calibrated over or near a hidden object, the sensor may automatically update the calibration value with a new lower value without operator intervention. This process may repeat until the calibration value is set to a value that represents the wall covering alone without hidden objects behind it. In addition, embodiments of this invention may be used with single plate sensor, sensors having side plates, sensors having two or more plates of similar area, or ratiometric sensors.

FIG. 1A illustrates a plan view of a known capacitive sensor 120 having a single plate 122 positioned against a wall structure 99 at a lateral distance D away from a hidden stud 100. Each stud 100 has two edges 102 and defines a centerline 101 relative to its positioning to the wall 99.

FIGS. 1B and 1C illustrate graphically a capacitance produced between the plate 122 and the wall 99. A capacitance curve 130 shows peaks at the centerline 101 of each stud 100 and a valley between a neighboring pair of studs 100. The capacitance curve 130 shows a minimum capacitance value when the sensor 120 is directly between the pair of studs 100. To mark an edge 102 of a stud 100, a sensor 120 uses a transition capacitance as a reference. To mark a centerline 101 of a stud 100, a sensor 120 must detect the peak of the capacitance curve 130.

As capacitance curve 130 passes through a transition capacitance value, the centerline 124 of the sensor 120 may be approximately over an edge 102 of the stud 100. While the capacitance is above this value, the sensor 120 may indicate it is over the stud 100. The transition capacitance value may be set at the factor and may be less useful in locating edges and centers of studs located behind wall structures having unknown thicknesses and studs having non-standard widths. Alternatively, the transition capacitance may be set to an offset value above the calibration value.

During calibration, a sensor may set an initial calibration value. If an operator placed the sensor between two studs, at a point where the measured capacitance is a minimum, the sensor may set the calibration value to a value that represents a calibration capacitance 140. If the operator placed the sensor over or near a stud, the measured capacitance may be a non-minimum value. As a result, the sensor may set the calibration value to a value that is too large, such as a value that represents an erroneous calibration capacitance 150.

FIG. 2 shows a flow chart of an auto-recalibration process, in accordance with the present invention. At step 201, a sensor begins calibration by taking a first capacitance measurement of the wall covering. At step 202, the sensor uses the measured capacitance of the wall covering as a reference for future measurements. The sensor may store the reference as a calibration value in a first associated memory.

At step 203, the sensor begins normal operation. A new capacitance measurement is taken by the sensor. The sensor may store the new capacitance measurement as a current measurement value in a second associated memory.

At step 204, the current capacitance measurement is used to determine if the calibration value is a proper calibration value. A proper calibration value may be a value that represents a capacitance of just a wall covering without substantial influence from studs and other objects. An improper calibration value may have been taken over or near a stud or metal wiring. An improper calibration value may make a sensor ineffective or less effective at detecting an edge of a stud.

Step 204, checking whether a correction is needed to the calibration value, may be executed with each new capacitance measurement. Alternatively, the calibration value may be checked at various times with one or more methods. For example, the calibration value may be checked with every $N^{th}$ new capacitance measurement or may be checked periodically. The calibration value may be checked intermittently. The calibration value may be checked during a first few seconds after initialization. The calibration value may be checked after a time-out period has elapsed in which a stud has not been detected.

For example, a calibration value may be checked every $1/10^{th}$ of a second for the first 5 seconds then not checked again unless 15 seconds has passed without detection of a stud. Alternatively, a calibration value may be checked every $1/5^{th}$ of a second while the sensor is operating. Alternatively, a calibration value may be checked with every new capacitance measurement taken.

A calibration value may be deemed improper if a new capacitance measurement is less than the calibration value. Alternatively, a calibration value may be deemed improper if a new capacitance measurement is within an offset value from the calibration value. For example, if the calibration value is 115 and the offset value is 10, a new capacitance measurement may be deemed improper if the new capacitance measurement was 105 or less. Additionally, a calibration value may be deemed improper if an average or a running average of a series of new capacitance measurements is within an offset value from the calibration value. A running average may be computed by an arithmetic mean. A running average may be to a median value. A running average may be a computation of new capacitance measurements after excluding extreme or abnormal values.



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

If the calibration value is proper, processing continues at step **206**. The new capacitance measurement along with the calibration value may be used to detect edges and/or a center-line of an object.

If the calibration value is improper, the calibration value may be updated at step **207**. If the calibration value is updated, it may be replaced with a new value. The calibration value may be updated by one of a variety of methods. For example, the calibration value may be updated with a copy of the new capacitance measurement. Alternatively, the calibration value may be decremented by a fraction of the difference between the prior calibration value and new capacitance measurement. Alternatively, the calibration value may be decremented by a fraction of the difference between the prior calibration value and another value such as a running average of new capacitance measurements. Additionally, the calibration value may be updated with each determination that the calibration value was deemed improper or after a series of improper determinations. Alternatively, the calibration value may be updated periodically, intermittently, and/or during a defined period, such as the beginning of use or after a duration of no stud detection.

FIGS. **3**–**6** each illustrate a capacitance curve and an overlying calibration capacitance of an auto-recalibration system, in accordance with the present invention.

FIG. **3** shows a series of sensor measurements represented as sensor capacitance curve **130**. In the scenario shown, a sensor initially sets a calibration value that represents an initial calibration capacitance at time TO. Between time T0 and time T1, the sensor measures new capacitance measurements (represented by curve **130**) that are greater than the initial calibration value. The calibration value is left unchanged. At time T1, subsequent new capacitance measurements fall below the initial calibration capacitance. The calibration value may be deemed improper if a new capacitance measurement value is less than the current calibration value. The calibration value may then take the value of the lower new capacitance measurement, as shown in calibration capacitance curve **300**. After a series of updates to the calibration value, an edge of a stud may be properly detected with a transition capacitance value based on the updated calibration value.

FIG. **4** shows a series of sensor measurements represented as sensor capacitance curve **131**. In the scenario shown, a sensor initially may set and update a calibration value between time T0 and time T2 as described above with reference to FIG. **3**. Between time T2 and time T3, the sensor may be removed from a wall or rocked away from the wall. During this time new capacitance measurements may be extremely low as shown in sensor capacitance curve **131**. It may be undesirable to update the calibration value to a value substantially lower than a value that represents the capacitance of a wall. A procedure to determine whether a calibration value is improper may compare the calibration value to a new capacitance measurement. If the difference is above a threshold value, the new capacitance measurement may be considered invalid and may be ignored. In such cases, a calibration value may be left unchanged as shown in the calibration capacitance curve **400**. Alternatively, calibration value may be slowly adjusted towards the lower value. For example, during each iteration an calibration value may be updated with a value equal to the calibration value decremented one percent of a difference between the calibration value and the new capacitance measurement.

Under circumstances that an operator initiates initialization while the sensor is off the wall or not at an angle flush with the wall, the sensor may erroneously set the calibration value to a value that represents a capacitance taken off of the wall. If during initialization the sensor determines that it is in a position away from the wall, the sensor may leave a calibration value at a default value or a null value. For example, a sensor may have a default initial value that represents a typical capacitance experienced by a sensor against multiple layers of sheetrock and multiple studs. Alternatively, a sensor may have a default initial value that indicates no value has been set. Alternatively, a sensor may have a default value representing a maximum possible value. Alternatively, a sensor may have a default value representing a minimum possible value.

FIG. **5** shows a series of sensor measurements represented as sensor capacitance curve **130**. In the scenario shown, a sensor may periodically update a calibration value. For example, at time T0, the sensor sets the calibration value to a value that represents an initial capacitance detected. Then the sensor periodically compares a new capacitance measurement to the calibration value. If the calibration value and a new capacitance measurement differ by more than a threshold amount, the sensor updates the calibration value. The threshold amount may be zero or a non-zero value. For example, at time T4 the sensor determines that the new capacitance measurement is more than a threshold amount below the calibration value. The sensor may then update the calibration value with a new value. For example, the sensor may update the calibration value with a value equal to the new capacitance measurement, as shown in the calibration capacitance curve **500** at time T4. The process repeats at the next period shown at time T5. Subsequent new capacitance measurement are within the threshold amount from the calibration value, therefore, the calibration value is not updated, as shown in the calibration capacitance curve **500** after time T5.

FIG. **6** shows a series of sensor measurements represented as sensor capacitance curve **130**. In the scenario shown, a sensor may periodically update a calibration value as described above with reference to FIG. **5**. However, instead of updating a calibration value to a value equal to a new capacitance measurement, the calibration value is decremented by a fraction of a value that represents a difference between the calibration value and the new capacitance measurement. For example, at times T6, T7, T8 and T9, the calibration value may be updated by a value that equals the calibration value less one-half of the difference between the calibration value and the new capacitance measurement, as shown in calibration capacitance curve **600**. A different fraction of the difference may be used, for example, one-fourth or three-fourths. The process may continue until the calibration value approximately equals the new capacitance measurement. Alternatively, the process may continue until a difference between the calibration value and a new capacitance measurement is less than a threshold value, as shown in calibration capacitance curve **600** after time T9.

FIGS. **7**–**8** both show a system block diagram of an auto-recalibration system, in accordance with the present invention.

FIG. **7** represents a data flow block diagram of a sensor system after initialization. Sensor circuitry (which is conventional) **701** measures and provides a capacitance measurement. The capacitance measurement may be recorded in a first associated memory **702**. A comparator **703** uses the capacitance measurement from first memory **702** and a second memory **704**. Second memory **704** may be initialized with a calibration value. By comparing values in first memory **702** and second memory **704**, comparator **703** determines whether the calibration value is proper or



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

improper. If the calibration value is improper, an updater **705** may compute or determine an updated calibration value and record it in second memory **704**. When updater **705** modifies second memory **704**, an indicator **706** may be activated. Indictor **706** may be used to alert an operator (e.g., via sound or a display) that a mis-calibration previously occurred and the sensor is attempting to automatically recalibrate itself to correct the error.

FIG. **8** illustrates that the sensor system of FIG. **7** may be implemented using a microprocessor. For example, sensor circuitry **801** may measure and provide a capacitance measurement to a microprocessor **802** coding the software, etc. is well within the abilities of one of ordinary skill in the art in light of this disclosure, and may be accomplished using any suitable programming language. Software, firmware, assembly code, machine code or the like may be used to instruct and control microprocessor **802**. Microprocessor (or microcontroller) **802** may include memory for storing a calibration value and one or more capacitance measurements and performs the functions of elements **702–705** of FIG. **7**. Instructions may be used to compare or compute whether a new capacitance measurement may show that a calibration value is invalid or improper. If so, microprocessor **802** may include additional instructions to update or compute and store an updated calibration value. Furthermore, microprocessor **802** may be coupled to an indicator **803** to provide an alert, such as an audible and/or visual alert, to an operator.

While the invention has been described in terms of particular embodiments and illustrative figures, those of ordinary skill in the art will recognize that the invention is not limited to the embodiments or figures described. Moreover, the figures provided are merely representational and may not be drawn to scale. Certain proportions thereof may be exaggerated, while others may be minimized. The figures are intended to illustrate various implementations of the invention that can be understood and appropriately carried out by those of ordinary skill in the art.

Therefore, it should be understood that the invention can be practiced with modification and alteration within the spirit and scope of the appended claims. The description is not intended to be exhaustive or to limit the invention to the precise form disclosed. It should be understood that the invention can be practiced with modification and alteration and that the invention be limited only by the claims and the equivalents thereof.

What is claimed as new and desired to be protected by Letters Patent of the United States is:

**1**. A method of recalibrating a stud sensing device for finding a location of a stud positioned behind a surface, the method comprising the acts of:

holding the stud sensing device at a first location on the surface;

placing the stud sensing device in an calibration mode;

sensing a first density at the first location in the calibration mode;

setting a calibration value based on the first sensed density;

placing the stud sensing device in an operating mode;

moving the stud sensing device to a second location on the surface;

sensing a second density at the second location;

setting a second density value based on the second sensed density;

the stud sensing device determining if it was calibrated over or near a stud; and

the stud sensing device recalibrating itself if it determined that the stud sensing device was calibrated over or near the stud.

**2**. The method of claim **1**, wherein the act of determining if the stud sensing device was calibrated over or near the stud includes:

comparing the calibration value to the second density value; and

determining that the stud sensing device was calibrated over or near the stud if the second density value is more than a threshold amount less than the calibration value.

**3**. The method of claim **1**, wherein the act of determining if the stud sensing device was calibrated over or near the stud includes:

comparing the calibration value to the second density value; and

determining that the stud sensing device was calibrated over or near the stud if the second density value is between a first threshold amount under the calibration value and a second threshold amount less than the calibration value.

**4**. The method of claim **3**, wherein the second threshold amount is an offset value from the calibration value.

**5**. The method of claim **3**, wherein the second threshold amount is a constant value.

**6**. The method of claim **1**, wherein the act of recalibrating the stud sensing device includes the stud sensing device resetting the calibration value based on the second density value.

**7**. The method of claim **6**, wherein the act of resetting the calibration value based on the second density value includes the stud sensing device setting the calibration value equal to the second density value.

**8**. The method of claim **6**, wherein the act of resetting the calibration value based on the second density value includes the stud sensing device decreasing the calibration value by a fraction of a difference between the calibration value and the second density value.

**9**. The method of claim **1**, further comprising the acts of:

moving the stud sensing device to a new location on the surface;

sensing a new density at the new location;

resetting the second density value based on the new sensed density;

the stud sensing device determining if it was recalibrated over or near the stud; and

the stud sensing device recalibrating itself if it determined that the stud sensing device was calibrated over or near the stud.

**10**. The method of claim **1**, further comprising the act of indicating to a user when the stud sensing device is recalibrated.

**11**. The method of claim **10**, wherein the act of indicating includes providing both an audible and visible indication to the user.

**12**. A stud sensing device capable of automatically recalibrating if it has erroneously been calibrated at a location over or near a stud, the stud sensing device comprising:

a first memory adapted to hold a calibration value;

a second memory adapted to hold a sensed value;

a sensor adapted to be applied to a surface, thereby determining a density behind the surface and providing the sensed value, wherein the sensor is operationally coupled to the second memory;

a comparator adapted to compare the first memory location to the second memory location, thereby determining if the calibration value represents a value sensed



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

over or near the stud, wherein the comparator is operationally coupled to the first and second memories; and

an updater adapted to update the first memory with an updated calibration value, wherein the updater is operationally coupled to an output of the comparator.

**13.** The sensor of claim **12**, further comprising a controller adapted to coordinate operation of the sensor, the comparator and the updater.

**14.** The sensor of claim **12**, further comprising an indicator adapted to indicate to a user when the first memory changes, wherein the indicator is operationally coupled to the output of the comparator.

**15.** The sensor of claim **12**, wherein the stud sensing device updates the calibration value without operator intervention.

**16.** The method of claim **1**, wherein the device recalibrates itself by updating a calibration value without user intervention.

**17.** A method of recalibrating a stud sensing device for finding a location of a stud positioned behind a surface, the method comprising the acts of:

holding the stud sensing device at a first location on the surface;

placing the stud sensing device in an calibration mode;

sensing a first density at the first location in the calibration mode;

setting a calibration value based on the first sensed density;

placing the stud sensing device in an operating mode;

moving the stud sensing device to a second location on the surface;

sensing a second density at the second location;

setting a second density value based on the second sensed density;

determining whether the stud sensing device was calibrated over or near a stud;

recalibrating the stud sensing device if the stud sensing device was calibrated over or near the stud;

wherein the act of determining whether the stud sensory device was calibrated over or near a stud includes:

comparing the calibration value to the second density value; and

determining that the stud sensing device was calibrated over or near the stud if the second density value is more than a threshold amount less than the calibration value.

**18.** A method of recalibrating a stud sensing device for finding a location of a stud positioned behind a surface, the method comprising the acts of:

holding the stud sensing device at a first location on the surface;

placing the stud sensing device in an calibration mode;

sensing a first density at the first location in the calibration mode;

setting a calibration value based on the first sensed density;

placing the stud sensing device in an operating mode;

moving the stud sensing device to a second location on the surface;

sensing a second density at the second location;

setting a second density value based on the second sensed density;

determining whether the stud sensing device was calibrated over or near a stud;

recalibrating the stud sensing device if the stud sensing device was calibrated over or near the stud;

wherein the act of determining whether the stud sensory device was calibrated over or near a stud includes:

comparing the calibration value to the second density value; and

determining that the stud sensing device was calibrated over or near the stud if the second density value is between a first threshold amount under the calibration value and a second threshold amount less than the calibration value.

**19.** A method of recalibrating a stud sensing device for finding a location of a stud positioned behind a surface, the method comprising the acts of:

holding the stud sensing device at a first location on the surface;

placing the stud sensing device in an calibration mode;

sensing a first density at the first location in the calibration mode;

setting a calibration value based on the first sensed density;

placing the stud sensing device in an operating mode;

moving the stud sensing device to a second location on the surface;

sensing a second density at the second location;

setting a second density value based on the second sensed density;

determining whether the stud sensing device was calibrated over or near a stud;

recalibrating the stud sensing device if the stud sensing device was calibrated over or near the stud;

wherein the act of recalibrating the stud sensing device includes resetting the calibration value based on the second density value; and

wherein the act of resetting the calibration value based on the second density value includes setting the calibration value equal to the second density value.

**20.** A method of recalibrating a stud sensing device for finding a location of a stud positioned behind a surface, the method comprising the acts of:

holding the stud sensing device at a first location on the surface;

placing the stud sensing device in an calibration mode;

sensing a first density at the first location in the calibration mode;

setting a calibration value based on the first sensed density;

placing the stud sensing device in an operating mode;

moving the stud sensing device to a second location on the surface;

sensing a second density at the second location;

setting a second density value based on the second sensed density;

determining whether the stud sensing device was calibrated over or near a stud;

recalibrating the stud sensing device if the stud sensing device was calibrated over or near the stud;

wherein the act of recalibrating the stud sensing device includes resetting the calibration value based on the second density value; and

wherein the act of resetting the calibration value based on the second density value includes decreasing the calibration value by a fraction of a difference between the calibration value and the second density value.

* * * * *



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

CX - 0002
RX - 0004
JX - 0002

U 8042612

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

May 04, 2020

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *7,148,703*
ISSUE DATE: *December 12, 2006*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

SYLVIA HOLLEY
Certifying Officer

UNITED STATES PATENT AND TRADEMARK OFFICE
DEPARTMENT OF COMMERCE

US007148703B2

(12) **United States Patent**
Miller

(10) **Patent No.: US 7,148,703 B2**
(45) **Date of Patent: *Dec. 12, 2006**

(54) **AUTO-DEEP SCAN FOR CAPACITIVE SENSING**

(75) Inventor: **Lawrence F. Miller**, Los Gatos, CA (US)

(73) Assignee: **Zircon Corporation**, Campbell, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/846,337**

(22) Filed: **May 14, 2004**

(65) **Prior Publication Data**

US 2005/0253597 A1 Nov. 17, 2005

(51) **Int. Cl.**
***G01R 27/26*** (2006.01)
***G01R 19/00*** (2006.01)

(52) **U.S. Cl.** ........................ **324/662**; 324/686; 324/67

(58) **Field of Classification Search** ............... 324/686, 324/662, 67, 663, 665
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,278,843 A 10/1966 Deming
3,662,258 A 5/1972 Murphy et al.
3,704,413 A 11/1972 Blevins
3,836,848 A 9/1974 Blevins
3,893,025 A 7/1975 Humphreys, Jr.
4,041,382 A 8/1977 Washburn
4,067,225 A 1/1978 Dorman et al.
4,086,528 A 4/1978 Walton
4,099,118 A 7/1978 Franklin et al.
4,130,796 A 12/1978 Shum
4,322,678 A 3/1982 Capots et al.
4,464,622 A 8/1984 Franklin
4,639,666 A 1/1987 Strosser et al.
4,676,100 A 6/1987 Eichberger
4,752,727 A 6/1988 Schneider
4,847,552 A 7/1989 Howard
4,853,617 A 8/1989 Douglas et al.

(Continued)

FOREIGN PATENT DOCUMENTS

EP 1 341 005 A2 9/2003

(Continued)

OTHER PUBLICATIONS

International Search Report mailed on May 30, 2005 for PCT patent application No. PCT/US2005/003348 filed Feb. 4, 2005, 3 pages.

(Continued)

*Primary Examiner*—Andrew H. Hirshfeld
*Assistant Examiner*—John Zhu
(74) *Attorney, Agent, or Firm*—Morrison & Foerster LLP

(57) **ABSTRACT**

A stud or joist sensor and associated sensing method using an amplitude and a ratio of capacitance measurements from a plurality of capacitive sensing elements. The sensor locates a feature of an object or discontinuity behind a surface or wall, such as an edge and/or a center of a stud behind the surface, a joist under a floorboard, a gap behind sheetrock, a metal conductor behind a surface or the like. The sensor may be moved over the surface, thereby detecting changes in capacitance. The change in capacitance is due to the effective dielectric constant caused by the passage over a hidden object such as a stud. When two capacitive sensing elements provide equivalent capacitance measures, the sensor is over a centerline of the stud. When a ratio of the capacitance measurements equals a transition ratio, the sensor is over an edge of the stud. When the sensor is over the stud and the capacitance measurements are low, the sensor is over a deep stud.

**14 Claims, 7 Drawing Sheets**






Copy provided by USPTO from the PIRS Image Database on 04-23-2020

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,868,910 | A | 9/1989 | Maulding | |
| 4,939,455 | A | 7/1990 | Tsugawa | |
| 4,947,116 | A | 8/1990 | Welcome et al. | |
| 4,992,741 | A | 2/1991 | Douglas et al. | |
| 5,023,494 | A | 6/1991 | Tsukii et al. | |
| 5,283,528 | A | 2/1994 | van Seeters | |
| 5,352,974 | A | 10/1994 | Heger | |
| 5,425,367 | A * | 6/1995 | Shapiro et al. | 600/424 |
| 5,457,394 | A | 10/1995 | McEwan | |
| 5,485,092 | A | 1/1996 | Fortin | |
| 5,594,353 | A | 1/1997 | Hemphill | |
| 5,617,031 | A | 4/1997 | Tuttle | |
| 5,619,128 | A | 4/1997 | Heger | |
| 5,812,057 | A | 9/1998 | Hepworth et al. | |
| 5,917,314 | A | 6/1999 | Heger et al. | |
| 6,023,159 | A | 2/2000 | Heger | |
| 6,198,271 | B1 * | 3/2001 | Heger et al. | 324/67 |
| 6,211,662 | B1 | 4/2001 | Bijawat et al. | |
| 6,501,284 | B1 * | 12/2002 | Gozzini | 324/662 |
| 6,552,677 | B1 * | 4/2003 | Barnes et al. | 342/22 |
| 6,556,935 | B1 | 4/2003 | Morimura et al. | |
| 6,587,093 | B1 * | 7/2003 | Shaw et al. | 345/163 |
| 6,650,126 | B1 | 11/2003 | Indihar | |
| 6,700,391 | B1 * | 3/2004 | Strack et al. | 324/662 |
| 6,804,262 | B1 * | 10/2004 | Vogel et al. | 370/480 |
| 6,894,508 | B1 * | 5/2005 | Sanoner et al. | 324/662 |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1 341 005 A3 | 9/2003 |

## OTHER PUBLICATIONS

International Search Report mailed on Jun. 8, 2005 for PCT patent application No. PCT/US2005/004586 filed on Feb. 11, 2005, 3 pages.

Wang, B. et al. (May 19-21, 1997). "High-Accuracy Circuits for On-Chip Capacitive Ratio Testing and Sensor Readout," *IEEE Instrumentation and Measurement Technology Conference, Ottawa, Canada* (May 19-21, 1997), 2:1169-1172.

* cited by examiner



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIGURE 1A




FIGURE 1B




FIGURE 1C



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIGURE 1D




FIGURE 1E



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIGURE 2B




FIGURE 2A



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIGURE 2C



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIGURE 3



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIG. 4A




FIG. 4B



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIG. 5



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

# AUTO-DEEP SCAN FOR CAPACITIVE SENSING

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to an electronic sensor, and, in particular, to a sensor suitable for detecting the location of an object behind a variety of surfaces, such as walls, floors and other non-electrically conductive structures (but not limited to building structures). More specifically, the invention relates to an electronic sensor useful to detect centerlines and edges of wall studs, floor joists, and the like.

2. Description of the Prior Art

U.S. Pat. No. 4,464,622 entitled "Electronic wall stud sensor," issued Aug. 7, 1984, and incorporated in its entirety by reference herein, discloses an electronic wall stud sensor particularly suitable for locating a stud positioned behind a wall surface. (A "stud" is a structural member of a building to which an interior wall surface such as wall board or paneling is affixed.) Typically in the U.S., "2-by-4" wooden studs are used in construction. Nominally, a 2-by-4 stud is 51 mm (2 inches) wide and 102 mm (4 inches) deep and of any suitable length. The actual dimensions of a 2-by-4 are more typically 38 mm (1½ inches) wide and 89 mm (3½ inches) deep. Use of English (inches) units and U.S. stud sizes here is in conformance with U.S. construction practice and is not intended to be limiting, but is only illustrative. Finding studs is a typical problem for building repairs, picture hanging, etc.

The sensor detects the stud by measuring a change in capacitance due to a change in the dielectric constant along the wall. Due to the placement of the studs, a wall surface exhibits changing dielectric constants while the sensor is moved along the wall surface. The sensor includes a plurality of capacitor plates, a circuit for detecting changes in the capacitance, and an indicator.

The plurality of capacitor plates is mounted in the sensor such that they can be positioned close to a wall's surface. When the capacitor plates are drawn along the surface, the circuit detects a change in the capacitance of the plates due to a change in the average dielectric constant of the surface. The capacitor plates are used to measure the effective capacitance or change in capacitance of a wall. Before detection begins, the sensor first performs a calibration to null out the effect of a wall in the absence of a stud.

The capacitor plates are composed of a center plate and a symmetric pair of electrically connected edge plates. A difference in capacitance between the center and edge plates is used to determine the location of the edge of a stud. The centerline of the stud is then determined by finding both the left and right edges of the stud and then measuring to the middle of the distance between the edges. Thus, multiple measurements must be made in order to determine the centerline of the stud. The indicator indicates a change in capacitance of the capacitor plate, thereby alerting an operator to the wall stud position. The indicator also alerts the operator when calibration is occurring.

While this procedure is effective in determining the centerline of a stud, significant errors in determining the location of the stud's edges can occur. One factor is the depth of the stud behind the surface. Due to the thickness of the sheetrock (also referred to as gypsum wall board and which has a thickness of 16 mm or equivalently ⅝ of an inch) or other wall surface material, a "ballooning" effect may distort the perceived width of the stud. The closer a stud is positioned to the surface, the wider the stud will appear



when sensed in this way. Similarly, the farther or deeper a stud is positioned, the narrower the stud will appear. This ballooning effect is exacerbated when the sensitivity of the sensor is increased to aid in detecting deeper studs. The ballooning may be asymmetric due to electrical wires, metallic pipes and other objects in close proximity to the stud, which in turn may lead to a reduced ability to accurately determine a stud's centerline. In the case of extreme ballooning, location of an edge of a stud can be inaccurately indicated by as much as 51 mm (2 inches). Similarly, the centerline of the stud may be so inaccurately indicated that it is completely off the actual stud location.

A first method of compensating for the ballooning effect is shown in U.S. Pat. No. 6,023,159, entitled "Stud sensor with dual sensitivity," issued Feb. 8, 2000, and incorporated by reference herein in its entirety. Unfortunately, using a dual sensitivity control only partially minimizes the ballooning effect.

A second method of compensating for the ballooning effect is shown in U.S. Pat. No. 5,917,314, entitled "Electronic wall-stud sensor with three capacitive elements," issued Jun. 29, 1999, and incorporated by reference herein. This second method discloses using three parallel sensing plates and using sums and differences between the various plate capacitances to determine the centerline and edges of a stud.

The above methods, which use electronic wall stud sensors, are unable to reliably and accurately sense an edge of a stud (or other structural member) through surfaces that are thicker than 38 mm (1½ inches). Additionally, these sensors, if overly sensitive, falsely indicate the presence of non-existing studs. Therefore, known sensors have disadvantages.

## BRIEF SUMMARY

An apparatus and method for determining a feature of a member located behind a surface while reducing effects of an unknown thickness of the member are provided. The feature is, e.g., a centerline and/or an edge of a building object or member, such as a stud or joist but is not so limited. The feature may also be an edge of a gap or discontinuity of the structure. The sensor apparatus includes a plurality of capacitive plates. The sensor may also include circuitry to sense an effective capacitance created by a plate, the covering and objects behind the covering. The sensor may compute a ratio between the capacitance measurements of a pair of the plates. A ratio of approximately one may indicate a centerline of a stud or joist or similar member. A ratio in a predetermined range may indicate an edge of a stud or joist. Additionally, the sensor may analyze a capacitance measurement to determine a depth of the feature.

Some embodiments of the invention provide a method of finding a feature behind a surface using a sensor having first and second plates, the method comprising the acts of: moving the sensor and surface adjacent one another; measuring a first capacitance of a first capacitor including the first plate and the feature; measuring a second capacitance of a second capacitor including the second plate and the feature; computing a ratio of the first and second capacitance measurements; and comparing one of the first or second capacitance measurements with a first threshold, thereby to determine an indication of a depth of the feature.

Some embodiments of the invention provide a method of finding a feature behind a surface using a sensor having a first plate and a second plate of approximately equal areas, the method comprising the acts of: moving the sensor and



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

surface adjacent one another; measuring a first capacitance of a first capacitor including the first plate and the feature; measuring a second capacitance of a second capacitor including the second plate and the feature; comparing the first capacitance measurement to the second capacitance measurement; comparing one of the first or second capacitance measurements with a first threshold; and repeating the acts of measuring and comparing.

Some embodiments of the invention provide a sensor for finding a feature of a structure comprising: a first plate having a first capacitance and adapted for forming a first capacitor with the structure; a second plate having a second capacitance and adapted for forming a second capacitor with the structure; a first measurement circuit coupled to the first plate, the first measurement circuit measuring a first capacitance value of the first capacitor; a second measurement circuit coupled to the second plate, the second measurement circuit measuring a second capacitance value of the second capacitor; and a comparison circuit coupled to the first and second measurement circuits, the comparison circuit generating a ratio of the first and second capacitance values and comparing one of the first or second capacitance values to a first threshold.

Some embodiments of the invention provide a sensor comprising: a first plate and a second plate positioned in about the same plane and spaced apart, and adapted to be located adjacent a surface; a measurement circuit coupled to the first and second plates thereby to measure a capacitance value of each of the plates; a first comparison circuit coupled to receive the measured capacitance values and determine a ratio between a change in the measured capacitance values; and a second comparison circuit coupled to receive one of the measured capacitance values and a threshold and to provide a comparison therebetween.

Other features and aspects of the invention will become apparent from the following detailed description, taken in conjunction with the accompanying drawings which illustrate, by way of example, the features in accordance with embodiments of the invention. The summary is not intended to limit the scope of the invention, which is defined solely by the claims attached hereto.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A–1D illustrate a plan view of and capacitance produced by a ratiometric capacitive sensor having two primary plates, in accordance with the present invention, positioned at a lateral distance away from an object, such as a hidden stud.

FIGS. 2A–2C show a sensor centered over studs and a graph of capacitance measurements of two primary plates versus a lateral distance between a sensor and a shallow object and a deep object, such as hidden studs, in accordance with the present invention.

FIG. 3 illustrates a process to indicate whether or not a depth feature of an object, such as a stud, has been detected, in accordance with the present invention.

FIGS. 4A and 4B each show a block diagram of a capacitive sensor having two primary plates and circuitry, in accordance with the present invention;

FIG. 5 shows detail of FIG. 4A.

## DETAILED DESCRIPTION

In the following description, reference is made to the accompanying drawings which illustrate several embodiments of the present invention. It is understood that other embodiments may be utilized and mechanical, compositional, structural, electrical, and operational changes may be made without departing from the spirit and scope of the present disclosure. The following detailed description is not to be taken in a limiting sense, and the scope of the embodiments of the present invention is defined only by the claims of the issued patent.

Some portions of the detailed description which follows are presented in terms of procedures, steps, logic blocks, processing, and other symbolic representations of operations on data bits that can be performed on computer memory. A procedure, computer executed step, logic block, process, etc., are here conceived to be a self-consistent sequence of steps or instructions leading to a desired result. The steps are those utilizing physical manipulations of physical quantities. These quantities can take the form of electrical, magnetic, or radio signals capable of being stored, transferred, combined, compared, and otherwise manipulated in a computer system. These signals may be referred to at times as bits, values, elements, symbols, characters, terms, numbers, or the like. Each step may be performed by hardware, software, firmware, or combinations thereof.

This application relates to U.S. patent application Ser. No. 10/794,356 filed Mar. 4, 2004, titled "RATIOMETRIC STUD SENSING" and which is incorporated herein in its entirety by reference.

A ratiometric capacitive sensor may use capacitance measurements from multiple conductive plates to determine the presence of objects, such as studs and joists, hidden behind a covering surface such as a wall, floor, ceiling, etc. In some embodiments, a ratiometric capacitive sensor includes two conductive plates. Each conductive plate acts as part of a separate capacitor. Circuitry coupled to each plate measures an effective change in capacity of the separate capacitors, which is effected by the density of material in close proximity to the plates. As a result, a wall or other surface covering combined with an underlying stud or other member form a larger capacitance than a wall covering alone without a stud. A capacitance measurement may be taken from each plate. The capacitance measurement from one plate may then be compared to a capacitance measurement of another plate to determine boundaries and features of the materials in the vicinity of the plates.

FIG. **1A** illustrates a plan view of a capacitive sensor **300** having two primary plates **301**, **302**, in accordance with the present invention. The sensor **300** is positioned against a wall **99** at a lateral distance D away from a hidden stud **100A**. A wall may have multiple studs **100** (e.g., **100A**, **100B** and **100C**). Each stud **100** has two edges **102** and defines a centerline **101** relative to its positioning along the wall **99**. Additionally, sensor **300** defines a centerline **304** that may be equally positioned between a first plate **301** and a second plate **302**. In some embodiments, associated circuitry and/or software (not shown) operates to independently measure values indicative of a capacitance of each plate **301** and **302**.

FIGS. **1B** and **1C** illustrate a capacitance produced between each respective plate **301** and **302** of the sensor **300** and the wall **99**. FIG. **1B** shows a capacitance curve **310** produced by the first plate **301** and the wall **99**. FIG. **1C** shows a capacitance curve **320** produced by the second plate **302** and the wall **99**. Capacitance curves **310** and **320** are drawn relative to the centerline **304** of the sensor **300**. Additionally, curves **310** and **320** show peaks when respective plates **301** and **302** are positioned over the centerline **101** of a stud **100** and show valleys when respective plates **301** and **302** are positioned between pairs of studs **100**,



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

At points where a sensor 300 measures a minimum capacitance valve or a relatively low capacitance valve, sensor 300 may be positioned far from any stud 100. The measured capacitance values increase as the sensor 300 nears the stud 100; however, the capacitance values of each plate 301 and 302 will differ if one of the plates is closer to the stud 100. For example, a first plate 301 may be close to or over an edge 102 of a stud 100. At the same time, the second plate 302 may still be positioned at a lateral distance away from the stud 100. In this case, the change in capacitance from its minimum value experienced by the first plate 301 will be greater than the change in capacitance experienced by the second plate 302.

In some embodiments, the capacitance measurements are used to calculate a ratio. A first capacitance measurement represents the change in capacitance from a calibration value experienced on a first plate 301. A second capacitance measurement represents the change in capacitance from a calibration value experienced on a second plate 302. A ratio between the first and second capacitance measurements may be computed. If the ratio is approximately equal to a determined value, it may be realized that a centerline 304 of the sensor 300 is centered over an edge 102 of a stud 100. If the capacitance measurements are equal or the ratio is approximately equal to unity, both plates may be centered over the stud's edge 102 and the centerline 304 of the sensor 300 may be centered over the centerline 101 of the stud 100.

FIG. 1D shows overlapping first and second capacitance curves 310 and 320 relative to the centerline 304 of the sensor 300 and a stud 100. A point at which curves 310 and 320 intersect may indicate a position of the sensor 300 where each plate is encountering an equal capacitance; therefore, the centerline 304 of the sensor 300 may be directly over a centerline 101 of the stud 100. In some embodiments, at least one of the capacitance values must be above a floor threshold value, a value above a calibration capacitance value, before the capacitance measurements are compared with each other.

FIG. 1E shows a graph of a curve 330, which represents a ratio of capacitance measurements of two primary plates 301, 302 versus a lateral distance between a ratiometric capacitive sensor's centerline 304 and a centerline 101 of a stud 100, in accordance with the present invention. This ratio may be computed as the smaller capacitance divided by the larger capacitance, thereby resulting in a ratio that is equal to or less than one.

The calculated results, shown in a ratio curve 330, exhibits a sharp peak. The sharp peak of curve 330 allows a ratiometric sensor to locate a stud's centerline 101 with increased accuracy over non-ratiometric sensor, which may generate rounded peaked curves.

Additionally, a transition ratio may be compared to the calculated ratio to determine the location of an edge 102 of a stud 100 as further described below. The transition ratio predicts a capacitance ratio formed at an edge of a stud when the sensor 300 is centered over the stud's edge for a particular wall structure. As such, a transition ratio may be used to indicate when the sensor 300 is centered over an edge 102.

A transition ratio may be determined in a number of ways. The transition ratio may be a factory set constant. Alternatively, the transition ratio may be set by an operator. In some embodiments, the transition ratio is calculated during operation.

In some embodiments, a transition ratio may be set during manufacturing as a factory set constant. For example, a factory may set a transition ratio equal to a fixed value, e.g., 0.33. When plates produce capacitance measurements that form a ratio approximately equal to 0.33, sensor 300 may indicate that the center of sensor 300 is directly over an edge 102 of stud 100.

In some embodiments, a transition ratio may be directly or indirectly selected by an operator of the sensor. For example, an operator may select a stud width and/or a wall thickness. The stud width and/or wall thickness may be used to select an appropriate transition ratio, for example, as shown in the table below.

| Stud Type | Wall Covering Thickness | Transition Ratio |
|---|---|---|
| Double stud 76 mm (3 inches) | Single sheet 13 mm (½ an inch) | 0.32 |
| Single stud 38 mm (1½ inches) | Single sheet 13 mm (½ an inch) | 0.33 |
| Double stud 76 mm (3 inches) | Double sheet 25 mm (1 inch) | 0.35 |
| Single stud 38 mm (1½ inches) | Double sheet 25 mm (1 inch) | 0.45 |

In some embodiments, a transition ratio may be automatically determined by the sensor 300 based on capacitance measurements. A capacitance measurement may be a measure of a maximum capacitance measurement on a plate as shown in FIG. 3.

In some circumstances, the actual ratio of measured plate capacitances at the stud's edge 102 varies predictably with the wall thickness. Therefore, a maximum measured capacitance value may be used to set a transition ratio used to locate a stud's edge. This maximum value may indicate a wall covering's thickness, with thicker walls having smaller maximum values. The maximum value may also provide an indication of the width of the stud, with wider studs having larger maximum values. The measured capacitance values may also be compared to indicate a direction of a stud with the plate having a higher capacitance measurement indicating the direction of the center of the stud.

In some embodiments, plate capacitance is measured by determining a time it takes to charge a plate 301 or 302 to a determined value. In other embodiments, plate capacitance is measured by determining a voltage that charges a plate 301 or 302 within a determined time. In either case, an output of a digital-to-analog converter ("DAC") may provide a voltage used to charge the plate. A DAC output may be represented by a digital input value. An input to the DAC may be supplied from a counter, such as an up/down counter, or may be supplied from a microcontroller or microprocessor. This input value may be referred to as a DAC count. A DAC count may have a determined reference point. For example, a DAC value may be referenced from zero. Alternatively, a DAC value may be referenced from a value determined from calibration processing or the like.

FIGS. 2A and 2B each illustrate a plan view of capacitive sensor 300 with the centerline 304 centered directly over a centerline 101 of a hidden stud 100, resulting in a center-to-center distance of D=0. In this position, each plate 301 and 302 may be partially over the stud 100. Each plate 301 and 302 will have a capacitance value that is some minimum threshold above its calibration value, below its maximum value, and approximately equal to a common value. Therefore, a centerline of an object may be located by identifying when two plates have capacitance values equal to a common value that is above some floor threshold value.



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

A covering of wall (surface) 99 may be of different thicknesses. A thin wall covering will exhibit a low nominal capacitance, where as a thicker wall covering will exhibit a higher nominal capacitance. A stud positioned behind a thin wall covering will produce a high maximum capacitance. A stud position behind a thicker wall covering will be farther away from the wall's external surface and therefore will produce a lower maximum capacitance.

FIG. 2C shows capacitance curves for two plates **301, 302** for a sensor **300** that has been pulled across a wall **99.** As a sensor **300** passes over a first stud **100**A, sensor **300** measures capacitances shown on curves **310**A and **320**A for respective plates **301** and **302.** As a sensor **300** passes over a second stud **100**B, sensor **300** measures lower capacitance values as shown in curves **310**B and **320**B. Lower capacitance values may represent a deeper (farther behind wall **99**) or narrower stud. Alternatively, higher capacitance values may represent a shallower or wider stud.

Sensor **300** may compare capacitance measurements to a depth threshold. For example, when sensor **300** is positioned over an edge of a stud, a center of a stud, or between edges of a stud, sensor **300** may indicate whether or not the detected stud is a deep stud or not a deep stud. The indication may be an audio indication, such as from a buzzer in sensor **300**, a visual indication, such as from an LED, a signal level, such as supplied to a control line, or any combination thereof.

The indication of a depth of a feature may be used by the sensor operator. For example, if most features are determined to originate from a non-deep stud, the operator may conclude that deep features are anomalies. Similarly, if most features are determined to be deep, then any non-deep features may be ignored by the operator.

Assuming stud **100**A is positioned at a first distance behind a wall's surface and stud **100**B is positioned at a farther distance behind the wall's surface, each stud will produce a different capacitance measurement when sensor **300** is centered over the stud. For example, when sensor **300** is centered over stud **100**A, DAC counts of 80 above calibration values on each plate may result. When sensor **300** is centered over stud **100**B, DAC counts of 30 above the calibration values on each plate may result.

Plates producing equal measurements above a floor threshold indicate that the sensor is centered over the stud. Additionally, a higher DAC count indicates that the stud is closer to the surface, the stud is wider than a reference stud and surface, or a material of higher conductivity is detected. An example DAC count of 80 may represent that a single-width stud is positioned behind a single-layer of sheetrock. An example DAC count of 30 may represent that a single-width stud is positioned behind a double-layer of sheetrock.

In some embodiments, a transition ratio may be calculated by sensor **300** based on a historic maximum capacitance measurement. In other embodiments, the transition ratio may be calculated based on an instantaneous maximum capacitance measurement.

A historic maximum capacitance measurement may be determined over time as measured from either plate **301** or **302.** A maximum capacitance measurement is expected when the plate **301** or **302** is centered over a stud. The maximum capacitance measurement may be saved in memory of sensor **300.** As the capacitance changes over time, an updated maximum capacitance value may be stored.

Alternatively, a capacitance measurement may be used. A capacitance measurement may be selected each time the sensor **300** takes each pair of capacitance measurements from plates **301** and **302.** In some embodiments, the larger



of the two capacitance measurements may represent the capacitance measurement. That is:

$$C=\max\{\text{FirstPlateValue},\text{SecondPlateValue}\}.$$

In other embodiments, the instantaneous capacitance value may be determined by examining the capacitance formed by a single plate **301.** In some embodiments, the instantaneous capacitance value is determined over a period of time, e.g., by a moving average or the like.

Using the capacitance measurement, the sensor **300** may select a transition ratio from a table or compute a transition ratio from a formula. A sensor **300**, having plates centered 38 mm (1½ inches) apart, with each plate 19 mm (¾ of an inch) wide, may use a transition ratio as shown in the table below. For example, a capacitance measurement of 1.4, representing a double-width stud hidden behind a single sheet of sheetrock, may have a transition ratio of 0.32. A lookup table in the memory of sensor **300** may be used to map a capacitance measurement to a transition ratio.

| Capacitance Measurement | Transition Ratio |
|---|---|
| 1.4 | 0.32 |
| 1.0 | 0.33 |
| 0.6 | 0.35 |
| 0.4 | 0.45 |

Alternatively, the sensor **300** may compute a transition ratio for each ratio calculation. In some embodiments, a transition ratio may be calculated as:

$$TR(P) = \begin{cases} 0.61 - 0.28\dfrac{C}{P_{1/2}} & \text{if } C < P_{1/2} \\ 0.33 & \text{else} \end{cases}$$

where TR(P) is a Transition Ratio; $P_{1/2}$ is a design constant; and C is a Capacitance Measurement. The design constant $P_{1/2}$ may be set during manufacturing and may represent the expected maximum capacitance measured over a reference wall structure having a single (nominal) stud having a width of 44 mm (1¾ inches) and a wall covering **99** having a thickness of 13 mm (½ of an inch). In some embodiments, the capacitance C parameter may be the historical maximum capacitance. In other embodiments, the capacitance C parameter may be the instantaneous maximum capacitance of two plate measurements as described above. The formula shows that if C is less than the design constant $P_{1/2}$, the formula is used. If C is greater than or equal to the design constant $P_{1/2}$, a fix value of 0.33 is used.

Once determined, the transition ratio may be used to indicate whether the sensor is centered over an edge of a stud. Sensor **300** may measure a first capacitance value on a first plate **301** and a second capacitance value on a second plate **302.** A capacitance ratio may be calculated between the first and second capacitance values. This capacitance ratio may be compared to the predicted transition ratio to determine whether the sensor **300** is presently centered over an edge **102** of a stud **100.**

For example, sensor **300** measuring a larger capacitance value of 1.4 may indicate the sensor **300** has passed over a double-wide stud having a width of 76 mm (3 inches) hidden behind a single layer of sheetrock having a thickness of 13 mm (½ an inch). The transition ratio for this wall structure



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

may be set to a value of 0.32. When the sensor **300** detects a position where the first and second capacitance measurements are approximately equal to 0.32, the sensor **300** may indicate that the sensor **300** is centered over an edge **102**. In some embodiments, the stud's edge location may be determined to an accuracy of approximately 3 mm (⅛ of an inch) over a wall covering thickness range of 13 to 25 mm (½ to 1 inch).

Measured capacitance values indicate a direction in which a stud **100** is located. At a stud's edge **102**, one plate may be directly over the centerline **101** of the stud **100**, while the other may be off to one side of the stud **100**. The plate **301** or **302** positioned over the stud **100** will have a larger capacitance than the other plate **302** or **301** and will pass through a maximum value as the sensor **300** is drawn across the stud **100**. A plate **301** or **302** showing a larger capacitance indicates that the centerline **304** of the sensor **300** needs to be moved in the direction of that plate **301** or **302**.

A ratio curve **330** may be computed as follows. When the first plate **301** produces a capacitance that is greater than the capacitance produced by the second plate **302**, a ratio is calculated by dividing the second plate's change in capacitance value by the larger first plate's change in capacitance value. Similarly, when the first plate **301** produces a capacitance that is less than the capacitance produced by the second plate **302**, the ratio is calculated by dividing the smaller first plate's change in capacitance value by the second plate's change in capacitance value. Formulaically, the ratio curve **330** may be computed by:

$$\text{cap_ratio}(D) = \frac{\min\{FirstPlateValue(D), SecondPlateValue(D)\}}{\max\{FirstPlateValue(D), SecondPlateValue(D)\}}$$

where the plate value may be a change in value from a calibration value such as a nominal or minimal value determined during calibration. Theoretically, a plate value may be an absolute measurement of capacitance rather than a measurement of a change in capacitance. Practically, a plate value or capacitance measurement is a relative measurement from a value that may exclude parasitic capacitances of a sensor's circuitry and a wall covering. In some embodiments, a plate value is an indirect measure of capacitance. For example, the plate value may be a measure of a number of clock cycles necessary to charge a plate **301** or **302** to a reference level.

FIG. **3** illustrates a process to indicate whether or not a depth feature of an object has been detected, in accordance with the present invention as carried out by a computer program executed by a processor resident in the sensor. The order of steps presented may be rearranged by those of ordinary skill in the art and coding such a program is well within the skill of one of ordinary skill in the art in light of this disclosure. Further, the steps of this process may conventionally be undertaken by conventional circuitry or the computer program or by a combination thereof.

At step **700**, a sensor **300** powers up and may be positioned against a surface **99**. Sensor **300** performs a calibration step **710** to reduce the impact of parasitic circuit and wall capacitances. The calibration step determines a calibration capacitance such as a DAC value that represents an absolute capacitance of a plate over the wall structure and includes parasitic capacitances of the sensor **300**.

At step **720**, sensor **300** begins a process of measuring plate capacitances, e.g., determining capacitance measurements in the form of a relative capacitance values from the calibration capacitance values. At step **730**, the sensor **300** computes a capacitance ratio between plate capacitance measurements from step **720**.

At step **740**, a sensor **300** determines whether the capacitive measurements of step **720** indicate a centerline **101** of an object or a discontinuity has been detected. That is, if the capacitance ratio is approximately equal to unity, or alternatively, if the capacitance measurements are approximately equal to one another. If not, the process may continue to step **770**. If so, at step **750**, sensor **300** may provide a visual and/or an audio indication that a centerline **101** of the object or the discontinuity is detected.

At step **760**, sensor **300** determines whether the detected center is a deep feature. A deep feature may be determined by comparing one or more of the measured plate capacitances (from step **720**) with a threshold value such as depth threshold indicated in FIG. 2C. If a deep feature is not detected, sensor **300** repeats the process with step **720**. If a deep feature is detected, at step **765**, sensor **300** may provide an indication that a deep feature was detected.

At step **770**, sensor **300** determines a transition ratio. At step **780**, sensor **300** compares the computed capacitance ratio to the determined transition ratio. That is, sensor **300** determines whether the capacitive measurements of step **720** indicate that an edge of an object or a discontinuity has been detected. An edge is detected when the capacitance ratio is approximately equal to a transition ratio. If not, sensor **300** repeats the process with step **720**. If so, at step **790**, sensor **300** provides a visual and/or an audio indication that an edge of the object or the discontinuity is detected. A sensor **300** then determines whether the detected edge is a deep feature as described with step **760** above.

Additionally, sensor **300** may determine a relative direction an object or a discontinuity exists based on the relative magnitudes of the measured plate capacitances. For example, the sensor **300** indicates that the stud is positioned to the left of the centerline **304** of the sensor **300**. Sensor **300** indicates the direction of an object or a discontinuity audibly and/or visually.

In operation, an operator or user may pass sensor **300** across wall **99**. If each stud feature is detected as not being associated with a deep stud except for one stud, the operator may use the deep indication as a warning and conclude the deep feature is an anomaly.

Similarly, if an operator discovers all stud features are associated with deep studs except for one non-deep stud, the operator may conclude that the non-deep stud is an anomaly. For example, a wall may have all wood studs and some metallic wiring. The wood studs, if behind two or three layers of sheetrock, may appear as deep studs. The metal wiring may appear as a shallow stud. The operator may conclude that the indication of a shallow stud was erroneous.

An apparatus in accordance with the present invention may have features implemented in hardware, software or a combination of hardware and software. Thus, blocks described with reference to the following figures may be implemented in hardware, software, firmware, dedicated circuitry, and/or programmable circuitry, or a combination thereof.

FIG. **4**A shows a block diagram of a capacitive sensor having two primary plates **301** and **302** and associated circuitry **400**A, in accordance with the present invention. In some embodiments, a sensor includes a first plate **301**, a second plate **302** and electronic circuitry **400**A having a first measurement circuit **410**A, a second measurement circuit **410**B, a comparison circuit **414**, and an indicator **416**. The first and second plates **301** and **302** are conventionally



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

charged and discharged by the respective first and second measurement circuits **410**A, **410**B.

Each measurement circuit **410**A, **410**B provides a capacitance measurement to the comparison circuit **414**. The capacitance measurement may be an indication of a change in capacitance from a nominal capacitance experienced during calibration. The comparison circuit **414** processes the capacitance measurements. For example, the comparison circuit **414** may compute a ratio between the capacitive measurements. The comparison circuit **414** may determine whether the capacitive measurements are within a predetermined value of each other. The comparison circuit **414** may determine whether one of the capacitive measurements is above or below a threshold, thereby determining a depth feature of an object, e.g., whether the object, such as a stud, is far or near to the surface.

The comparison circuit **414** then provides a signal to the indicator **416**. The indicator **416** may be used to alert the operator of information regarding an object, such as a stud. The indicator **416** may identify a detection of, for example, an edge of an object, a center of an object, or that the sensor is over an object, or the sensor is approaching an object. The indicator **416** may provide a direction of increasing capacitance, thereby informing an operator as to which direction to move the sensor. The indicator **416** may also provide an indication of whether the object is near or far/deep from the surface. The comparison circuit **414** (e.g., a comparator) may compare and/or process the capacitance measurements to determine whether an object or a discontinuity is present and/or whether a feature of an object or a discontinuity is detected. For example, comparison circuit **414** may determine that the sensor **300** is centered over a stud **100** by detecting that the capacitance measurements are equal to each other and also above a floor threshold. Capacitance measurements may be considered equal when they are within a predetermined percentage value or absolute value from each other.

Comparison circuit **414** may determine that the sensor is centered over an edge **102** of a stud **100** by detecting that the capacitance measurements form a ratio that is equal to a transition ratio. The transition ratio may be a fixed value, a value indirectly or directly selected by a user, a value extracted from a lookup table or a computed value. A capacitance ratio may be considered equal to the transition ratio when the capacitance ratio falls within range of values about the transition ratio.

In some embodiments, the comparison circuit **414** couples capacitance measurement to the indicator **416**. The indicator **416** may visually (or audibly) display a value indicative of each capacitance value. The operator may use the displayed values to visually determine whether an object or a discontinuity exists, for example, by looking for changing capacitive measurements. Additionally, an operator may use the displayed values to visually determine the location of edges **102** and centerlines **101** of studs **100**, for example, by looking for capacitance measurements equaling a transition ratio. Also shown in FIG. **4**A is threshold circuitry including a source **411** of a threshold voltage coupled to threshold comparator **413** which also is coupled to the output terminals of measurement circuits **410**A, **410**B and which outputs a signal to indicator **416** to indicate if the feature is deep. Reference voltage source **419** supplies a reference voltage to each of measurement circuits **410**A, **410**B. Processing circuit **417** receives an input signal from comparison circuit **414** to receive the ratio value from same and also is coupled to memory **421** storing a look-up table having the transition ratio. Processing circuit **417** also supplies an output signal to measurement circuits **410**A, **410**B, see below regarding FIG. **5**.

FIG. **4**B shows another version of a sensor having two primary plates **301** and **302** and circuitry **400**B. The sensor includes a first plate **301**, a second plate **302** and electronic circuitry **400**B having a first measurement circuit **420**A, a second measurement circuit **420**B, a properly programmed microcomputer or a microcontroller **424**, and an indicator **426**. Here microcontroller **424** carries out the comparator functions of comparison circuit **414** of FIG. **4**A.

The first and second plates **301** and **302** are charged and discharged by the respective first and second measurement circuits **420**A, **420**B. Each measurement **402**A, **402**B circuit provides a capacitance measurement to the microcontroller **424**. Additionally, the microcontroller **424** may provide timing or other control signals to the first and second measurement circuits **420**A and **420**B. The microcontroller **424** processes the capacitance measurements and may provide a signal to the indicator **426**. The indicator **416** may include a display, such as a liquid crystal display and/or LEDs, and may include an audio device, such as a speaker or buzzer. FIG. **5** shows detail of measurement circuits **410**A, **410**B, in this case **410**A. It includes a current source **510** coupled to the associated plate **301**, and a discharge switch **512** similarly coupled. Also included is a digital-to-analog converter (DAC) having its input terminal coupled to receive a data signal from the processing circuit **417** and an output terminal coupled to an input terminal of a comparator **516**. The other input terminal of comparator **516** is coupled to plate **301**.

A ratiometric capacitive sensor **300** in accordance with the invention may be used to detect a variety of hidden objects in addition to studs and joists. For example, a sensor having long and narrow plates may be used to find a crack or gap hidden behind a surface. Sensor **300** may be used to find a safe hidden behind a wall. Sensor **300** may be used to find brick wall hidden behind sheetrock. Additionally, sensor **300** may be stationary and be positioned to allow objects with hidden features to pass across its plates.

While the present invention has been described with reference to one or more particular variations, those skilled in the art will recognize that many changes may be made thereto without departing from the spirit and scope of the present invention. Each of these embodiments and obvious variations thereof are contemplated as falling within the scope of the claimed invention, which is set forth in the following claims.

We claim:

**1**. A sensor for finding a feature of a structure behind a surface comprising:

a first plate having a first capacitance and adapted for forming a first capacitor with the structure;

a second plate having a second capacitance and adapted for forming a second capacitor with the structure;

a first measurement circuit coupled to the first plate, the first measurement circuit measuring a first capacitance value of the first capacitor;

a second measurement circuit coupled to the second plate, the second measurement circuit measuring a second capacitance value of the second capacitor; and

a comparison circuit coupled to the first and second measurement circuits, the comparison circuit generating a ratio of the first and second capacitance values to determine a lateral location of the feature relative to the plates and comparing one of the first or second capacitance values to a first threshold to determine a depth of



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

the feature relative to the surface, further comprising threshold circuitry coupled to first and second measurement circuits, the threshold circuitry determining whether the first and second capacitance values are above a second threshold to determine if the feature is deep.

2. The sensor of claim 1, wherein:

the first capacitance value represents a difference between the first capacitance and an initial capacitance of the first capacitor; and

the second capacitance value represents a difference between the second capacitance and an initial capacitance of the second capacitor.

3. The sensor of claim 1, further comprising a processing circuit coupled to the comparison circuit and coupled to receive the ratio value.

4. The sensor of claim 3, wherein the processing circuit determines whether the ratio is within a predetermined range.

5. The sensor of claim 4, further including an indicator coupled to the processing circuit, the indicator providing an indication that the sensor is over an edge of the structure when the ratio is within the predetermined range.

6. The sensor of claim 3, wherein the processing circuit determines whether the capacitance ratio is within a predetermined range of one.

7. The sensor of claim 6, further including an indicator coupled to the processing circuit, the indicator providing an indication that the sensor is over a centerline of a portion of the structure when the ratio is within the range of one.

8. The sensor of claim 5, further including a memory storing look-up table and coupled to the processing circuit, the look-up table having a transition ratio for the processing circuit, wherein the transition ratio is used to set the predetermined range.

9. The sensor of claim 3, further comprising:

a source of a reference voltage;

wherein the first measurement circuit includes a first index, the first index indicating a number of clock cycles needed to charge the first plate to the reference voltage level; and

wherein the second measurement circuit includes a second index, the second index indicating a number of clock cycles needed to charge the second plate to the reference voltage level.



10. The sensor of claim 9, wherein the first and second measurement circuits respectively include:

a current source coupled to a respective one of the first or second plates;

a discharge switch coupled to the respective one of the first or second plates;

a digital-to-analog converter (DAC) having an input terminal coupled to receive a data signal from the processing circuit and an output terminal; and

a comparator having a first input terminal coupled to the respective one of the first or second plates, a second input terminal coupled to the DAC, and an output terminal providing the output signal of the measurement circuit.

11. A sensor comprising:

a first plate and a second plate positioned in about the same plane and spaced apart, and adapted to be located adjacent a surface;

a measurement circuit coupled to the first and second plates thereby to measure a capacitance value of each of the plates;

a first comparison circuit coupled to receive the measured capacitance values and determine a ratio between a change in the measured capacitance values to determine a lateral location of a feature behind the surface relative to the plates; and

a second comparison circuit coupled to receive one of the measured capacitance values and a threshold and to provide a comparison therebetween to determine a depth of the feature relative to the surface,

further comprising an indicator coupled to the second comparison circuit thereby to provide an indication of the depth of the feature behind the surface.

12. The sensor of claim 11, further comprising an indicator coupled to the first comparison circuit thereby to provide an indication of the ratio of the capacitances.

13. The sensor of claim 12, wherein the indication is that the ratio is approximately equal to a predetermined ratio, thereby locating an edge of an object behind the surface.

14. The sensor of claim 12, wherein the indication is that the ratio is approximately equal to one, thereby locating a centerline of an object behind the surface.

* * * * *



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

CX - 0003

RX - 0007

JX - 0003

U 8042612

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

May 04, 2020

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *8,604,771*

ISSUE DATE: *December 10, 2013*

By Authority of the

Under Secretary of Commerce for Intellectual Property

and Director of the United States Patent and Trademark Office

SYLVIA HOLLEY

Certifying Officer

UNITED STATES PATENT AND TRADEMARK OFFICE

DEPARTMENT OF COMMERCE

US008604771B2

(12) **United States Patent**
**Wingate**

(10) **Patent No.:** **US 8,604,771 B2**
(45) **Date of Patent:** **Dec. 10, 2013**

(54) **HAND TOOL HAVING A PIVOT GRIP FOR SENSING A MEASUREMENT BEHIND A TARGET SURFACE**

(75) Inventor: **Barry Wingate**, San Jose, CA (US)

(73) Assignee: **Zircon Corporation**, Campbell, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 362 days.

(21) Appl. No.: **12/333,911**

(22) Filed: **Dec. 12, 2008**

(65) **Prior Publication Data**

US 2009/0151523 A1 Jun. 18, 2009

**Related U.S. Application Data**

(60) Provisional application No. 61/013,992, filed on Dec. 14, 2007, provisional application No. 61/105,856, filed on Oct. 16, 2008.

(51) **Int. Cl.**
*G01N 19/00* (2006.01)

(52) **U.S. Cl.**
USPC ........ **324/67**

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,249,113 B1 * 6/2001 Krantz et al. .......... 324/67
2005/0069371 A1 * 3/2005 Lutgen et al. .......... 401/48

* cited by examiner

*Primary Examiner* — Minh N Tang
(74) *Attorney, Agent, or Firm* — Silicon Valley Patent Group LLP

(57) **ABSTRACT**

An implementation of a system and method for a hand tool having a pivot grip is provided. The pivot grip provides an axis of rotation perpendicular and centered with a pair of concave finger holds positioned at the grip. The hand tool includes a housing forming the pivot grip, a sensor (e.g., stud sensor, capacitive sensor, electromagnetic sensor, metallic sensor, RF sensor, and/or the like) and a power switch.

**24 Claims, 8 Drawing Sheets**






Copy provided by USPTO ...




FIG. 1



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIG. 2A




FIG. 2B



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIG. 3A




FIG. 3B



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIG. 4



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIG. 5



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIG. 7



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIG. 6A




FIG. 6B



Copy provided by USPTO from the PIRS Image Database on 04-23-2020




FIG. 8



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

# HAND TOOL HAVING A PIVOT GRIP FOR SENSING A MEASUREMENT BEHIND A TARGET SURFACE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application Ser. No. 61/013,992, to first named inventor Barry Wingate, filed Dec. 14, 2007 entitled "Pivot grip", and also claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application Ser. No. 61/105,856 to first named inventor Anthony J. Rossetti, filed Oct. 16, 2008 and entitled "Dynamic information projection for a wall sensor", both of which are incorporated herein by reference in their entirety.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates generally to hand tools and more specifically to a hand tool having a pivot grip.

2. Background of the Invention

Hand tools such as stud sensor that one slides across a target surface often have handles or grips positioned for an operator to use the hand tool in a fixed orientation with respect to the operator and the target surface. Typical hand tools include a grip and a power button, which is depressed during operation to provide power to internal circuitry. The sides of exiting hand tool grips are either convex outward or vertical/flat. The power buttons of existing hand tools are square, oval or oblong. Some existing hand tools include running boards to prevent an operator from dragging a finger along the target surface.

However, the above described conventional hand tools fail to allow for comfortable positioning among various orientations of a target surface, such as a floor below the operator, wall in front of the operator and ceiling above the operator. Therefore, a need exists for a more comfortable hand tool having a grip that allows for easier positioning among various target surface orientations.

## SUMMARY

Some embodiments of the present invention provide for a hand tool for sensing a measurement behind a target surface, the hand tool comprising: a housing; a sensor coupled in the housing; and a grip having a pair of concave finger holds positioned at opposite sides of the grip to provide an axis of rotation.

Some embodiments of the present invention provide for a method for using a hand tool against target surfaces, wherein the hand tool comprises a grip having a pair of concave finger holds positioned on the grip to provide an axis of rotation, the method comprising: providing the hand tool; holding the hand tool with a thumb at a first concave finger hold of the pair of concave finger holds and with a finger at a second concave finger hold of the pair of concave finger holds; positioning the hand tool against a first target surface; and rotating the hand tool about the axis of rotation relative to the finger and thumb.

Some embodiments of the present invention provide for a hand tool for sensing a measurement behind a target surface, the hand tool comprising: a housing comprising a first indicator and a slit to allow light to pass through; a sensor coupled to the housing; and a first LED coupled to the sensor; wherein the first LED, when illuminated, backlights the first indicator and spotlights the target surface through the slit.

Embodiments of the present invention are also described below and shown in the drawings. These and other aspects, features and advantages of the invention will be apparent from reference to the embodiments described hereinafter.



## BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the invention will be described, by way of example only, with reference to the drawings.

FIG. **1** shows top down views of various hand held tools.

FIGS. **2**A and **2**B show a pivot impression from half of a pivot grip, in accordance with embodiments of the present invention.

FIGS. **3**A and **3**B show a front view and a top view of a hand held tool grip, in accordance with embodiments of the present invention.

FIGS. **4** and **5** show a hand tool being held by an operator, in accordance with embodiments of the present invention.

FIGS. **6**A, **6**B and **7** show a hand tool including a pivot grip and power switch, in accordance with embodiments of the present invention.

FIG. **8** describes a process of using a hand tool including a pivot grip, in accordance with embodiments of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

In the following description, reference is made to the accompanying drawings, which illustrate several embodiments of the present invention. It is understood that other embodiments may be utilized and mechanical, compositional, structural and operational changes may be made without departing from the spirit and scope of the present disclosure. The following detailed description is not to be taken in a limiting sense.

A hand tool having a pivot grip, in accordance with embodiments of the present invention, may be for sensing a measurement behind a target surface. The pivot grip provides an axis of rotation perpendicular and centered with a pair of concave finger holds positioned at the grip. The hand tool includes a housing or housing means. The housing or housing means may be a plastic housing formed by injection molding two or more components, which are assembled during manufacturing. The hand tool also includes a sensor or sensing means mounted in the housing. The sensor or sensing means may be a capacitive sensor, electromagnetic sensor, stud sensor, metallic sensor, RF sensor, or the like mounted to the interior of the housing.

The hand tool also includes a pivot grip or griping means. The pivot grip or griping means includes pair of concave finger holds positioned at opposite sides of the grip to provide the axis of rotation. A first finger hold may be used for either positioning an operator's finger such as an index finger or positioning the operator's thumb. The second finger hold may be used for positioning the other finger or thumb of the same hand of the operator. As a result, the pivot grip (also called a grip) provides for ergonomic handling of the hand tool, which may easily be repositioned for mixed use against walls, ceilings and floors, for example to scan for studs. Furthermore, the "shoe sole" form feature that partially surrounds the end of the hand tool may represent the positioning of the sensor plate and active end of the hand tool.

The grip (or pinch grip for use between a thumb and a forefinger) requires little conscious effort to maintain the grip. It may seem to rest in the hand when scanning vertical and overhead surfaces. The opposing digits rest in opposing concave recesses, so formed that the hand tool may pivot



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

freely between the fingers to follow the surface to be scanned. This provides a pivotable, comfortable, secure, hold on the hand tool housing regardless of its orientation to the operator.

The hand tool may also include a switch or switching means. The switch or switching means may be a mechanical switch or non-mechanical switch and may be positioned in a single or both concave recesses as described below.

FIG. **1** shows top down views of various hand held tools, such as a stud sensor or other sensing tool. A firsts sensing tool **100** includes a concave portion **102** that provides resting positions for an operator's thumb and index finger. A second sensing tool **110** provides a convex portion that provides similar resting positions for the operator's thumb and index finger. Either sensing tool **100** or **110** may be augmented with a running board **122** to provide thumb and finger support and to isolate the thumb and fingers from a wall **130**. A third sensing tool **120** includes such a running board **122**. A fourth sensing tool **140** also includes concave portions **142** that provides resting positions for an operator's thumb and index finger. None of these sensing tools, however, provide a pivoting grip and each have encumbrances when an operator changes a relative positioning between the hand tool sensing tool and the operator's arm.

FIGS. **2**A and **2**B show a pivot impression from half of a pivot grip, in accordance with embodiments of the present invention. FIG. **2**A shows a perspective view of part of a pivot grip. One way of defining a shape of a finger hold is to press a finger or thumb into a block of clay and rotate the clay relative to the finger or thumb while applying a force between the finger or thumb and the block of clay. The resulting clay block will now have a three-dimensional concave depression. The concave finger holds provide ergonomic hand positioning.

This concave depression may be viewed as a first three-dimensional concave arch along the x-axis and a second three-dimensional concave arch along the y-axis, where the finger or thumb was rotated about the z-axis of a three-dimensional Cartesian coordinate system. The concave arch (from a cross-sectional view) may define an arch with a constant radius thereby defining a segment of a circle. If both x-axis and y-axis arches provide a constant arch having a common radius, then the impression will define a partial surface area of a sphere (three-dimensional circle). If the x-axis and y-axis arches provide two different arches having different radiuses, then the impression will define a partial surface area of an ovoid (egg shaped or three-dimensional oval) or prolate or oblate spheroid (three-dimensional ellipse rotated about the ellipse's major or minor axis, respectively). Alternatively, the concaved depression may be generally opened on one end of the depression (e.g., see FIG. **7**).

A pair of finger holds forms a pivot grip and also defines an axis of rotation **210**. The pivot grip if formed when an operator holds a hand held tool in a pitching manner between a thumb and a finger. The axis of rotation **210** is defined by two points closest to each other where one point resides on each surface. These two points also identify where the two surfaces are parallel to each other and also directly facing one another. An imaginary line drawn between these two points identifies an axis of rotation **210** between the tool and an operator's hand. The operator rotates about this axis of rotation **210** when using the tool along a surface or when re-positioning the tool between different surfaces.

The finger holds (or pinch grips) are concave formed depressions in the hand tool that allow the operator to pinch the hand tool between a thumb and a finger. The pair of finger holds provides a pivotable, comfortable and secure hold on the hand tool when held against various target surfaces. For example, the hand tool may be a hand held scanner such as a stud sensor, alternating current (AC) sensor, metal sensor and the like. For effective and efficient use of a hand tool such as a scanner, an operator's thumb and figures should be kept away from any sensor plates. These sensor plates may be placed in the front half of the scanner and parallel to the to-be scanned target surface. Wiring, LEDs and traces should also be kept away from the sensor plates.

An operator may use the hand tools against various target surfaces. The hand tool includes a grip having a pair of concave finger holds positioned on the grip to provide an axis of rotation **210**. The operator holds the hand tool with a thumb at a first concave finger hold of the pair of concave finger holds and with a finger at a second concave finger hold of the pair of concave finger holds. The operator then positions the hand tool against a first target surface, such as a wall. For the operator to scan a ceiling, the operator rotates the hand tool about the axis of rotation **210** relative to the finger and thumb to orient the hand tool for a second target surface (e.g., the ceiling). Next, the operator slides the hand tool along the surface or re-positions the hand tool against the second target surface. The first and second target surfaces may be perpendicular or parallel to each other. The operator may then rotate the hand tool about the axis of rotation **210** relative to the finger and thumb to orient the hand tool for a third target surface. The operator then re-positions the hand tool against the third target surface.

FIGS. **3**A and **3**B show a front view **300** and a top view **320** of a hand held tool grip, in accordance with embodiments of the present invention. In this variation of the grip of a hand tool, the prototype shown includes concave finger holds that are concave along the front of the finger hold but tapered out to be less concaved towards the back of the finger hold. The grip provides an axis of rotation **310** and also provides the function of a running board by distancing the thumb and finger from the surface at points **302** and **322**.

FIG. **3**A shows a front cross sectional view **300** where the concave finger holds act to provide running board functionality to inhibit an operator's finger and thumb from inadvertently touching the target surface. That is, a finger ledge or running board helps press the sensing tool to the scanned surface and prevent the fingers scraping the target surface, such as a wall **130** from FIG. **1**. This feature is integrated and enhanced in the pinch grip with a more comfortable, finger friendly curvature with fingernail clearance.

FIGS. **4** and **5** show a hand tool being held by an operator, in accordance with embodiments of the present invention. FIG. **4** shows a side view of hand placement relative to a sensing tool **400** when the hand tool is held in a vertical position against a wall **402** or other vertical surface. The convex finger holds allow for various relative positioning of a hand. In a first position, the tool **400** and hand form a first relative angle **410**. In a second position, for example further up the wall **402**, the tool **400** and hand form a second relative angle **420**. The concave grip provides for a large range of relative angles **430** between these to positions. The large range of relative angles **430** allows for comfortable handling and control of the tool **400** about an axis of rotation **450**.

FIG. **5** shows a side view of a hand placement relative to hand held sensing tool when the hand tool is held in various vertical and horizontal positions. In a first position **510** on a first horizontal surface, the tool and the hand are shown to form a first relative angle (e.g., angle **410** from FIG. **4**). As the operator pushes the tool away, the tool and the hand may form a second relative angle (e.g., angle **420** from FIG. **4**). The operator may move the tool from the first horizontal surface to a vertical surface to a second position **520** where the tool and



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

the hand are again shown to form the first relative angle. Sliding the tool from the second position **520** to a third position **530** forms the second relative angle between the tool and the hand. Repositioning the tool from the vertical surface to a second horizontal surface to a forth position **540** is shown to reset the relative angle between the operator and tool to the first relative angle. Such relative angles are provide as examples only and are not intended to be limiting.

FIGS. **6**A, **6**B and **7** show a hand tool **600** including a pivot grip **602** and power switch **630**, in accordance with embodiments of the present invention.

FIGS. **6**A and **6**B show a back perspective view **600**A and a front perspective view **600**B, respectively. The hand tool **600** includes a left concave finger hold **610** and a right concave finger hold **620**, which may each form a symmetric surface. Alternatively, a concave finger hold may be asymmetrical. The pair of concave finger holds provides an axis of rotation **640**.

The right concave finger hold **620** is shown to have an integrated power switch **630**, which is formed to continue the concave nature of the finger hold. In some embodiments, the tool includes a mechanical power switch built into one of the two concave finger holds (as shown). In operation, an operator pitches the tool at the finger holds thereby depressing the mechanical power switch and energizing the tool for operation. Alternatively, the tool utilizes a conventional power switch apart from the finger holds. For example, a switch is positioned on an exterior face of the tool. Alternatively, a non-mechanical switch is employed. For example, a motion sensing switch may be used such that when the tool is moved, it is energized for a predetermined period of time. Alternatively, the pair of concave finger holds may each include a sensor to detect the presences of a finger. For example, the tool may include an isolated conductive plate at each concave finger hold and circuitry to measure a resistance or capacitance between the two conductive plates. Alternatively, the two isolated conductive plates may be positioned in one of the two finger holds such that an operator's finger completes a circuit or alters an electrical characteristic detectable by the tool.

FIG. **7** shows an additional model of a hand tool, in accordance with embodiments of the present invention. The drawings show relative dimensions of a hand tool from a top-down view **700**A and a side view **700**B. The hand tool includes a right concave finger hold **710** and a left concave finger hold **720** with integrated switch **730**. In some embodiments, the right concave finger hold **710** and left concave finger hold **720** are both shaped with a common radius. In other embodiments, the finger holds have different radiuses. For example, the right finger hold **710** may be deeper than the left finger hold **720** (or vise versa). The finger holds **710** and **720** define an axis of rotation **740**.

FIG. **8** describes a process of using a hand tool including a pivot grip, in accordance with embodiments of the present invention. The hand tool, which includes a grip having a pair of three-dimensional concave finger holds positioned on the grip to provide an axis of rotation, is used against target surfaces. At **800**, the hand tool is provided. At **810**, an operator holds the hand tool with a thumb and a finger. The thumb is positioned at a first three-dimensional concave finger hold of the pair of three-dimensional concave finger holds to define an axis of rotation. Similarly, the finger is positioned at a second three-dimensional concave finger hold of the pair of three-dimensional concave finger holds. In this manner, the operator may allow the hand tool to pivot relative to the operator's hand. The action of holding or pinching the hand tool between the thumb and finger may trigger a switch and energizing the hand tool. The switch may be mechanical or non-mechanical and may use employ either a single finger hold or both finger holds as described above.

At **820**, the operator positions the hand tool against a first target surface. The target surface may be a wall, ceiling, floor or the like. Steps **810** and **820** are interchangeable in order. At **830**, the operator allows the hand tool to rotate about the axis of rotation relative to the finger and thumb. For example, the operator may slide the hand tool along the surface thereby extending or contracting the operator's reach, which allows the hand to rotate freely about the axis of rotation. Alternatively, the operator may re-position the hand tool to orient the hand tool for a second target surface and similarly allow the hand tool to rotate about the axis of rotation. This process may continue when the operator re-positions the hand tool against the second target surface. The target surfaces may be perpendicular or parallel to each other. By allowing the operator to more comfortably rotate the hand tool about the axis of rotation, the hand tool may readily detects and indicates the presence of a hidden object behind one of the target surfaces.

Therefore, it should be understood that the invention can be practiced with modification and alteration within the spirit and scope of the appended claims. For example, the pivot grip may be used with other hand tools as well, such as a handle on a paint pad, a cleaning tool or other tool having a handle that one used on perpendicular planer surfaces. The description is not intended to be exhaustive or to limit the invention to the precise form disclosed. It should be understood that the invention can be practiced with modification and alteration.

What is claimed is:

**1**. A hand tool for sensing a measurement behind a target surface, the hand tool comprising:
- a housing;
- a sensor coupled in the housing; and
- a grip having a pair of three-dimensional concave finger holds positioned at opposite sides of the grip to provide an axis of rotation.

**2**. The hand tool of claim **1**, wherein each of the pair of three-dimensional concave finger holds comprises a first concave arch in a first dimension and a second concave arch in a second dimension orthogonal to the first dimension.

**3**. The hand tool of claim **2**, wherein the first concave arch provides an arch of a constant radius.

**4**. The hand tool of claim **3**, wherein the second concave arch provides an arch of the constant radius.

**5**. The hand tool of claim **1**, further comprising:
- a power button;
- wherein the power button is positioned in one of the pair of three-dimensional concave finger holds.

**6**. The hand tool of claim **1**, further comprising a non-mechanical power switch.

**7**. The hand tool of claim **6**, wherein the non-mechanical power switch comprises a pair of isolated conductive plates located on a single one of the pair of three-dimensional concave finger holds.

**8**. The hand tool of claim **6**, wherein the non-mechanical power switch comprises a pair of isolated conductive plates located on the pair of three-dimensional concave finger holds.

**9**. The hand tool of claim **1**, wherein the hand tool comprises a stud finder.

**10**. The hand tool of claim **1**, wherein the sensor comprises a capacitive sensor.

**11**. The hand tool of claim **1**, wherein each of the pair of three-dimensional concave finger holds comprises a first concave arch in a first dimension intersecting with a second concave arch in a second dimension orthogonal to the first dimension.



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

12. The hand tool of claim 1, further comprising:

a non-mechanical power switch, wherein the non-mechanical power switch comprises a pair of isolated conductive plates located on a single one of the pair of three-dimensional concave finger holds;

wherein each of the pair of three-dimensional concave finger holds comprises a first concave arch in a first dimension and a second concave arch in a second dimension orthogonal to the first dimension;

wherein the first concave arch provides an arch of a constant radius; and

wherein the second concave arch provides an arch of the constant radius.

13. A hand tool for sensing a measurement behind a target surface, the hand tool comprising:

housing means for providing a housing to the hand tool;

sensing means for sensing a hidden characteristic, wherein the sensing means is coupled in the housing means; and

gripping means for gripping and for providing an axis of rotation.

14. The hand tool of claim 13, further comprising a switching means to energize the tool.

15. The hand tool of claim 14, wherein the switching means is mechanical.

16. The hand tool of claim 14, wherein the switching means is non-mechanical.

17. A method for using a hand tool against target surfaces, wherein the hand tool comprises a grip having a pair of three-dimensional concave finger holds positioned on the grip to provide an axis of rotation, the method comprising:

providing the hand tool;

holding the hand tool with a thumb at a first three-dimensional concave finger hold of the pair of three-dimensional concave finger holds and with a finger at a second three-dimensional concave finger hold of the pair of three-dimensional concave finger holds;

positioning the hand tool against a first target surface; and

rotating the hand tool about the axis of rotation relative to the finger and thumb.

18. The method of claim 17, further comprising re-positioning the hand tool against a second target surface.

19. The method of claim 18, wherein the first target surface is perpendicular to the second target surface.

20. The method of claim 18, wherein the first target surface is parallel to the second target surface.

21. The method of claim 18, further comprising:

rotating the hand tool about the axis of rotation relative to the finger and thumb to orient the hand tool for a third target surface; and

re-positioning the hand tool against the third target surface.

22. The method of claim 17, further comprising

detecting a hidden object behind the first target surface; and

indicating to an operator detection of the hidden object.

23. The method of claim 17, wherein the act of holding the hand tool comprises energizing the hand tool with at least one of the thumb and the finger using at least one of the pair of three-dimensional concave finger holds.

24. The method of claim 17, wherein each of the pair of three-dimensional concave finger holds comprises a first concave arch in a first dimension intersecting with a second concave arch in a second dimension orthogonal to the first dimension.

* * * * *



Copy provided by USPTO from the PIRS Image Database on 04-23-2020

CX - 0004
RX - 0010
JX - 0004

U 8052678

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

July 20, 2020

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *9,475,185*
ISSUE DATE: *October 25, 2016*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

M. Tarver

M. TARVER
Certifying Officer

UNITED STATES PATENT AND TRADEMARK OFFICE
DEPARTMENT OF COMMERCE

US009475185B2

(12) **United States Patent**
**Wingate et al.**

(10) **Patent No.: US 9,475,185 B2**
(45) **Date of Patent: *Oct. 25, 2016**

(54) **HAND TOOL HAVING A PIVOT GRIP FOR SENSING MEASUREMENTS BEHIND A TARGET SURFACE**

(71) Applicant: **Zircon Corporation**, Campbell, CA (US)

(72) Inventors: **Barry Wingate**, San Jose, CA (US); **Richard Meech Halliday**, San Jose, CA (US)

(73) Assignee: **ZIRCON CORPORATION**, Campbell, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 233 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/096,759**

(22) Filed: **Dec. 4, 2013**

(65) **Prior Publication Data**

US 2014/0084901 A1 Mar. 27, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 12/333,911, filed on Dec. 12, 2008, now Pat. No. 8,604,771.

(60) Provisional application No. 61/013,992, filed on Dec. 14, 2007, provisional application No. 61/105,856, filed on Oct. 16, 2008.

(51) **Int. Cl.**
*G01R 19/00* (2006.01)
*B25G 1/10* (2006.01)

(52) **U.S. Cl.**
CPC ............. *B25G 1/102* (2013.01); *Y10T 16/476* (2015.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,249,113 B1 * | 6/2001 | Krantz | G01V 3/15 324/67 |
| 6,681,664 B1 * | 1/2004 | Hsien | B25G 1/105 30/340 |
| 7,193,405 B2 * | 3/2007 | Murray | G01V 3/15 324/326 |
| 7,316,073 B2 * | 1/2008 | Murray | G01C 15/00 33/286 |
| 8,604,771 B2 * | 12/2013 | Wingate | B25G 1/102 324/67 |

* cited by examiner

*Primary Examiner* — Minh N Tang
(74) *Attorney, Agent, or Firm* — Silicon Valley Patent Group LLP

(57) **ABSTRACT**

An implementation of a system and method for a hand tool having a pivot grip is provided. The pivot grip provides an axis of rotation perpendicular to and centered with a pair of concave finger holds positioned at the grip. The hand tool includes a housing forming the pivot grip, a sensor (e.g., stud sensor, capacitive sensor, electromagnetic sensor, metallic sensor, RF sensor, and/or the like) and a power switch.

**22 Claims, 8 Drawing Sheets**






Copy provided by USPTO from the PIRS Image Database on 07-02-2020




FIG. 1



Copy provided by USPTO from the PIRS Image Database on 07-02-2020




FIG. 2A




FIG. 2B



Copy provided by USPTO from the PIRS Image Database on 07-02-2020




FIG. 3A




FIG. 3B



Copy provided by USPTO from the PIRS Image Database on 07-02-2020




FIG. 4



Copy provided by USPTO from the PIRS Image Database on 07-02-2020




FIG. 5



Copy provided by USPTO from the PIRS Image Database on 07-02-2020




FIG. 6A




FIG. 6B



Copy provided by USPTO from the PIRS Image Database on 07-02-2020




FIG. 7



Copy provided by USPTO from the PIRS Image Database on 07-02-2020




FIG. 8



Copy provided by USPTO from the PIRS Image Database on 07-02-2020

# HAND TOOL HAVING A PIVOT GRIP FOR SENSING MEASUREMENTS BEHIND A TARGET SURFACE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation and claims the benefit, under 35 U.S.C. 120, of U.S. Pat. No. 8,604,771, to first named inventor Barry Wingate, filed Dec. 12, 2008 entitled "Hand tool having a pivot grip for sensing measurements behind a target surface", which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application Ser. No. 61/013,992, to first named inventor Barry Wingate, filed Dec. 14, 2007 entitled "Pivot grip", and also claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application Ser. No. 61/105,856 to first named inventor Anthony J. Rossetti, filed Oct. 16, 2008 and entitled "Dynamic information projection for a wall sensor", all of which are incorporated herein by reference in their entirety.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates generally to hand tools and more specifically to a hand tool having a pivot grip.

2. Background of the Invention

Hand tools such as stud sensor that one slides across a target surface often have handles or grips positioned for an operator to use the hand tool in a fixed orientation with respect to the operator and the target surface. Typical hand tools include a grip and a power button, which is depressed during operation to provide power to internal circuitry. The sides of existing hand tool grips are either convex outward or vertical/flat. The power buttons of existing hand tools are square, oval or oblong. Some existing hand tools include running boards to prevent an operator from dragging a finger along the target surface.

However, the above described conventional hand tools fail to allow for comfortable positioning among various orientations of a target surface, such as a floor below the operator, wall in front of the operator and ceiling above the operator. Therefore, a need exists for a more comfortable hand tool having a grip that allows for easier positioning among various target surface orientations.

## SUMMARY

Some embodiments of the present invention provide for a hand tool for sensing a measurement behind a target surface, the hand tool comprising: a housing; a sensor coupled in the housing; and a grip having a pair of concave finger holds positioned at opposite sides of the grip to provide an axis of rotation.

Some embodiments of the present invention provide for a method for using a hand tool against target surfaces, wherein the hand tool comprises a grip having a pair of concave finger holds positioned on the grip to provide an axis of rotation, the method comprising: providing the hand tool; holding the hand tool with a thumb at a first concave finger hold of the pair of concave finger holds and with a finger at a second concave finger hold of the pair of concave finger holds; positioning the hand tool against a first target surface; and rotating the hand tool about the axis of rotation relative to the finger and thumb.

Some embodiments of the present invention provide for a hand tool for sensing a measurement behind a target surface,



the hand tool comprising: a housing comprising a first indicator and a slit to allow light to pass through; a sensor coupled to the housing; and a first LED coupled to the sensor; wherein the first LED, when illuminated, backlights the first indicator and spotlights the target surface through the slit.

Embodiments of the present invention are also described below and shown in the drawings. These and other aspects, features and advantages of the invention will be apparent from reference to the embodiments described hereinafter.

## BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the invention will be described, by way of example only, with reference to the drawings.

FIG. **1** shows top down views of various hand held tools.

FIGS. **2**A and **2**B show a pivot impression from half of a pivot grip, in accordance with embodiments of the present invention.

FIGS. **3**A and **3**B show a front view and a top view of a hand held tool grip, in accordance with embodiments of the present invention.

FIGS. **4** and **5** show a hand tool being held by an operator, in accordance with embodiments of the present invention.

FIGS. **6**A, **6**B and **7** show a hand tool including a pivot grip and power switch, in accordance with embodiments of the present invention.

FIG. **8** describes a process of using a hand tool including a pivot grip, in accordance with embodiments of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

In the following description, reference is made to the accompanying drawings, which illustrate several embodiments of the present invention. It is understood that other embodiments may be utilized and mechanical, compositional, structural and operational changes may be made without departing from the spirit and scope of the present disclosure. The following detailed description is not to be taken in a limiting sense.

A hand tool having a pivot grip, in accordance with embodiments of the present invention, may be for sensing a measurement behind a target surface. The pivot grip provides an axis of rotation perpendicular and centered with a pair of concave finger holds positioned at the grip. The hand tool includes a housing or housing means. The housing or housing means may be a plastic housing formed by injection molding two or more components, which are assembled during manufacturing. The hand tool also includes a sensor or sensing means mounted in the housing. The sensor or sensing means may be a capacitive sensor, electromagnetic sensor, stud sensor, metallic sensor, RF sensor, or the like mounted to the interior of the housing.

The hand tool also includes a pivot grip or griping means. The pivot grip or griping means includes pair of concave finger holds positioned at opposite sides of the grip to provide the axis of rotation. A first finger hold may be used for either positioning an operator's finger such as an index finger or positioning the operator's thumb. The second finger hold may be used for positioning the other finger or thumb of the same hand of the operator. As a result, the pivot grip (also called a grip) provides for ergonomic handling of the hand tool, which may easily be repositioned for mixed use against walls, ceilings and floors, for example, to scan for studs. Furthermore, the "shoe sole" form feature that par-



Copy provided by USPTO from the PIRS Image Database on 07-02-2020

tially surrounds the end of the hand tool may represent the positioning of the sensor plate and active end of the hand tool.

The grip (or pinch grip for use between a thumb and a forefinger) requires little conscious effort to maintain the grip. It may seem to rest in the hand when scanning vertical and overhead surfaces. The opposing digits rest in opposing concave recesses, so formed that the hand tool may pivot freely between the fingers to follow the surface to be scanned. This provides a pivotable, comfortable, secure, hold on the hand tool housing regardless of its orientation to the operator.

The hand tool may also include a switch or switching means. The switch or switching means may be a mechanical switch or non-mechanical switch and may be positioned in a single or both concave recesses as described below.

FIG. **1** shows top down views of various hand held tools, such as a stud sensor or other sensing tool. A first sensing tool **100** includes a concave portion **102** that provides resting positions for an operator's thumb and index finger. A second sensing tool **110** provides a convex portion that provides similar resting positions for the operator's thumb and index finger. Either sensing tool **100** or **110** may be augmented with a running board **122** to provide thumb and finger support and to isolate the thumb and fingers from a wall **130**. A third sensing tool **120** includes such a running board **122**. A fourth sensing tool **140** also includes concave portions **142** that provide resting positions for an operator's thumb and index finger. None of these sensing tools, however, provide a pivoting grip and each have encumbrances when an operator changes a relative positioning between the hand tool sensing tool and the operator's arm.

FIGS. **2**A and **2**B show a pivot impression from half of a pivot grip, in accordance with embodiments of the present invention. FIG. **2**A shows a perspective view of part of a pivot grip. One way of defining a shape of a finger hold is to press a finger or thumb into a block of clay and rotate the clay relative to the finger or thumb while applying a force between the finger or thumb and the block of clay. The resulting clay block will now have a three-dimensional concave depression. The concave finger holds provide ergonomic hand positioning.

This concave depression may be viewed as a first three-dimensional concave arch along the x-axis and a second three-dimensional concave arch along the y-axis, where the finger or thumb was rotated about the z-axis of a three-dimensional Cartesian coordinate system. The concave arch (from a cross-sectional view) may define an arch with a constant radius thereby defining a segment of a circle. If both x-axis and y-axis arches provide a constant arch having a common radius, then the impression will define a partial surface area of a sphere (three-dimensional circle). If the x-axis and y-axis arches provide two different arches having different radiuses, then the impression will define a partial surface area of an ovoid (egg shaped or three-dimensional oval) or prolate or oblate spheroid (three-dimensional ellipse rotated about the ellipse's major or minor axis, respectively). Alternatively, the concave depression may be generally opened on one end of the depression (e.g., see FIG. **7**).

A pair of finger holds forms a pivot grip and also defines an axis of rotation **210**. The pivot grip is formed when an operator holds a hand held tool in a pitching manner between a thumb and a finger. The axis of rotation **210** is defined by two points closest to each other where one point resides on each surface. These two points also identify where the two surfaces are parallel to each other and also directly facing one another. An imaginary line drawn between these two points identifies an axis of rotation **210** between the tool and an operator's hand. The operator rotates about this axis of rotation **210** when using the tool along a surface or when re-positioning the tool between different surfaces.

The finger holds (or pinch grips) are concave formed depressions in the hand tool that allow the operator to pinch the hand tool between a thumb and a finger. The pair of finger holds provides a pivotable, comfortable and secure hold on the hand tool when held against various target surfaces. For example, the hand tool may be a hand held scanner such as a stud sensor, alternating current (AC) sensor, metal sensor and the like. For effective and efficient use of a hand tool such as a scanner, an operator's thumb and figures should be kept away from any sensor plates. These sensor plates may be placed in the front half of the scanner and parallel to the to-be scanned target surface. Wiring, LEDs and traces should also be kept away from the sensor plates.

An operator may use the hand tools against various target surfaces. The hand tool includes a grip having a pair of concave finger holds positioned on the grip to provide an axis of rotation **210**. The operator holds the hand tool with a thumb at a first concave finger hold of the pair of concave finger holds and with a finger at a second concave finger hold of the pair of concave finger holds. The operator then positions the hand tool against a first target surface, such as a wall. For the operator to scan a ceiling, the operator rotates the hand tool about the axis of rotation **210** relative to the finger and thumb to orient the hand tool for a second target surface (e.g., the ceiling). Next, the operator slides the hand tool along the surface or re-positions the hand tool against the second target surface. The first and second target surfaces may be perpendicular or parallel to each other. The operator may then rotate the hand tool about the axis of rotation **210** relative to the finger and thumb to orient the hand tool for a third target surface. The operator then re-positions the hand tool against the third target surface.

FIGS. **3**A and **3**B show a front view **300** and a top view **320** of a hand held tool grip, in accordance with embodiments of the present invention. In this variation of the grip of a hand tool, the prototype shown includes concave finger holds that are concave along the front of the finger hold but tapered out to be less concaved towards the back of the finger hold. The grip provides an axis of rotation **310** and also provides the function of a running board by distancing the thumb and finger from the surface at points **302** and **322**.

FIG. **3**A shows a front cross sectional view **300** where the concave finger holds act to provide running board functionality to inhibit an operator's finger and thumb from inadvertently touching the target surface. That is, a finger ledge or running board helps press the sensing tool to the scanned surface and prevent the fingers scraping the target surface, such as a wall **130** from FIG. **1**. This feature is integrated and enhanced in the pinch grip with a more comfortable, finger friendly curvature with fingernail clearance.

FIGS. **4** and **5** show a hand tool being held by an operator, in accordance with embodiments of the present invention. FIG. **4** shows a side view of hand placement relative to a sensing tool **400** when the hand tool is held in a vertical position against a wall **402** or other vertical surface. The convex finger holds allow for various relative positioning of a hand. In a first position, the tool **400** and hand form a first relative angle **410**. In a second position, for example, further up the wall **402**, the tool **400** and hand form a second relative angle **420**. The concave grip provides for a large range of relative angles **430** between these to positions. The large



Copy provided by USPTO from the PIRS Image Database on 07-02-2020

range of relative angles **430** allows for comfortable handling and control of the tool **400** about an axis of rotation **450**.

FIG. **5** shows a side view of a hand placement relative to hand held sensing tool when the hand tool is held in various vertical and horizontal positions. In a first position **510** on a first horizontal surface, the tool and the hand are shown to form a first relative angle (e.g., angle **410** from FIG. **4**). As the operator pushes the tool away, the tool and the hand may form a second relative angle (e.g., angle **420** from FIG. **4**). The operator may move the tool from the first horizontal surface to a vertical surface to a second position **520** where the tool and the hand are again shown to form the first relative angle. Sliding the tool from the second position **520** to a third position **530** forms the second relative angle between the tool and the hand. Repositioning the tool from the vertical surface to a second horizontal surface to a forth position **540** is shown to reset the relative angle between the operator and tool to the first relative angle. Such relative angles are provide as examples only and are not intended to be limiting.

FIGS. **6**A, **6**B and **7** show a hand tool **600** including a pivot grip **620** and power switch **630**, in accordance with embodiments of the present invention.

FIGS. **6**A and **6**B show a back perspective view **600**A and a front perspective view **600**B, respectively. The hand tool **600** includes a left concave finger hold **610** and a right concave finger hold **620**, which may each form a symmetric surface. Alternatively, a concave finger hold may be asymmetrical. The pair of concave finger holds provides an axis of rotation **640**.

The left concave finger hold **610** is shown to have an integrated power switch **630**, which is formed to continue the concave nature of the finger hold. In some embodiments, the tool includes a mechanical power switch built into one of the two concave finger holds (as shown). In operation, an operator pitches the tool at the finger holds thereby depressing the mechanical power switch and energizing the tool for operation. Alternatively, the tool utilizes a conventional power switch apart from the finger holds. For example, a switch is positioned on an exterior face of the tool. Alternatively, a non-mechanical switch is employed. For example, a motion sensing switch may be used such that when the tool is moved, it is energized for a predetermined period of time. Alternatively, the pair of concave finger holds may each include a sensor to detect the presences of a finger. For example, the tool may include an isolated conductive plate at each concave finger hold and circuitry to measure a resistance or capacitance between the two conductive plates. Alternatively, the two isolated conductive plates may be positioned in one of the two finger holds such that an operator's finger completes a circuit or alters an electrical characteristic detectable by the tool.

FIG. **7** shows an additional model of a hand tool, in accordance with embodiments of the present invention. The drawings show relative dimensions of a hand tool from a top-down view **700**A and a side view **700**B. The hand tool includes a right concave finger hold **710** and a left concave finger hold **720** with integrated switch **730**. In some embodiments, the right concave finger hold **710** and left concave finger hold **720** are both shaped with a common radius. In other embodiments, the finger holds have different radiuses. For example, the right finger hold **710** may be deeper than the left finger hold **720** (or vice versa). The finger holds **710** and **720** define an axis of rotation **740**.

FIG. **8** describes a process of using a hand tool including a pivot grip, in accordance with embodiments of the present invention. The hand tool, which includes a grip having a pair of three-dimensional concave finger holds positioned on the grip to provide an axis of rotation, is used against target surfaces. At **800**, the hand tool is provided. At **810**, an operator holds the hand tool with a thumb and a finger. The thumb is positioned at a first three-dimensional concave finger hold of the pair of three-dimensional concave finger holds to define an axis of rotation. Similarly, the finger is positioned at a second three-dimensional concave finger hold of the pair of three-dimensional concave finger holds. In this manner, the operator may allow the hand tool to pivot relative to the operator's hand. The action of holding or pinching the hand tool between the thumb and finger may trigger a switch and energize the hand tool. The switch may be mechanical or non-mechanical and may use employ either a single finger hold or both finger holds as described above.

At **820**, the operator positions the hand tool against a first target surface. The target surface may be a wall, ceiling, floor or the like. Steps **810** and **820** are interchangeable in order. At **830**, the operator allows the hand tool to rotate about the axis of rotation relative to the finger and thumb. For example, the operator may slide the hand tool along the surface thereby extending or contracting the operator's reach, which allows the hand to rotate freely about the axis of rotation. Alternatively, the operator may re-position the hand tool to orient the hand tool for a second target surface and similarly allow the hand tool to rotate about the axis of rotation. This process may continue when the operator re-positions the hand tool against the second target surface. The target surfaces may be perpendicular or parallel to each other. By allowing the operator to more comfortably rotate the hand tool about the axis of rotation, the hand tool may readily detect and indicate the presence of a hidden object behind one of the target surfaces.

Therefore, it should be understood that the invention can be practiced with modification and alteration within the spirit and scope of the appended claims. For example, the pivot grip may be used with other hand tools as well, such as a handle on a paint pad, a cleaning tool or other tool having a handle that one used on perpendicular planer surfaces. The description is not intended to be exhaustive or to limit the invention to the precise form disclosed. It should be understood that the invention can be practiced with modification and alteration.

What is claimed is:

**1**. A stud finder for sensing a measurement behind a target surface, the stud finder comprising:
- a housing;
- a sensor coupled in the housing; and
- only two depressed finger holds positioned at opposite sides of a grip allowing pivoting to provide an axis of rotation.

**2**. The stud finder of claim **1**, further comprising:
- a power button;
- wherein the power button is positioned in one of the two depressed finger holds.

**3**. The stud finder of claim **1**, further comprising a finger ledge.

**4**. The stud finder of claim **3**, wherein the finger ledge distances a thumb and a finger from scraping the target surface.

**5**. The stud finder of claim **1**, further comprising a running board.

**6**. The stud finder of claim **5**, wherein the running board isolates a thumb and a finger from the target surface.

**7**. The stud finder of claim **5**, wherein the running board distances a thumb and a finger from the target surface.



Copy provided by USPTO from the PIRS Image Database on 07-02-2020

8. The stud finder of claim 5, wherein the running board inhibits a thumb and a finger from inadvertently touching the target surface.

9. The stud finder of claim 5, wherein the running board provides a barrier between:
a thumb and a finger; and
the target surface.

10. The stud finder of claim 1, wherein the housing forms an acute angle at a front edge in a side view for a side comprising one of the two depressed finger holds.

11. The stud finder of claim 10, wherein the acute angle is 70 degrees or less.

12. The stud finder of claim 10, wherein the acute angle is between 30 and 45 degrees.

13. The stud finder of claim 1, wherein the housing forms a V-notch at a center of a front side in a top-down view.

14. A stud finder for sensing a measurement behind a target surface, the stud finder comprising:
housing means for providing a housing to the stud finder;
sensing means for sensing a hidden characteristic, wherein the sensing means is coupled in the housing means;
gripping means for gripping and for providing an axis of rotation, wherein the gripping means comprises only two depressed finger holds positioned at opposite sides allowing pivoting to provide an axis of rotation; and
a running board means to distance a thumb and a finger from the target surface.

15. The stud finder of claim 14, further comprising a switching means, within the gripping means, to energize the stud finder.

16. The stud finder of claim 14, further comprising a finger ledge means to distance a thumb and a finger from scraping the target surface.

17. A method for using a stud finder against target surfaces, wherein the stud finder comprises a grip having only two depressed finger holds allowing pivoting to provide an axis of rotation, the method comprising:
providing the stud finder with the only two depressed finger holds;
holding the stud finder with a thumb at a first depressed finger hold of the two depressed finger holds and with a finger at a second depressed finger hold of the two depressed finger holds;
positioning the stud finder against a first target surface; and
rotating the stud finder about the axis of rotation relative to the thumb and the finger.

18. The method of claim 17, further comprising re-positioning the stud finder against a second target surface.

19. The method of claim 17, further comprising:
rotating the stud finder about the axis of rotation relative to the thumb and the finger to orient the stud finder for a third target surface;
re-positioning the stud finder against the third target surface.

20. The method of claim 17, further comprising:
detecting a hidden object behind the first target surface; and
indicating to an operator detection of the hidden object.

21. The method of claim 17, wherein holding the stud finder comprises energizing the stud finder with at least one of the thumb and the finger using one of the two depressed finger holds.

22. The method of claim 17, further comprising distancing the thumb and the finger from the target surfaces with a running board.

* * * * *



Copy provided by USPTO from the PIRS Image Database on 07-02-2020

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 14th day of September, 2022, I caused this Non-Confidential Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ Omair M. Farooqui
*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   [ X ] this brief contains [*13,489*] words.

   [ ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2. This brief complies with the typeface and type style requirements because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

   [ ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: September 14, 2022

/s/ Omair M. Farooqui
*Counsel for Appellant*