**2022-1649**

# United States Court of Appeals for the Federal Circuit

ZIRCON CORP.,

*Appellant,*

– v. –

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

STANLEY BLACK & DECKER, INC.,
BLACK & DECKER (U.S.), INC.,

*Intervenors.*

*On Appeal from the United States International Trade Commission in Investigation No. 337-TA-1221*

## REPLY BRIEF OF APPELLANT

OMARI M. FAROOQUI
PALO ALTO LEGAL GROUP, PC
1023 Corporation Way, 2nd Floor
Palo Alto, California 94303
(408) 579-1281
omair@paloaltolegalgroup.com

*Counsel for Appellant*

JANUARY 10, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ... ii

I. ARGUMENT ... 1

II. DOMESTIC INDUSTRY ... 1

A. The Commission's Rejection of Zircon's Domestic Industry Calculation Based on Aggregation is Legal Error ... 1

1. There is Substantial Overlap Between Zircon's DI Products and the Asserted Patents ... 3

2. Allocations of Investments Per Patent Are Evident from the Record ... 8

B. '662 patent R&D Investments ... 10

III. '662 PATENT VALIDITY ... 14

A. The Clear and Convincing Evidence Standard to Invalidate Claims 1, 6, 9, 12, 13, 15, 16 or 17 of the '662 Patent was Not Met ... 14

B. Steber, DE336, Miller and Sanoner, Alone or in Combination, Fail to Provide Clear and Convincing Evidence of Obviousness of the Auto-Recalibration Features of the '662 Patented Inventions ... 16

IV. THE COMMISSION'S '771 AND '185 PATENT INVALIDITY FINDINGS ARE NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE ... 23

A. Respondents did Not Meet Their Burden to Demonstrate that Claims 1, 5, 9 and 10 of the '771 patent and claims 1 and 2 of the '185 patent are Invalid under 35 U.S.C. § 102 or that Claims 5, 6, 7, 8, 9, 10, 11, 13, 14 and 15 of the '185 Patent are invalid as obvious under 35 U.S.C. §103, based on the Zircon 1 ... 23

V. CONCLUSIVE EVIDENCE ESTABLISHED THAT METHOD CLAIM 22 OF THE '771 PATENT AND METHOD CLAIMS 17, 20 AND 21 OF THE '185 PATENT ARE INFRINGED ... 28

VI. CONCLUSION ... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Certain Audio Digital-to-Analog Converters and Prods. Containing Same*, Inv. No. 337-TA-499, Final Initial Determ., 2004 WL 3121325, *61 (Nov. 15, 2004) .......... 7

*Certain Digital Cameras, Software, and Components Thereof*, Inv. No. 337-TA-1059, Init. Det. at 97 (Sep. 13, 2018) .......... 6

*Certain Dynamic Random Access Memories*, Inv. No. 337-TA-242, Comm'n Op. at 66-67 (Sep. 21, 1987) .......... 8

*Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers*, Inv. No. 337-TA-701, Order No. 58, 2010 WL 5621540 (Nov. 18, 2010) .......... 12

*Certain Electronic Devices, Including Streaming Players, Televisions, Set Top Boxes, Remote Controllers, and Components Thereof*, Inv. No. 337-TA-1200, Init. Det. at 135 (July 9, 2021) .......... 13

*Certain Electronic Imaging Devices*, Inv. No. 337-TA-850, Comm'n Op., 2018 WL 11201935, *53 (April 21, 2014) .......... 7

*Certain Integrated Circuit Chips and Products Containing the Same*, Inv. No. 337-TA-859, Comm'n Op. at 40-41 (Aug. 22, 2014) .......... 10, 13

*Certain Laparoscopic Surgical Staplers, Road Cartridges, and Components Thereof*, Inv. No. 337-TA-1167, Init. Det. at 109 (June 8, 2021) .......... 10-11

*Certain Laser Bar Code Scanners and Scan Engines, Components Thereof and Products Containing Same*, Inv. No. 337-TA-551, Order No. 25 at 10; 10 at n.3(Aug. 1, 2006) .......... 7-8

*Certain LED Lighting Devices, LED Power Supplies, and Components Thereof*, Inv. No. 337-TA-1081, Init. Det. at 157 (December 19, 2018) .......... 12

*Certain Mobile Device Holders and Components Thereof*, Inv. No. 337-TA-1028, Comm'n Op. at 18 (Mar. 22, 2018) .......... 1

*Certain Multi-Stage Fuel Vapor Canister Systems and Activated Carbon Components Thereof*, Inv. No. 337-TA-1140, Init. Det. at 218 (Jan. 28, 2020) .......... 13

*Certain Percussive Massage Devices*,
Inv. No. 337-TA-1206, Commission Opinion, January 4, 2022 ....................7

*Certain Semiconductor Devices and Consumer Audiovisual Products Containing the Same*,
Inv. No. 337-TA-1047, Initial Det. at 437 (May 11, 2018), reviewed on other grounds, Comm'n Op. (Sept. 11, 2019) ....................6

*Core Wireless Licensing S.A.R.L v. Apple Inc.*,
899 F.3d 1356 (Fed. Cir. 2018)....................32

*Hyosung TNS Inc. v. Intern. Trade Com'n.*,
926 F. 3d 1353 (June 17, 2019) ....................13

*InTouch Techs., Inc. v. VGo Commc'ns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014).................... 18-19

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) ....................29

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007).................... 15, 16

*Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp.*,
785 F.3d 625 (Fed. Cir. 2015).................... 29, 30

**Statutes and Other Authorities:**

19 U.S.C. § 1337 ....................1, 5

19 U.S.C. § 1337(a)(2)....................1

19 U.S.C. § 1337(a)(3)....................1

19 U.S.C. § 1337(a)(3)(A)-(C) ....................3

35 U.S.C. § 102....................23

35 U.S.C. § 103....................23

35 U.S.C. § 271(b) ....................28

Commission Rule 210.38.................... 8-9

Fed. R. Evid. 703 ....................25

# I. ARGUMENT

Appellant Zircon Corporation ("Zircon") addresses herein the arguments raised by Appellee The Commission ("Appellee") and Intervenors[1], collectively "Respondents". Zircon requests that this Court reverse and remand this case to the Commission as a result of the clear legal and factual errors and inconsistencies in the findings by the Commission's decision which was not supported by substantial evidence.

# II. DOMESTIC INDUSTRY

## A. The Commission's Rejection of Zircon's Domestic Industry Calculation Based on Aggregation is Legal Error

Section 337 requires that the Complainant show domestic industry investments in "articles" protected by the asserted patent(s). *See Certain Mobile Device Holders and Components Thereof*, Inv. No. 337-TA-1028, Comm'n Op. at 18 (Mar. 22, 2018) ("§337(a)(2) and (3) require that domestic investments be related to articles protected by the intellectual property ("IP") rights involved, and in the case of research and development, those investments must be in exploitation of the IP rights concerned, *but these statutory provisions do not expressly address how complainants must present their evidence to meet these statutory requirements*.")(Emphasis added). Zircon satisfied this requirement in its domestic

[1] Stanley Black & Decker Inc., and Black & Decker (U.S.) Inc., ("Stanley")

industry calculation. Zircon's methodology in apportioning its investments based on the combined revenue of the domestic industry products is appropriate since there is substantial patent and functional overlap between the products covered by the asserted patents. All of these products are stud finders with components that provide the same or similar information to the user. Approximately 87% of all of Zircon's U.S. revenue comes from the domestic industry products ("DI Products") at issue in this Investigation and nearly its entire corresponding U.S. operations are devoted to research, engineering, development and support of these DI Products and the IP contained therein. (Zircon's Appeal Brief, p. 51; Appx14395, Q/A 20). Zircon's plant and labor force support these efforts and Zircon's investments in the single stud finder industry that include these products. (Zircon's Appeal Brief, pp. 55-62).

Respondents' argument that Zircon's investment in each patent is indeterminable is incorrect. When Zircon filed its Complaint, Zircon identified its domestic investments allocated to each asserted patent based on the precise percentage of revenue allocated to each of its DI Products by each asserted patent. (Appx1054; Appx1057-1058). After specifically requesting this information during briefing, the Commission failed to accept Zircon's domestic revenue-based investment allocation method. Instead, the Commission improperly rejected Zircon's entire domestic industry calculation for combining investments across all

three patents and allocating on the basis of sales revenue of the products covered by the asserted patents. The final totals of Zircon's investments in plant, property and equipment ("PP&E"), labor and capital ("L&C"), and research, development and engineering ("R&D") were confirmed through its expert's testimony. (Appx14403-14408, Q/A 72-92).

### 1. There is Substantial Overlap Between Zircon's DI Products and the Asserted Patents

Zircon's expert properly aggregated its investments across its three asserted patents ('662, '771 and '185 patents) because there is substantial overlap between the DI Products that practice these patents and the investments into plant, labor and R&D and engineering which support these products is coextensive. (Appx14403-14408, Q/A 24, 28, 49-63). Using Zircon's sales revenue percentages, Zircon's investments in each of its three patents are independently substantial *and* significant under 19 U.S.C. 1337(a)(3)(A)-(C). The Commission improperly rejected Zircon's methodology, finding that Zircon did not meet the economic prong of the domestic industry requirement. Importantly, the Commission did not take issue with the amount of Zircon's domestic investments in its 53 DI Products. Instead, it simply refused to consider the aggregation of Zircon's investments in its DI Products, even though the same methodology was previously accepted when there was substantial overlap between the DI Products and the asserted patents.

The Initial Determination ("ID") did not discredit Zircon's investments based on "aggregation", nor did it reject the substantial overlap of Zircon's patent practicing products, of which 35 of 53 DI Products practice both the '771 and '185 patents. As emphasized in Zircon's Appeal Brief, 8 DI Products (K&M Series) were not included in Zircon's revenue allocation of its 53 DI Products because revenue information for these then recently introduced products was not yet available at the time Zircon's financial expert, Mr. Walter Bratic, rendered his opinion. (Zircon's Appeal Brief, p. 61). Thus, of the 53 DI Products that practice one or more of the asserted patents, financial information for only 45 is included in Zircon's DI Product investment calculations. Thirty-five (35) of the 45 DI Products (77)%, practice two asserted patents (the '771 and '185) and 14, or 31%, practice all three asserted patents. (Zircon's Appeal Brief, p. 61).

Providing data on investments on a per patent basis in a multi-patent case makes sense when there are completely different products covered by separate asserted patent(s) or different departments of a large company where employee activities are directed to different practicing products. This is not the case for Zircon. Zircon's asserted patents cover the parts, components, housings, and circuitry of the products that perform one or more of the same functions in the 53 DI Product stud finders developed and sold by Zircon. Because there is significant overlap between the DI revenue-generating products (i.e., 77% practice two patents

and 31% practice all three patents), using a revenue-based investment allocation method applied to DI products covered by multiple asserted patents eliminates double counting DI Investments for such patents in the FY2015-2020 time frame for which Zircon presented its investments in its domestic industry for these patents. (Zircon's Appeal Brief, p. 57).

Accordingly, Zircon's methodology of using its revenue from all its DI Products and allocating its investments under §337 as a proportion of DI Product revenue divided by total revenue gives a more accurate and conservative presentation of Zircon's investments for its PP&E, L&C and R&D for the articles covered by Zircon's asserted patents.

Respondents concede that it is not imperative to track investments on a per-patent or even a product basis; and that reasonable revenue based allocation methods based on sales of the patented products are appropriate (e.g., taking the revenue percentage of the DI Product sales and multiplying across the net investments in PP&E, L&C and R&D). Respondents, nevertheless, take the position that it is never appropriate to consolidate (or aggregate) using a sales based allocation method that includes all the DI Products' investments unless there is a 1:1:1 overlap between all three patents-in-suit. Respondents argue that Zircon is trying to inflate its DI investment numbers by aggregating, but as detailed above, this is incorrect.

Because Zircon does not maintain records to track its domestic expenses or investments across patents or even product groups, Zircon properly used a revenue-based allocation method to quantify the amount of its investments in PP&E, L&C and R&D across its DI Products which is expressly allowed by Commission precedent. Sales-based allocations are commonly used "to determine how much . . . investment is related to the asserted patents and the DI products." *Certain Semiconductor Devices and Consumer Audiovisual Products Containing the Same*, Inv. No. 337-TA-1047, Initial Det. at 437 (May 11, 2018), reviewed on other grounds, Comm'n Op. (Sept. 11, 2019). *See also Certain Digital Cameras, Software, and Components* Thereof, Inv. No. 337-TA-1059, Init. Det. at 97 (Sep. 13, 2018)(holding that "there is no requirement for a patent-by-patent expenditure allocation" even where "certain patents were eliminated from th[e] investigation and [complainant] did not adjust its expenditures.")(*citing Male Prophylactic Devices*, Comm'n Op. at 39)

Moreover, because all of Zircon's DI Products are stud finders and it is a small company, nearly all of the activities at Zircon's plant and its labor and capital are devoted to developing and supporting these products. Appx14410-14411, Q/A 107-110; Appx14728-14730, Q/A 87-94; Appx6546; Appx6548; Appx6549; Appx14717, Q/A 13; Appx14733, Q/A 109; Appx14735, Q/A 116; Tr., Appx1351:15-1352:6). This is similar to the situation in the recent Commission

Opinion where the Commission found that Hyperice, a domestic company, "grew its domestic industry based on the commercial success of the DI Products that practice the '574 patent, which Hyperice internally developed and continues to support." (*Certain Percussive Massage Devices*, Inv. No. 337-TA-1206, Commission Opinion, January 4, 2022, p. 15).

Respondents cite inapplicable case law, turning on fact patterns where there was **no overlap whatsoever** between DI product groups practicing the patents at issue in those cases. This is entirely opposite Zircon's facts where there is substantial overlap between DI revenue-generating products (i.e., 100% practice at least one patent, 77% practice two patents and 31% practice all three patents). *Certain Electronic Imaging Devices*, Inv. No. 337-TA-850, Comm'n Op., 2018 WL 11201935, *53 (April 21, 2014) ("Electronic Imaging Devices") and *Certain Audio Digital-to-Analog Converters and Prods. Containing Same*, Inv. No. 337-TA-499 ("Audio Digital-to-Analog Converters"), Final Initial Determ., 2004 WL 3121325, *61 (Nov. 15, 2004). CO, Appx62. As Zircon noted in its Appeal Brief, there was **absolutely no overlap** between the asserted patents and the practicing domestic industry products in either of these cases.[2] To the contrary, in the present

[2] CALJ Bullock distinguished *Audio Digital-to-Analog Converters* for precisely this reason in his opinion in *Certain Laser Bar Code Scanners*, where he held that where there is some overlap between the DI Product groupings, the authority in *Audio Digital-to-Analog Converters* was "not germane to the facts." *See Certain Laser Bar Code Scanners and Scan Engines, Components Thereof and Products*

case, all of Zircon's domestic industry products are stud finders and there is significant overlap between all three asserted patents and the DI Products in question.

Therefore, based on the "substantial overlap" standard articulated by the Commission in *Certain Dynamic Random Access Memories*, and the fact that all of the asserted claims are directed to stud-finding tools, the Commission should have found on analysis that Zircon's economic prong evidence was appropriate on the basis that there is a "single industry which exploits the patents in the production of" stud-finders. See *Certain Dynamic Random Access Memories*, Inv. No. 337-TA-242, Comm'n Op. at 66-67 (Sep. 21, 1987).

#### 2. Allocations of Investments Per Patent Are Evident from the Record

The record in this matter provides the specific breakdown of revenue per patent and its corresponding allocation to Zircon's investments: '662 patent – 37.2%, '771 patent – 77.9%, and '185 patent – 77.8%. (Mr. Bourque's Declaration attached to the Complaint, Appx1041-1058; See also Zircon's Appeal Brief, pp. 56-57). As noted in Zircon's Appeal Brief, Respondents' argument that Zircon's investments on a per patent basis are indeterminable is absolutely incorrect. (Id.) Commission Order No. 41 specifically stated that "[p]ursuant to Commission Rule

---

*Containing Same,* Inv. No. 337-TA-551, Order No. 25 at 10; 10 at n.3(Aug. 1, 2006)("*Certain Laser Bar Code Scanners*").

210.38, the pleadings in this investigation are already part of the record and do not need to be separately admitted as hearing exhibits." (See Order No. 41, June 23, 2021, at p. 2)(emphasis added).

**The allocation table from Mr. Bourque's declaration (providing the patent-by-patent breakdown of investments based on the revenue allocation) was also cited in his witness statement, which itself was admitted as evidence**. (Appx14736-14737, Q/A 122-123) Accordingly, Mr. Bourque's patent-by-patent allocation table as part of the pleadings, his own witness statement, and the official ITC record, *were in evidence* and should have been sufficient for the Commission to confirm that the allocations per patent and Zircon's investments in its articles covered by each patent were independently significant and substantial. The evidence of Zircon's total numerical amounts of investment in PP&E, L&C and R&D per year were already admitted into evidence. (Zircon's Appeal Brief, pp. 51-55). Mr. Bourque's allocation table merely provided additional information on the percentage of product revenue attributable to each patent for application of Zircon's DI Product investments. This was not new or unadmitted evidence, it was simple math applied to the evidence already in the record and was cited in Mr. Bourque's witness statement admitted in evidence. Appx14736-14737, Q/A 122-123.

### B. ‘662 patent R&D Investments

Zircon exploits the ‘662 patent through its development, engineering and support of no less than 30 DI Products that practice the ‘662 patent, including the recently released K&M Series products that incorporate the Simon chip. (ID at 44-53; Zircon’s Post Trial Brief, pp. Appx2485-2501; Appx14607-14608, Q/A 168, 169; Appx14873; see also Appx14734-14737, Q/A 114-125).[3] Zircon's R&D investments in the ‘662 patent fulfill the requirement for a nexus by showing a continuing exploitation of the asserted patent in the commercial embodiments of the articles protected by that patent. No patent-by-patent allocation is required for Zircon to establish R&D investments in the ‘662 patent. *Certain Integrated Circuit Chips and Products Containing the Same*, Inv. No. 337-TA-859, Comm'n Op. at 40-41 (Aug. 22, 2014)(“Integrated Chips”). The Commission ignores the fact that 17 of 30 of Zircon’s DI Products practicing the ‘662 patent were released between FY2010-FY2020, including the 8 K&M Series products that incorporate the Simon chip released in FY2020. (Appx6562, ‘Patent Item Table’ Tab; and Appx14607-14608, Q/A 168, 169; Appx14873). Zircon’s continuing commercial exploitation of the ‘662 patent is sufficient evidence to establish a nexus between its R&D investment and the ‘662 patent. See e.g., *Certain Laparoscopic Surgical Staplers,*

[3] The ID’s findings that Zircon’s 30 DI Products meet the technical prong requirement and practice each limitation of claims 1, 6, 8, 12, 13, 15, 16 and 17 of the ‘662 patent was not challenged by the Commission. (ID at Appx3781).

*Road Cartridges, and Components Thereof*, Inv. No. 337-TA-1167, Init. Det. at 109 (June 8, 2021)("As required by paragraph C, there is also a nexus between Ethicon's investment in R&D and the asserted patents because the DI products are the commercial embodiments of those patents.").

Respondents argue that Appellant's R&D investments in the Simon Chip between 2015-2020, which comprised approximately 20% of Zircon's R&D budget in that period should not be credited because this estimate lacks corroboration and/or is unreliable. (Commission Response Brief, pp. 33-34). Mr. Bourque, who is Zircon's longstanding COO and CFO, credibly testified that Zircon's investments in the Simon chip incorporating the '662 patented technology was the most significant R&D and engineering project over the last ten years. Appx14734-14737, Q/A 115. The Simon chip, incorporates the functionalities covered by the '662 Patent and was integrated in Zircon's SuperScan™ K1 – K4 and M1 – M4 DI Products in 2020. Appx14734-14737, Q/A 114-119, Q/A 122-125; see also Appx14404, Q/A 73). The Commission's rejection of this testimony was clearly erroneous. Appellant's estimates in R&D expenses attributed to the Simon chip through *Mr. Bourque's sworn testimony and supporting underlying documentation,* should have been credited under Commission precedent.

> The Commission commonly accepts good faith estimates of investments of this nature that are unsupported by actual records. 'There is no Commission requirement that sworn witness testimony directed to the domestic industry requirement cannot be credited without further corroboration by underlying

> documentation.' *Solid State Storage Drives*, Comm'n Op. at 22 (*citing Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers*, Inv. No. 337-TA-701, Order No. 58, 2010 WL 5621540, at *3 (Nov. 18, 2010)). *Certain LED Lighting Devices, LED Power Supplies, and Components Thereof*, Inv. No. 337-TA-1081, Init. Det. at 157 (December 19, 2018).

Moreover, Mr. Bourque's representations are corroborated by the immense engineering effort reflected in the Simon chip's technical specification documents as well as through the 2020 release of the K&M series products that incorporate the Simon chip. Appx14734-14735, Q/A 114-115, Appx14736, Q/A 119; Appx10055-10077; and Appx10091-10257; Appx14404, Q/A 73).

Respondents point to Mr. Steve Schwarzenbach's testimony that the "basic methodology" behind recalibration "has not needed to be changed significantly" during the 2015-2020 timeframe. See ID at Appx3882, citing RX-0212C [Appx17248] at 177:8-17. However, that statement does **not** show that (1) Zircon has stopped investing in research and development to exploit its patented technologies, or (2) that the Simon chip did not account for 20% of Zircon's annual R&D spending since 2010. Rather, Mr. Schwarzenbach's statement verifies Zircon's continued exploitation of the '662 patented technology in its DI products, a fact that is not in dispute,[4] and which is sufficient to establish a nexus between Zircon's R&D expenditures and the exploitation of its patented technologies.

---

[4] See ID at 44. ("Respondents do not dispute that Zircon's products practice claims 1, 6, 9, and 16 of the '662 patent….")

*Certain Electronic Devices, Including Streaming Players, Televisions, Set Top Boxes, Remote Controllers, and Components Thereof*, Inv. No. 337-TA-1200, Init. Det. at 135 (July 9, 2021), citing *Certain Multi-Stage Fuel Vapor Canister Systems and Activated Carbon Components Thereof*, Inv. No. 337-TA-1140, Init. Det. at 218 (Jan. 28, 2020). See also, *Integrated Circuit*, Inv. No. 337-TA-859, Comm'n Op. 36-44 (August 22, 2014).

The continuing development and support of patented products through meaningful expenditures exploiting earlier R&D investments relating to such patents is recognized by this Court as supporting a determination that a domestic industry exits:

> We see no legal error in the ITC's conclusion that a past investment may, by virtue of its connection to ongoing field service and assembly expenses, support a finding that the economic prong of the domestic industry requirement is met. Here, there is substantial evidence supporting the ITC's finding that Diebold's earlier substantial investment in research and development relating to the '631 patent was relevant based on the ongoing qualifying and meaningful expenditures exploiting that technology, and that there was a sufficient nexus between the earlier investment in research and the continuing expenditures. We affirm the ITC's determination that a domestic industry exists for the '631 patent." *Hyosung TNS Inc. v. Intern. Trade Com'n.*, 926 F. 3d 1353 (June 17, 2019).

Zircon's R&D investment in the '662 patent qualifies for a determination that a domestic industry exists. The Commission's finding of no domestic industry, notwithstanding these investments, was clearly erroneous and contrary to law.

## III. ‘662 PATENT VALIDITY

### A. The Clear and Convincing Evidence Standard to Invalidate Claims 1, 6, 9, 12, 13, 15, 16 or 17 of the ‘662 Patent was Not Met

The ALJ found that the ‘662 patent was not obvious. The ALJ also made clear that Stanley did not meet the clear and convincing evidence standard for each of the references that it applied to the ‘662 patent. The Commission did not adopt any of the ALJ’s factual or legal findings concerning the ‘662 patent and it did not cite *KSR* for the clear and convincing evidence standard. The Commission ignored this heightened standard, ignored the factual determinations made by the ALJ, and then proceeded to apply hindsight reasoning to its legally erroneous conclusion which should be reviewed *de novo.*

Respondents argue that the Commission’s underlying factual determinations related to its findings of obviousness for the ‘662 patent are supported by substantial evidence. However, Respondents failed to identify a single statement from the Commission’s decision that speaks to the clear and convincing evidence standard required for patent invalidity. Instead, Respondents argue that the Commission applied that standard because it incorporated the ALJ’s findings, even though not explicitly set forth in the decision, or that it is implicit because the Commission cited *KSR*. (Commission Response Brief, p. 45; Stanley Response

Brief, pp. 33-34). These arguments are flawed and misrepresent the Commission's decision.

Applying *KSR*, the Federal Circuit has held that, where a patent challenger contends that a patent is invalid for obviousness based on a combination of prior art references, "the burden falls on the patent challenger to show by clear and convincing evidence that a person of ordinary skill in the art ["POSITA"] would have had reason to attempt to make the composition or device . . . and would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007).

The Commission's findings show neither a reason to combine the references nor a reasonable expectation of success. If implementing auto-recalibration in stud sensors as disclosed and claimed in the '662 patent was such an obvious solution, at least one of the references (Steber, DE336, Sanoner or Miller) would have described or mentioned this possibility. None of them do. As Zircon's technical expert Dr. Chrissan opined, manual recalibration was seen as an acceptable solution at the time for stud sensors, and the inventors of the cited prior art did not think of or invent auto-recalibration for stud sensors to do away with the step of having to start over (manual recalibration). (Appx14684, Q/A 115). Equally important, those references provided ***no evidence*** (and certainly not clear and convincing evidence) indicating a need or desire to implement auto-recalibration as

described by the ’662 patent. *Id.* The fact that the ’662 was the first to describe auto-recalibration in light of the manual calibration discussions in the cited stud sensor prior art, coupled with the presumption of validity, strongly supports a finding of non-obviousness. *Id.*

### B. Steber, DE336, Miller and Sanoner, Alone or in Combination, Fail to Provide Clear and Convincing Evidence of Obviousness of the Auto-Recalibration Features of the ‘662 Patented Inventions

Respondents argue that the Steber reference is more relevant than the Heger ‘128 patent that was before the Patent Office, because Steber has a microprocessor which can be easily programmed. As Dr. Chrissan noted, Respondents’ distinction of Steber and Heger ‘128 is wrong. Modifying Heger ‘128 would involve modifying the “display processor” operation similar to modifying Steber’s microprocessor operation, neither of which can be easily programmed, hence the need to develop the ‘662 patented invention. (Appx14664, Q/A 37-39).

Respondents further argue that any programming to implement auto-recalibration as taught in the ‘662 patent would simply have been an obvious solution. Other than this unsupported conclusory argument by Respondents, there is nothing in the record that supports the proposition that it would have been obvious or even possible to program Steber to implement the teachings of the ‘662 patent or that it could be easily accomplished. Respondents’ only evidence to support this is Stanley’s use of an incomplete portion of Mr. Miller’s deposition

testimony (Stanley Response Brief, p. 42). In fact, to the contrary, Mr. Miller did not state that auto recalibration to an integrated circuit was an obvious solution because "the question [whether implementing auto recalibration was a matter of redesigning the code] is not something that can be answered from an engineering standpoint." (Emphasis added)(Appx16891). Whether or not redesigning software code can successfully implement a novel feature, depends on the underlying nature and function of the product. Whether it is obvious or reasonable to expect success is again dependent upon the nature and function of the product. Dr. Chrissan notes that programming Steber to implement auto-recalibration is not an easy or straightforward routine. (Appx14664-14666, Q/A 38-40, 44). Surely if it was easy to implement auto-recalibration, either Steber or one of the other references would have suggested that the manual recalibration and the user alert suggested in Steber could be replaced or reprogrammed for an auto-recalibrating stud sensor as claimed in the '662 patent. None of the references suggest this and there is no evidence by Respondents from the time of the invention to suggest a POSITA would have been prompted to implement such a solution.

Respondents further argue that any gaps in Steber are solved by DE336 which teaches auto-recalibrating a stationary sensor, used for a different purpose in a completely different context and field. However, these arguments were fully considered and rejected by the ID, which found

> Respondents fail to explain why one of ordinary skill in the art would be motivated to modify the manual recalibration in Steber to implement the automatic recalibration of DE366. …The DE366 sensor is designed for applications where manual calibration would be difficult, while Steber discloses a handheld tool where recalibration is easily triggered with a switch.

(ID at Appx3786-3788). While Respondents argue that DE336 could apply to "conventional sensors", DE336 makes no mention of stud sensors, moveable wall sensors, or anything that would even vaguely resemble a stud sensor. DE336 is designed to calibrate much differently than a stud sensor through a mechanism that requires filling and refilling a tank through a "learning process". There is no evidence to suggest that one of ordinary skill would turn to DE336 as an obvious solution to implement auto-recalibration in a stud sensor (a handheld device, designed to be moved during operation) as claimed in the '662 patent. See Appx14957, slide 32 and Appx14959, slide 34; Appx14667-14668, Q/A 52.

Respondents fail to address the completely different hardware and process taught in DE336. Instead, Respondents argue that gaps can be filled and the motivation or reasons to combine with Steber can be deduced from the "concept of automatically adjusting a calibration value when a certain condition is met." (Stanley Response Brief, p. 48 citing conclusory testimony of Stanley's expert). However, conclusory expert testimony is not sufficient evidence for a motivation to combine. *InTouch Techs., Inc. v. VGo Commc'ns, Inc.*, 751 F.3d 1327, 1349; 1351–54 (Fed.

Cir. 2014). The Commission's conclusion of obviousness based on combining Steber with DE336 is not clear and convincing when there is extensive evidence to the contrary and conflicting expert testimony.

Respondents argue that the Miller reference, directed to wire finding, provides additional reasons to implement auto-recalibration with stud sensors and the Commission's obviousness findings, accordingly, are based on substantial evidence. Respondents contend that a POSITA would be motivated to combine Steber with Miller because stud finding and wire detection circuits are commonly combined in the same device. (Stanley Response Brief, pp. 40-41). However, including two different functional capabilities in a single device, does not mean the technology of each is interchangeable. For example, a smartphone includes both a camera and a telephone performing different functions using unrelated technologies that are not interchangeable. Furthermore, Miller was before the USPTO during the '662 prosecution and the Examiner did not find the '662 auto recalibration claims obvious or anticipated by Miller.

The Commission's factual findings are not supported by evidence. Miller does not provide clear and convincing evidence for modifying Steber to implement auto-recalibration in a stud sensor as described and claimed in the '662 patent. Miller describes that the concealed energized electric conductor is detected based on comparison of detected AC signal levels with a *predetermined value* (not an adjusted

calibration value). This threshold is selected such that any variations due to studs do not interfere with the detection. (See Appx17025 (Miller) at [0044] ("If the number is too low, random variations due to wall conditions, such as a stud or nail, can cause erroneous indications"; Appx17021 (Miller) Fig. 7 diagraming a calibration chart showing "predetermined value"). Miller's device does not include (i) any stud sensing functionality, (ii) capacitance-based measurements, (iii) setting calibration values, calibration and operating modes, or (iv) updating calibration values as described and claimed in the '662 patent. (Appx14673-14674, Q/A 71-72). Contrary to Respondents' claims, the Miller calibration process for AC Wire detection is not "nearly identical," or even close to the calibration process described and claimed in the '662 patent, which is why the USPTO did not issue any substantive rejections based on Miller.

Accordingly, the ID correctly found that the reasons Respondents offered for the combination of Steber and Miller did not provide clear and convincing evidence of obviousness:

> Miller merely describes the benefits of recalibration generally, which are also described in Steber. *Compare* RX-0184 [Appx17025] at [0039] *to* RX-0171 at 4:27-40. It is not clear from the record whether it would have been obvious to one of skill in the art to apply the automatic recalibration for AC wire detection in Miller to the stud detector in Steber. (ID at Appx3790).

Respondents again only point to the conclusory statements of Dr. Messner without providing any evidence from these references that a POSITA would be

motivated to turn to the different field of wire finders to implement auto-recalibration in stud sensing, *using a different calibration methodology*. As Dr. Chrissan explains, “one of ordinary skill in the art would not turn to the field of AC signal detection in order to improve the functionality of a stud sensor. This would be true even if both AC signal detection and stud sensing were combined in a single device.” (Appx14674, Q/A 73, see also Id. at Appx14660, Q/A 26; Appx14673-14674, Q/A 71 and 72; and Appx14689, Q/A 129). As noted above, the method for auto-recalibrating AC signal detectors is wholly different than that developed for auto-recalibrating a capacitive sensing stud sensor, even when both functions are available in the same device.

With respect to the Sanoner reference, another reference that was before the Patent Office examiner during the prosecution of the ‘662 patent, there is even less evidence to consider this for the concept of auto-recalibration as described and claimed in the ‘662 patent, or clear and convincing evidence. Respondents misrepresent the teachings of Sanoner as if its initial calibration sequence can apply to miscalibration of the device over or near a stud. (Stanley Response Brief, p. 38). Dr. Chrissan pointed out that Sanoner (Appx17486, Appx17517, Appx17558) does not discuss miscalibrating over a stud at all, nor auto-recalibrating for that condition. (Appx14683-14684, Q/A 112). A failed calibration as described by Sanoner would be due to the thickness of the wall covering or the position of a user’s hand. (*Id.*,

citing Appx17497 at [0005] and [0008]; Appx17502 at [0132]). Sanoner teaches that a user "should" move the sensor to a new location if calibration fails but provides no further guidance to a POSITA or a user. Given that Sanoner's discussion of recalibration is entirely within an initial calibration sequence that the user manually repeats until that initial calibration sequence passes certain internal checks, Sanoner is much different from the '662 patent, and is actually one of the problems that the '662 Patent overcame.

Claim 1 of the '662 patent recites completing an initial calibration mode, entering an operating mode, and then the device auto-recalibrating if the initial calibration was performed while the stud sensor *was over or near a stud*. This is nowhere taught or suggested in Sanoner. Indeed, Sanoner's reasons for a possible need to recalibrate within an initial calibration sequence do not even include starting over or near a stud. Appx17502, Sanoner '918 at [0132] (stating only "[f]ailed calibration may be because the wall lining material is too thick or dense"). This provides further evidence that Sanoner's discussion is unrelated to the '662's auto-recalibration invention, and—like Steber—would not have motivated a POSITA to search for such a solution. For the reasons stated above, neither Steber, Heger '128, Sanoner, Miller (RX-0184) and/or DE336, alone or in combination renders the '662 Asserted claims invalid.

## IV. THE COMMISSION'S '771 AND '185 PATENT INVALIDITY FINDINGS ARE NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE

### A. Respondents did Not Meet Their Burden to Demonstrate that Claims 1, 5, 9 and 10 of the '771 patent and claims 1 and 2 of the '185 patent are Invalid under 35 U.S.C. § 102 or that Claims 5, 6, 7, 8, 9, 10, 11, 13, 14 and 15 of the '185 Patent are invalid as obvious under 35 U.S.C. §103, based on the Zircon 1

To summarize, the anticipation or obviousness of the aforementioned claims is based on whether the Zircon 1 device discloses the following claim elements:

- "a grip having a pair of three-dimensional concave finger holds positioned at opposite sides of the grip to provide an axis of rotation" (claim 1, '771 patent)

- "only two depressed finger holds positioned at opposite sides of a grip allowing pivoting to provide an axis of rotation" (claim 1, '185 patent)

- "gripping means for gripping and for providing an axis of rotation, wherein the gripping means comprises only two depressed finger holds positioned at opposite sides allowing pivoting to provide an axis of rotation" (claim 14, '185)

The ALJ construed "axis of rotation" to mean "an imaginary line between two points about which a body is allowed to rotate, excluding finger holds that are designed to resist rotational movement." (Appx3803-3804)(Emphasis added).

The ID correctly found that the Zircon 1 did not include grips providing an "axis of rotation" under the claim construction because its side walls were

designed to resist rotational movement. (ID at Appx3822-3823)[5]. The Commission, however, reversed this finding, comingling its infringement opinions concerning Stanley's S-Series Products with its invalidity opinions for the Zircon 1, when the products and their corresponding grips and features are completely different. (Commission Opinion ("CO") at Appx48-49).

The only evidence offered by the Commission for whether the Zircon 1 grips contain an "axis of rotation" designed to resist rotational movement were pictures of the device along with testimony from Stanley's expert. (CO at Appx48). Respondents offered no testing, surveys or evidence of actual use of these devices by users to show whether they would actually hold the device in such a manner to allow for pivoting along an axis of rotation. Respondents' evidence is not clear and convincing in view of the significant design differences between the Zircon 1 and the devices embodied in the claims of the '771 and '185 patent. (Appx14510-14511, Q/A 74-76).

The Zircon 1 grips are designed not to rotate, but to resist rotational movement. The brick-like design of the stud finder and the narrow indentations along the length of the Zircon 1 do not provide for finger holds with an "axis of rotation". Zircon's expert, Mr. Joel Delman, extensively analyzed the Zircon 1

[5] Appellant agrees with the ID's ultimate conclusion, albeit for different reasons as discussed below.

along with inventor testimony, comparison of products embodied by the '771 and '185 patents, and explained that the Zircon 1 side walls were not "grips" with an "axis of rotation". (Appx14507-14511, Q/A 62-76). Respondents criticize Mr. Delman's reliance on inventor deposition testimony. However, expert testimony may be based on deposition transcripts and demonstratives as expressly allowed by the ALJ and the Federal Rules of evidence. (ITC Order No. 40, Appx1267-1268; see also Fed. R. Evid. 703)[6].

The Commission cites Stanley's expert, who argues that an axis of rotation can be found between any two points on the sides of the housing, including the power switch. (Commission Response Brief, p. 53; Stanley Response Brief, p. 54-55). However, while it's possible to draw an imaginary line between any two points, the narrow and shallow features that Respondents point to along the side of the Zircon 1 housing are not designed for, nor do they constitute, depressed pivot points to accommodate a thumb and an opposing finger. Thus they are wholly unsuited for use in a pivot grip for rotation around an imaginary line between a finger and thumb. The Zircon 1 design defeats the entire purpose of having a concave and depressed finger hold that invites rotation.[7] (Appx14507, Q/A 62).

---

[6] An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. (FRE 703).

[7] As Mr. Delman offered in his witness statement, "I have experienced through my

Ironically, the evidence that Respondents rely on to demonstrate that the grips of Zircon 1 have concave or depressed finger holds providing an axis of rotation actually shows a user holding the Zircon 1 like a bar of soap, along no pivot points.




(Commission Response Brief, p. 53, citing Appx3822). It is clear from the instructional manuals of the Zircon 1 that the oblong indentations that run lengthwise down the sides of the housing are not intended for a user to rotate or pivot the device along a single axis of rotation, nor is there any evidence of this. This is why the ALJ found that "there is no disclosure of this rotation in any of the prior art material related to the Zircon 1" when it found that claim 17 of the '185 was not anticipated by Zircon 1. (ID at Appx3864). The clear and substantial

---

own testing of the Zircon 1, and my observations of others using the tool, it immediately slips from the user's grasp should one attempt to allow the tool to rotate around an axis of rotation, because there is nothing about these features which provide the contours required to permit such pivoting between a user's finger and thumb." (Appx14507, Q/A 62).

evidence discussed above confirms no "axis of rotation" in the Zircon 1. It is clear that the Commission's reversal of the holdings of the ALJ and finding that the '771 and '185 patents were anticipated and obvious in view of Zircon 1, is unsupported by substantial evidence.

Respondents further argue that the Commission's decision is supported by substantial evidence and that it is immaterial whether the Zircon 1 device "grips" prevent the user's thumb and fingers from hitting the wall. (Commission Response Brief, p. 56). This is incorrect. If the thumb and fingers (as shown on p. 37 of Zircon's Appeal Brief) regularly contact the wall because the Zircon 1's shallow grip and its depth and dimensions do not keep fingers in place along an axis of rotation, then such grips inherently "resist rotational movement" and do not meet the "axis of rotation" limitation of the claims. The '771 and '185 pivot grips, with their axis of rotation, are what keeps the thumb and fingers in place while the device is able to rotate freely about that axis, giving the user greater precision in moving the device up, down and across surfaces. See Figure 4 of the '771 patent below.




FIG. 4

(ID at Appx3801; Appx140; Appx154)

As detailed in the record, substantial evidence shows that the Zircon 1 device does not have grips with concave/depressed finger holds that provide an axis of rotation. (Zircon' Appeal Brief, pp. 36-39). Simply put, the Commission's anticipation and/or obviousness determinations regarding claims 1, 5, 9 and 10 of the '771 patent and claims 1 and 2, 5, 6, 7, 8, 9, 10, 11, 13, 14 and 15 of the '185 are not supported by clear and convincing evidence.

## V. CONCLUSIVE EVIDENCE ESTABLISHED THAT METHOD CLAIM 22 OF THE '771 PATENT AND METHOD CLAIMS 17, 20 AND 21 OF THE '185 PATENT ARE INFRINGED

In support of its inducement arguments for infringement of the method claims under 35 U.S.C. §271(b), Zircon pointed to extensive evidence in the

record that Stanley's own marketing materials and videos instruct and show users in the use of the Stanley S-Series products in an infringing manner, including "rotating the hand tool about the axis of rotation." (Zircon Appeal Brief, p. 45). The Commission recently noted that "the Supreme Court in *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* recognized that providing instruction on how to engage in an infringing use "show[s] an affirmative intent that the product be used to infringe." 545 U.S. 913, 936 (2005)." *Certain High-Density Fiber Optic Equipment and Components Thereof*, Comm'n Op. at 36 (August 23, 2021). See also *Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp*., 785 F.3d 625, 630-31 (Fed. Cir. 2015) ("[i]nducement can be found where there is '[e]vidence of active steps taken to encourage direct infringement,' which can in turn be found in 'advertising an infringing use or instructing how to engage in an infringing use.'").

Mr. Delman testified that "Stanley user manuals, videos, and instructional guides are clear evidence of [the infringement of the '771 patent], as [they] clearly instruct a user on how to use the Accused Products as described in the method claims of the '771 patent." (Appx14455-14456, Q/A 107). For example, Stanley's

YouTube videos promote the accused products as being capable of being rotated about the axis of rotation relative to a finger and thumb[8]:

| Stanley Stud Sensor 300 CX-543C at 00:02 | Stanley Stud Sensor 300 CX-543C at 00:37 | Stanley Stud Sensor 300 CX-543C at 00:56 |
|---|---|---|
|  |  |  |

The ID accepted Stanley's videos and instructional manuals as evidence of inducement and practice of the other steps of the method claims (e.g., the steps of "holding the hand tool with thumb and finger", "positioning the hand tool against a first target surface" (ID at Appx3813-3815) and "positioning the stud finder against a first target surface")(Appx3853-3855). However, the ID made erroneous contradictory findings using the same evidence, and Respondents hinge their oppositions on the erroneous findings that (1) these videos and instruction manuals failed to show the accused products being "rotated"; and (2) that there was no evidence of customers using the products to "rotate" the devices. (Id.).

The Commission's opinion relying on the same evidence establishes an "axis of rotation" in the accused devices. (CO at Appx45-46). Referring to the

[8] Appx12064 (CX543C instructional video for the Stanley Studsensor 300). See also Appx12061, Appx12062, and Appx12063 for instructional videos for the Stanley Studsensors 100, 150 and 200, respectively.

below product videos (Appx12061 at 00:14, 00:35) showing Stanley's own use, published and disseminated video instructions, the Commission states: "*Those videos show the accused Stanley products being held with multiple fingers without precluding the user's thumb and index finger from gripping the devices at different angles about an axis of rotation*." (Emphasis added)(Appx45).







This video shows the user's thumb moving from a horizontal position into a vertical position as the stud finder is moved up a surface and is thus "rotating" along the "axis of rotation" relative to the user's fingers. This evidence is sufficient to show that the method claims were being performed by users, employees or agents of Stanley through instructional videos provided by Stanley.

Stanley's arguments that the user manuals actually instruct merely moving the device across a straight line without rotation between the thumb and fingers is contradicted by Stanley's video(s). Further, that the products are capable of non-infringing uses is irrelevant. "[I]nfringement is not avoided merely because a non-

infringing mode of operation is possible." *Core Wireless Licensing S.A.R.L v. Apple Inc.*, 899 F.3d 1356, 1363 (Fed. Cir. 2018).

## VI. CONCLUSION

For the reasons set forth herein and in Appellant Zircon's Opening Appeal Brief, Zircon requests that Court grant the relief requested in Zircon's Opening Appeal Brief and reverse and remand this case to the Commission consistent with the relief requested by Appellant. (Conclusion, Appellant's Opening Appeal Brief at 64-65).

Dated: January 10, 2023

Respectfully submitted,

/s/ Omair M. Farooqui
Omair M. Farooqui
Attorneys for Appellant Zircon Corporation

PALO ALTO LEGAL GROUP, P.C.
1023 Corporation Way, 2nd Floor
Palo Alto, California 94303
T: 408-579-1281
F: 408-886-9468
E: omair@paloaltolegalgroup.com

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2022-1649

**Short Case Caption:** Zircon Corp. v. ITC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 6,988 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 01/10/2023

Signature: /s/ Omair M. Farooqui

Name: Omair M. Farooqui

Save for Filing